UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| SHIVA STEIN, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 1:20-cv-02030-JPB |
| Plaintiff, | ) ) | <u>CLASS ACTION</u> |
| vs. | ) ) ) | |
| AARON'S INC., et al., | ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) ) | |

**LEAD PLAINTIFF'S COMPLAINT FOR VIOLATIONS OF THE <u>FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................................2

II.   JURISDICTION AND VENUE ................................................................11

III.  PARTIES ...................................................................................................12

     A.    Plaintiff ..........................................................................................12

     B.    Defendants .....................................................................................12

           1.    Corporate Defendant ..........................................................12

           2.    Individual Defendants ........................................................12

IV.  SUBSTANTIVE ALLEGATIONS ...........................................................16

     A.    Background ....................................................................................16

     B.    Aaron's Multi-Billion Dollar Business Is Built on Preying on Vulnerable Consumers ..........................................................17

     C.    Aaron's Is Dependent on Its AB and Progressive Segments .............21

     D.    Leading Up to the Class Period, Progressive Propels the Company's Growth, and Aaron's Engages in Illicit Activities to Revive Its Core Business ....................................................23

           1.    Aaron's Acquires Progressive and Begins Transformative Initiatives................................................24

           2.    Aaron's Engages in Anti-Competitive Activity at AB to Suppress Increasing Competition ...........................26

           3.    Aaron's Continues Its Transformative Initiatives and Engages in Deceptive Conduct at Progressive to Inflate Growth..........................................................................28

**Page**

E.     Throughout the Class Period, Aaron's Concealed Two
       Unlawful Schemes and Misled the Market About the
       Company's Profitability and Growth Prospects...................................35

F.     Aaron's Suffers Multiple Stock Declines as Its True Financial
       Condition Is Revealed Through a Series of Partial Disclosures .........43

V.     MATERIALLY FALSE OR MISLEADING STATEMENTS AND
       OMISSIONS ISSUED DURING THE CLASS PERIOD ...........................45

A.     Aaron's and Progressive's False and Misleading Financial
       Results ................................................................................................46

B.     Fourth Quarter and Full-Year 2017....................................................50

C.     First Quarter 2018 ..............................................................................58

D.     Second Quarter 2018: the Disclosure of the CIDs from the FTC
       Relating to Progressive's Predatory and Deceptive Practices ...........63

E.     Third Quarter 2018: Higher Operating Expenses from the CIDs .......69

F.     Fourth Quarter and Full-Year 2018....................................................77

G.     First Quarter 2019: the Disclosure of a Second CID .........................83

H.     Stifel Cross Sector Insight Conference ..............................................90

I.     Second Quarter 2019 ..........................................................................93

J.     Third Quarter 2019: Reduced 2019 Outlook and AB's Consent
       Decree with the FTC ..........................................................................99

K.     The Truth Emerges............................................................................108

VI.    POST-CLASS PERIOD REVELATIONS...............................................115

Page

VII.  BY FAILING TO DISCLOSE THE IMPACT OF PREDATORY, DECEPTIVE, AND ANTI-COMPETITIVE PRACTICES ON AARON'S GROWTH, DEFENDANTS VIOLATED SEC DISCLOSURE RULES .................................................................118

VIII.  ADDITIONAL SCIENTER ALLEGATIONS .........................................123

A.  The Importance of Progressive and AB to the Company's Operations .........................................................................124

B.  The FTC's Findings Support an Inference of Defendants' Scienter ............................................................................126

C.  The Individual Defendants' Substantial Experience, Significant Access to Data, and Monitoring of the Company's Business ..........129

D.  The Magnitude of the Fraud.............................................135

E.  The Individual Defendants' Motivation to Conceal Their Fraudulent Conduct .........................................................136

IX.  LOSS CAUSATION/ECONOMIC LOSS ...................................142

A.  July 26, 2018 .................................................................143

B.  October 25, 2018 ............................................................144

C.  November 4, 2019 ...........................................................145

D.  February 20, 2020............................................................146

X.  APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE.................................................149

XI.  NO SAFE HARBOR .................................................................151

XII.  CLASS ACTION ALLEGATIONS ...........................................154

**Page**

COUNT I :...............................................................................................156

    VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND
        RULE 10b-5 PROMULGATED THEREUNDER AGAINST
        ALL DEFENDANTS ......................................................................156

COUNT II : ............................................................................................158

    VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
        AGAINST THE INDIVIDUAL DEFENDANTS ...........................158

PRAYER FOR RELIEF .......................................................................160

JURY DEMAND ...................................................................................161

- iv -

By and through its undersigned counsel, Lead Plaintiff Laborers Pension Trust Fund for Northern Nevada ("Plaintiff") alleges the following against Aaron's Inc. ("Aaron's" or "Company"), John W. Robinson, III ("Robinson"), Steven A. Michaels ("Michaels"), Ryan K. Woodley ("Woodley"), and Douglas A. Lindsay ("Lindsay") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Aaron's with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain Defendants and other related non-parties; (c) review of news articles, securities analyst reports, and shareholder communications; (d) review of other publicly available information concerning Defendants; (e) investigation of factual sources; (f) interviews with former employees; and (g) review of relevant Federal Trade Commission ("FTC") litigation[1]. Many of the facts supporting the allegations contained herein are known only to Defendants named herein or are exclusively within their custody and control.  Plaintiff believes that

---

[1]   *In the Matter of Aaron's Inc.*, Dkt. No. C-4714 (FTC); *FTC v. Prog Leasing, LLC*, No. 1:20-cv-01668-JPB (N.D. Ga.).

substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   NATURE OF THE ACTION

1.     Plaintiff brings this federal securities class action on behalf of itself and all other similarly situated persons or entities ("Class") who purchased or otherwise acquired the publicly traded common stock of Aaron's between February 15, 2018 and February 19, 2020, inclusive ("Class Period"), seeking to pursue remedies for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

2.     This case concerns Defendants' efforts to maintain Aaron's growth and mask the inevitable decline of the Company's "core" segment, through undisclosed, illicit, anti-competitive, and deceptive conduct within Aaron's two largest business segments, and the concealed negative impact that those activities would have on the Company's financial results and business prospects.

3.     Aaron's is a leading rent-to-own ("RTO") company that provides essential household items, including furniture, computers, and appliances.  Aaron's targets "underserved, credit challenged" customers with the promise of more flexible payment options and no credit check.  In exchange for an initial fee and recurring

weekly or monthly payments through Aaron's rental contract, consumers can obtain products that they otherwise could not purchase outright.   In most instances, however, Aaron's contracts result in financially strained consumers paying anywhere from 1.5 to 12 times what the products are worth.

4.      Throughout the Class Period, the Company was almost entirely dependent upon its two largest segments, Aaron's Business ("AB")[2] and Progressive Leasing, Inc. ("Progressive"), which accounted for over 98% of the Company's total revenues.   AB, referred to as Aaron's "core" or legacy business, offers products through Aaron's stores and Aarons.com.  Progressive is the Company's virtual lease-to-own segment.

5.      Due to the Company's vulnerable customer base, Aaron's is regulated by local, state, and federal laws, as well as oversight by government agencies such as the FTC.  For example, the Federal Trade Commission Act, 15 U.S.C. §41, *et seq.* ("FTC Act"), prohibits "unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce."  *See* 15 U.S.C. §45.  Because the structure

---

[2]   The AB segment was created as of December 31, 2017 by combining the Company's previous Sales and Lease Ownership, Franchise, and Woodhaven segments.

of Aaron's RTO contracts permits it to circumvent numerous requirements, such as limits on interest rates, the FTC has increased its scrutiny of the RTO industry.

6.     Historically, Aaron's experienced continuous growth through brick-and-mortar Aaron's stores at the Company's "core" AB segment.[3]  Leading up to the Class Period, however, the "core" segment's profitability and growth began to decline as a result of increased competition and shifting consumer preferences to a virtual market.  Facing poor growth, and threatened by investor outrage, Aaron's was forced to adapt its traditional model.  In 2014, the Company underwent a management shake-up and expanded into the virtual marketplace by acquiring Progressive.

7.     From that time forward, Progressive became Aaron's growth vehicle, while Defendants desperately attempted, through various "strategic plan[s]," "rigorous evaluation[s]," and "restructuring" initiatives, to return its "core" segment to sustainable growth.  For example, in the years leading up to the Class Period, Progressive's revenues increased dramatically by over 140% from full-years 2014

---

[3]   Prior to December 31, 2017, the Company's "core" business was AB Sales and Lease Ownership division.  After December 31, 2017, this segment was combined with others to form AB.

through 2016, while the Company's "core" business faced a 7.6% decline for the same period.

8.       As a means to maintain Aaron's appearance of continuous growth and mask the inevitable decline of AB, leading up to and throughout the Class Period, the Company engaged in illicit, anti-competitive, predatory, and deceptive conduct in violation of the FTC Act at both AB and Progressive.  *First*, in AB, Defendants entered into anti-competitive "swap" agreements with the Company's major competitors, Rent-A-Center, Inc. ("RAC") and Buddy's Newco, LLC ("Buddy's"), designed and implemented to suppress competition in a given geographic region. The swap agreement consisted as follows: when closing a store, Aaron's would sell its customer rental contracts to a competitor with a store nearby.  In exchange, Aaron's would buy that competitor's customer rental contracts for one of its underperforming stores in another location.  Both parties would then agree to close and not to open any new stores in the respective locations of the sold customer rental contracts.

9.       *Second*, at Progressive, Defendants engaged in deceptive and predatory practices to improperly boost Progressive's revenues by hiding from consumers the full price they were paying for products obtained through Progressive's RTO contracts.  For example, while routinely advertising directly, or through its retailers,

a "90 day payment option" or "90 days same as cash!," Defendants failed to disclose that even if the consumer paid off the merchandise within 90 days, they would still pay the retail price of the merchandise, plus an initial payment or mark-up of up to 20% of the retail price.

10.    Despite these practices, the Company regularly highlighted Progressive's and Aaron's "record" growth, the Company's "[c]hampion compliance" with applicable regulations, and its customer-centric business model.

11.    In addition, Defendants also misled investors about AB's growth prospects.  Although it was clear to Defendants at the start of the Class Period that AB's continuous growth decline was inevitable in the long term, Defendants touted the success of the Company's initiatives meant to increase revenue growth (while concealing that these initiatives were rooted in unlawful anti-competitive practices), and promised AB's return "to sustainable growth."

12.    Through these practices, Defendants were able to create the perception that Aaron's was experiencing significant and ongoing growth, while concealing that such growth was obtained though illicit and misleading practices.  As a result of Defendants' conduct, Aaron's stock price soared, reaching a Class Period high of $78.14 per share on October 29, 2019.  Defendants were able to reap the benefits of

their misrepresentations and omissions to the market by engaging in insider stock sales for collective proceeds totaling over $13 million.

13.    However, as Defendants later revealed through a series of partial revelations, they were engaging in illegal conduct violating the FTC Act in both AB and Progressive, and AB would never "return to sustainable growth."  These revelations had a negative impact on the Company's financial results and growth prospects, decimating Aaron's stock price and causing significant harm to investors.

14.    Negative news regarding the Company's predatory and deceptive practices began to emerge on July 26, 2018, when the Company announced its second quarter 2018 ("2Q18") financial results.  Aaron's revealed it had received Civil Investigative Demands ("CIDs") from the FTC related to "whether disclosures related to financial products offered by the Company through [AB] and [Progressive] are in violation of the Federal Trade Commission Act."  Defendants attempted to assuage any investor concerns over the CIDs by misleadingly assuring investors that it was "fully cooperating with the FTC" and in "compliance with the FTC Act."  In response, the price of Aaron's common stock fell 11% per share, to close at $43.47 on July 27, 2018.  But for Defendants' false assurances, the Company's stock price would have declined further.

15.     On October 24, 2018, additional news reached the market when Defendants announced the Company's third quarter 2018 ("3Q18") financial results, disclosing that Aaron's reported a 12% increase in operating expenses for the quarter, attributed in part to "expense and legal fees" surrounding the FTC investigation.  In response, Aaron's stock price fell an additional 8.7%, to close at $43.89 per share on October 25, 2018, on increased trading volume.

16.     On April 25, 2019, the Company announced its first quarter 2019 ("1Q19") financial results and stated it was facing yet another CID.  This time, the CID related to its anti-competitive activity at AB and whether "certain transactions involving the [swap] of customer lease agreements . . . violated the FTC Act."

17.     The truth regarding the negative impact of the Company's unlawful practices and AB's unsustainability began to more fully emerge on November 4, 2019, when Aaron's announced its third quarter 2019 ("3Q19") financial results. Aaron's revealed that the FTC was commencing an enforcement action against Progressive relating to its deceptive and predatory practices and that the Company had entered into a Consent Decree with the FTC regarding its anti-competitive swap agreements.  On this news, Aaron's stock price fell 11.38%, to close at $65.46 per share on November 5, 2019, on increased trading volume.

18.     Finally, on February 20, 2020, additional truth was more fully revealed when Defendants announced Aaron's fourth quarter 2019 ("4Q19") and full-year 2019 ("FY19") financial results.  Defendants revealed a $175 million settlement with the FTC regarding Progressive's predatory practices, poor 4Q19 and FY19 results at AB, and 2020 guidance below analyst expectations.  The FTC settlement resulted in "a $179 million pre-tax charge" and another $15 million in required "compliance initiatives."  AB reported a 5.4% decrease in revenues for the quarter, "entered 2020 with a lower portfolio balance than 2019," and Robinson admitted the Company would be taking a more "prudent approach" to investing in AB going forward.  As a result, the Company reported a net loss of $107.1 million for the quarter, down 273.6% from the prior year's period, and an earnings per share ("EPS") decrease of $2.49 per share, a decrease of 279.8% from the prior year's period.

19.     The market reacted accordingly, causing the Company's stock price to tumble over 19%, falling from a close of $56.15 per share on February 19, 2020, to $45.45 per share on February 20, 2020.

20.     All told, Aaron's stock fell *nearly 42%* from its Class Period high of $78.14 per share on October 29, 2019, to its closing price of $45.45 on February 20, 2020.

21.     Notably, Defendants' fraudulent conduct was confirmed after the Class Period through additional revelations.  On February 25, 2020 and April 24, 2020, respectively, the Company published its Consent Decrees with the FTC related to its anti-competitive conduct at AB ("AB Consent Decree") and predatory and deceptive conduct at Progressive ("Progressive Consent Decree").   The Consent Decrees prohibited the Company from any further improper conduct going forward and confirmed the FTC's belief that Aaron's "violated" the FTC Act in both instances. *See* Ex. A at 7; Ex. B at 2.  On April 13, 2020 and May 5, 2020, Aaron's announced "a proposal to implement a holding company structure for Aaron's," to provide "greater operational and financing flexibility."   Analysts reacted positively, noting the new structure would prevent the Company's segments (*i.e.*, AB or Progressive) from "legally infect[ing]" each other and "the flexibility to sell off an underperforming segment" (*i.e.*, AB).   Moreover, on May 7, 2020, Aaron's announced poor first quarter 2020 ("1Q20") financial results at AB and disclosed there was no longer any premium on AB's market value versus its book value on Aaron's financial statements, forcing the Company to take a "$446.9 million goodwill impairment charge."

## II.   JURISDICTION AND VENUE

22.   The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

23.   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

24.   Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c) and Section 27 of the Exchange Act.  Aaron's principal executive offices are located in this District, many of the acts and practices complained of herein occurred in substantial part in this District, and Defendants disseminated materially false and misleading statements complained of herein to Aaron's shareholders from this District.

25.   In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Plaintiff

26.    Lead Plaintiff Laborers Pension Trust Fund for Northern Nevada, as set forth in the certification on file [ECF No. 9-2], incorporated by reference herein, purchased Aaron's securities at artificially inflated prices during the Class Period and was damaged when the truth was revealed, as detailed herein. *See also* ECF No. 9-3.

### B.    Defendants

#### 1.    Corporate Defendant

27.    Defendant Aaron's Inc. is incorporated in Georgia, with its principal executive offices located at 400 Galleria Parkway SE, Suite 300, Atlanta, Georgia 30339-3182.  Aaron's common stock trades on the New York Stock Exchange ("NYSE"), an efficient market, under the ticker symbol "AAN."

#### 2.    Individual Defendants

28.    Defendant John W. Robinson, III has served as Aaron's Chief Executive Officer ("CEO") since November 2014 and is a member of Aaron's Board of Directors.  Robinson was previously Executive Vice President of Aaron's and CEO of Progressive.  During the Class Period, Robinson engaged in insider sales of Aaron's common stock at inflated prices, for proceeds of approximately $6.6 million.

- 12 -

29.     Defendant Steven A. Michaels has served as Aaron's Chief Financial Officer ("CFO") and President of Strategic Operations since February 2016. According to Aaron's, Michaels has "oversight for several key business functions including analytics, business development and manufacturing."  Michaels joined Aaron's in 1995 and has held various positions within the Company.  Prior to becoming CFO, Michaels was the President of the Company from April 2014 until February 2016.  During the Class Period, Michaels engaged in insider sales of Aaron's common stock at inflated prices, for proceeds of approximately $1.9 million.

30.     Defendant Ryan K. Woodley has served as CEO of Progressive since January 2015.  Woodley joined Aaron's as Chief Operating Officer ("COO") and CFO in June 2013.  During the Class Period, Woodley engaged in insider sales of Aaron's common stock at inflated prices, for proceeds of approximately $4.3 million.

31.     Defendant Douglas A. Lindsay has served as the President of AB since February 2016.  During the Class Period, Lindsay engaged in insider sales of Aaron's common stock at inflated prices, for proceeds of approximately $791,000.

32.     Defendants Robinson, Michaels, Woodley, and Lindsay are sometimes collectively referred to herein as the "Individual Defendants."

- 13 -

33.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Aaron's, were privy to confidential and proprietary information concerning Aaron's financials and operations, growth initiatives, and regulatory compliance.  Because of their positions with Aaron's, the Individual Defendants had access to non-public information about the Company's, Progressive's and AB's business practices and growth prospects through access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

34.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to cause the Company to engage in the unlawful conduct complained of

herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of Aaron's business.

35.    The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Aaron's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, and, through them, to the investing public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions within the Company, and their access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein and are liable for the false and misleading statements pleaded herein.

36.    As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was registered with the SEC, traded on the NYSE, and governed by the federal securities laws, the Individual Defendants

had a duty to promptly disseminate accurate and truthful information with respect to Aaron's business, including the negative financial impact that would result from the Company's failure to comply with the FTC Act, Progressive's illegal, deceptive and predatory practices, AB's unlawful anti-competitive swap agreements, AB's inability to return to sustainable growth, and the Company's future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of Aaron's stock would be based upon truthful and accurate information.    The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background

37.    Established in 1955, Aaron's is a "leader" in the over $8 billion RTO industry which provides "underserved, credit-challenged" consumers with essential household products including furniture, computers, appliances, mattresses, and phones that they could not purchase outright.

38.    While traditionally a brick-and-mortar business, Aaron's recently expanded into the virtual marketplace.  As of December 31, 2019, the Company had 1,502 Aaron's stores in 37 states, Canada, and Puerto Rico and an e-commerce

platform, Aarons.com.  The Company also operated virtual RTO services through approximately 25,000 retail locations owned and operated by other companies and e-commerce merchants, including Lowe's, Big Lots, and Best Buy, in 46 states and the District of Columbia.

39.     Since inception, the Company has experienced significant growth, with Aaron's reporting almost $3.9 billion in revenues for 2019, and having approximately 12,100 employees.

**B.      Aaron's Multi-Billion Dollar Business Is Built on Preying on Vulnerable Consumers**

40.     The traditional Aaron's customer lacks disposable funds and has "limited access to traditional credit sources such as bank financing, installment credit or credit cards."  In April 2000, the FTC issued a seminal report on the RTO industry, finding that 73% of RTO customers had a high school education or less, and 59% had household incomes of less than $25,000.  Because Aaron's agreements require no down payments or credit checks, they are usually their customers' only option.

41.     Aaron's rental agreements typically require an initial $49 to $79 fee and a recurring weekly or monthly payment (usually 12 to 24 months).  The rental agreement automatically renews for as long as the consumer chooses to keep the merchandise, creating a recurring revenue stream for Aaron's.  Customers may

cancel the agreement at any time by returning the merchandise.  Upon fulfillment of the rental agreement, title then passes from Aaron's to the consumer.

42.     These rental agreements, however, do not come without a high cost. While consumers are lured into these agreements with the promise of more flexible payment options than traditional retailers, in most instances, consumers end up paying significantly more than the item's retail or cash price.  For example, under most RTO contracts, a customer will pay between $1,000 and $2,400 for a television, stereo, or other major appliance worth as little as $200 retail, if used, and seldom more than $600 retail, if new.[4]  This means that an already financially strapped RTO customer will pay 1.5 to 12 times what a cash customer would pay in a traditional retail store for the same household item.  *Id*.

43.     Keenly aware of its vulnerable customer base, Aaron's distinguishes itself from other RTOs by its "lower cost" and customer-centric business model. Aaron's also claims it has "[c]hampion compliance" with local, state, and federal laws, and government agency regulations, like the FTC.

---

[4]   *See* National Consumer Law Center et al., Comment Letter In the Matter of Rent-to Own Store Swaps, FTC File No. 191-0074, at 5 (Mar. 20, 2020), https://www.regulations.gov/document?D=FTC2020-0020-0002 (last visited July 6, 2020).

44.     The structure of Aaron's RTO contracts, however, allows the Company to circumvent the majority of consumer protection laws that otherwise govern the lending or banking industry.  For example, although RTO contracts are essentially a loan resulting in what would be the equivalent of an interest rate of over 100%, because they are labeled as "rent-to-own" as opposed to a standard credit or loan, Aaron's avoids state usury laws that otherwise limit the interest rates in standard credit or loan transactions.  Also, because RTO contracts are termed in weekly or monthly intervals, with no obligation to renew, the disclosure requirements of certain federal statutes, such as the Truth in Lending Act, are inapplicable.

45.     Given these loop-holes, as Aaron's acknowledges, "federal regulatory authorities, such as the FTC, are increasingly focused on the subprime financial marketplace in which the lease-to-own industry operates[.]"  The FTC was created in 1914, when President Woodrow Wilson signed the FTC Act into law.  The FTC's mission is to protect consumers and competition.  The FTC Act empowers the FTC to "prevent unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce" and "seek monetary redress and other relief for conduct injurious to consumers."  *See* 15 U.S.C. §45.

46.     The FTC has a long history with the RTO industry, and Aaron's specifically.  The FTC was one of the first government agencies to examine the RTO

industry with its 2000 report.  In 2003, the FTC performed a follow up to the 2000 report, finding that consumers living in states with stricter disclosure obligations requiring the total purchase price on product labels were 30% less likely to use RTO transactions with the intent to purchase than consumers living in other states.  In 2011, the FTC testified before the House of Representatives Financial Institutions and Consumer Credit Subcommittee of the Financial Services Committee and noted concerns regarding the high prices charged for buying RTO products, and whether consumers receive adequate disclosures about RTO transactions.  In March 2014, the FTC settled charges with Aaron's regarding its "direct and vital role" in its franchisees' installation and use of software on rental computers that secretly monitored consumers, including by taking webcam pictures of them in their homes.

47.     Given the high mark-ups and minimal regulation, the RTO industry has become "intensely competitive."  Aaron's main competition comes from other national, regional, and local operators of RTO stores, including RAC and Buddy's, virtual RTO companies, traditional and e-commerce retailers, and indirectly from consumer finance companies and rental stores that do not offer their customers a purchase option.  As a result of this increasing competition, the Company's relationship with its customers, including, "customer satisfaction" was "critical" to its growth.

### C.   Aaron's Is Dependent on Its AB and Progressive Segments

48.   Throughout the Class Period, Aaron's conducted its business through three operating segments: (a) AB; (b) Progressive; and (c) Dent-A-Med, Inc., d/b/a the HELPcard® ("DAMI"), which provides second-look credit products originated through federally insured banks.[5]  Most relevant here are AB and Progressive.

49.   AB and Progressive accounted for a material amount of the Company's business.  For full-years 2017, 2018, and 2019, AB reported stagnant revenue of $1.8 billion comprising approximately 53%, 47%, 45% of the Company's total revenues, respectively.  At the same time, Progressive served as a "leader" in the ever-growing RTO virtual market and reported steadily increasing revenues of $1.6 billion in 2017, $1.99 billion in 2018, and $2.1 billion for 2019, comprising 46%, 52%, and 53.8%, respectively, of the Company's total revenues.

50.   Historically, the Company's "core" AB segment operated via traditional brick-and-mortar, Aaron's-branded stores.  In the last decade, however, AB has undergone numerous transitions to offer a more fulsome omni-channel platform to include Aarons.com.

---

[5]   In January 1, 2020, DAMI was merged into, and began operating as, Vive Financial, LLC.

51.    AB offers products from popular brands like Philips, Samsung, Whirlpool, Hewlett-Packard, LG, Simmons, and Ashley.  Aaron's prides itself on AB's Aaron's-branded store concept, including merchandising, pricing, and agreement terms, "designed to appeal to our target consumer market."  Because AB customers traditionally come to Aaron's stores to repeat shop, as well as pay their bills, having Aaron's stores in locations geographically convenient to its target customers is key.

52.    Established in 1999, Progressive was acquired by the Company in 2014 as part of Aaron's "transformational" initiative to expand into the virtual RTO market.  Progressive has no stores of its own, and instead partners with retailers and e-commerce websites like Best Buy to offer subprime consumers with virtual RTO payment plans.

53.    Unlike Aaron's stores, which are located in geographic locations central to Aaron's consumer base, consumers learn about Progressive through promotional advertising in store or via a retailer's website, or from a sales pitch from a Company-trained retail associate.  Because Progressive employees are usually not staffed in retail stores, Aaron's provides "extensive, on-going, hands-on training to all employees that interact" with Progressive's customers.  In addition to its standard

monthly contracts, Progressive and its retailers highlight Progressive's "90 Days Same As Cash" or "early buy-out option" plans.

54.     A customer applies for a Progressive plan online via a retailer's website or at a retailer's store.  Progressive uses a proprietary Internet-based platform known as "Approve.Me" that allows consumers to apply for Progressive or an alternative form of financing via the retailer (*e.g.*, revolving credit with 0% interest for 12 months) through a single application process.

55.     As of December 31, 2019, the division had over 1,072,000 customers and provided lease-purchase solutions through approximately 22,000 retail locations in 46 states and the District of Columbia, including e-commerce merchants. Progressive, unlike it competitors, chooses not to operate in Minnesota, New Jersey, Vermont, or Wisconsin, states that have stronger consumer protection laws, including interest rate caps.

**D.     Leading Up to the Class Period, Progressive Propels the Company's Growth, and Aaron's Engages in Illicit Activities to Revive Its Core Business**

56.     Historically, Aaron's experienced tremendous growth at its brick-and-mortar RTO stores through new store openings, increased same store revenues, and minimal competition.  By 2013, however, Aaron's faced a fundamental shift by consumers away from the Company's traditional in-store shopping experience

towards a virtual marketplace.  After years of consistently high, single-digit revenue growth, the Company reported a 1% increase in total revenues to $2.235 billion for 2013 as compared to the prior year.  At the time, Aaron's was one of the largest RTO businesses in the industry, behind competitor RAC, with over 2,150 stores.

57.     The Company's poor performance did not go unnoticed.  By March 2014, the Company's second largest shareholder, Vintage Capital Management, LLC, demanded that Aaron's independent directors "bring in a new management team to stabilize and improve Aaron's business or sell the company to someone who is better able to run it."

### 1.     Aaron's Acquires Progressive and Begins Transformative Initiatives

58.     Desperate to maintain its leadership role in the industry, Aaron's expanded its brick-and-mortar model to gain a foothold into the virtual marketplace. In April 2014, the Company announced it had acquired a 100% ownership interest in Progressive for $700 million.  The Company described the Progressive acquisition as "strategically transformational for the Company" and noted it "will continue to strengthen our business."

59.     Aaron's also revamped its executive structure, with both its COO, Dave Buck ("Buck"), and CEO, Ron Allen ("Allen"), leaving the Company within a two-month period, from July through August 2014.  Upon departure, Allen noted the

- 24 -

Company's plans "to deliver improved results in our core business and the transformational acquisition of the fast-growing" Progressive business.    In November 2014, Robinson was named as CEO.

60.    Throughout 2014, the Company also undertook a "rigorous evaluation" of its declining core segment and implemented a "strategic plan" to reposition the segment for long-term growth.  The plan included "closing underperforming stores and moderating store growth in new geographic markets to reduce costs."  By closing an underperforming store, Aaron's was able to transfer the revenue stream from a closed store's consumer contracts to another nearby Aaron's store, thereby maintaining its customers (who depended on the store being close by) and increasing the profitability of the transferred-to store.  Where Aaron's did not have a nearby store, it would often sell the closed store's consumer rental contracts to a competitor that did, rather than risk losing the value of the existing contracts by transferring them to a more distant Aaron's store.

61.    From 2014 and leading up to the Class Period, Progressive propelled the Company's growth story, while Aaron's undertook numerous "restructuring" and other initiatives to maintain growth and return the diminishing "core" segment

to profitability.[6]   For example, by the end of 2014, the Company's revenues increased 22.0%, to $2.7 billion compared to the previous year, due to over $500 million in revenue growth from Progressive, and despite a $40 million revenue decrease from the Company's "core" business.  Given this success, in January 2015, Woodley was promoted to CFO of Progressive.

### 2.   Aaron's Engages in Anti-Competitive Activity at AB to Suppress Increasing Competition

62.     In mid-2015, competition in the RTO industry increased exponentially from both traditional retailers and other virtual lenders, and the "core" segment's growth was on the decline.  Desperate to show the market that its legacy business would return to greatness, in June 2015 (and throughout the Class Period), the Company began engaging in illicit swap agreements with its competitors RAC and Buddy's to close down stores in a given geographic region to suppress competition. *See* Ex. C at ¶¶1-5, 15-24.

_____

[6]   Initiatives in AB included "improved marketing and customer acquisition strategies, improved collections and merchandise loss controls, optimization of product mix, increases in customer retention and cost efficiency initiatives," introducing "next generation store concepts to appeal to our changing target consumer market," and "investing in improving our analytical capabilities to optimize pricing, promotion and both product mix and product lifecycle management[.]"

63.    The plan was simple: Aaron's (or its competitors RAC and Buddy's) would close an underperforming store in a certain area where its competitors operated and sell the consumer rental contracts to one of the nearby competitors in exchange for that competitor agreeing to sell its consumer rental contracts in another geographic region where that competitor was closing an underperforming store to Aaron's, RAC, or Buddy's. *Id*. at ¶¶3, 15.  Unlike traditional swap agreements, these agreements included non-competition clauses whereby Aaron's, Buddy's, or RAC and the nearby competitor each agreed to close any stores in the geographic location associated with the consumer rental contracts being sold and not to open new stores within a specified distance for a period of time.  *Id*. at ¶¶4, 16.

64.    By entering into these anti-competitive agreements, Aaron's was able to exit out of a poorly performing geographic market, ensure a favorable purchase of its underperforming stores' consumer rental contracts, and minimize the competition in the areas where it continued to operate.

65.    Despite advantages for Aaron's, its anti-competitive agreements were in direct violation of the FTC Act, which prohibits "unfair methods of competition." 15 U.S.C. §45; Ex. C at ¶¶5, 23-24.  Aaron's stores are concentrated in regions easily accessible by its vulnerable customers, known as repeat shoppers, who pay their bills in person.  By minimizing the number of RTOs in a region, Aaron's and its

competitors' swap agreements were purposefully suppressing competition and the numerous benefits it provides for financially strapped consumers, such as pricing, quality, and service competition. *Id*. at ¶19; Ex. D at 1. As such, these swap agreements were in clear violation of the FTC Act. Ex. C at ¶¶23-24.

66. For year-end 2015, the Company reported revenues of $3.180 billion, an increase of 18% from the prior year, despite noting headwinds from increased competition. Again, the Company credited its success to Progressive, which generated $1 billion in revenues for the period. Despite the Company's illicit activity, Aaron's "core" business reported a $50 million revenue decline.

### 3. Aaron's Continues Its Transformative Initiatives and Engages in Deceptive Conduct at Progressive to Inflate Growth

67. In January 2016, Aaron's announced yet another senior management shake-up: CFO Gilbert Danielson was stepping down to be replaced by Michaels, and Lindsay was named President of AB. Commenting on the changes, Robinson noted Aaron's need for "new perspectives and relevant outside expertise."

68. Also in 2016, still seeing declines in the "core" segment, and as a means to continue its anti-competitive activity, the Company initiated a "restructuring program." The 2016 restructuring program entailed a "thorough review" of Aaron's

stores, including "the subsequent closure or planned closure of underperforming stores."

69.     In addition, knowing that Aaron's growth was becoming increasingly dependent on Progressive, and with Defendants facing pressures to succeed, starting in 2016 and continuing throughout the Class Period, Defendants engaged in yet another illegal scheme.  *See* Ex. E at ¶51.  This time, Aaron's used Progressive to lure vulnerable customers into purchasing Progressive's plans by purposefully misrepresenting the exorbitant prices paid for Progressive's products.  *Id*. at ¶¶1, 9-11, 15-46.  In doing so, leading up to the Class Period, the Company was able to artificially inflate Progressive's growth and buy the Company time to turn AB's "core" profitability around.

70.     Because Progressive has no stores, in most instances, consumers have never heard of Progressive or its RTO plans when they go to a retail store or website. Nor do they intend to purchase items using an RTO payment plan.  The retail price they see in the store or on the website is, therefore, the price they expect to pay.  *Id*. at ¶16.  Consumers learn about Progressive from promotional materials (banners, posters, brochures), via in-person sales pitches at retail stores, and through advertisements on e-commerce sites after they have already decided to purchase an item.  These promotional materials and sales pitches were specifically designed to,

and had the intended effect of, deceiving customers as to the total costs of Progressive's products, fees, and other costs. *Id*. at ¶¶18-25.

71.    For example, from 2016 and throughout the Class Period, Progressive routinely advertised its "90 day payment option," but failed to adequately disclose – or at all – that even if the consumer paid off the merchandise within 90 days, they would still pay the retail price of the merchandise, plus an initial payment or mark-up of up to 20% of the retail price. *Id*. at ¶44.  If customers utilized Progressive's "[e]arly [b]uyout [o]ption" and purchased merchandise after renting it for 90 days, they still paid Progressive a percentage of the remaining balance (typically 65%), plus any amount then due or overdue. *Id*.

72.    In addition, as part of the Company's hands-on training, it taught retail sales associates how to deceptively pitch Progressive's plans though training manuals known as "Retailer Procedures" (setting forth various requirements for interacting with Progressive customers). *Id*. at ¶23.  These "procedures" masked the true cost of Progressive's plans and directed sales associates to state there were no extra fees, charges, or costs associated with Progressive's RTO plans.  For example, in response to the question "What's the interest rate like?" Progressive's Retailer Procedures advised its sales associates to state, "There actually isn't an interest rate, because it's not a loan." *Id*. at ¶24.  In fact, the training noted that an "incorrect"

answer to the question would be, "Well, there's not an interest rate, but if there was an interest rate, it would be something around this much[.]"  *Id.*

73.     Progressive also reviewed and approved deceptive marketing materials prepared by retail stores for Progressive's RTO plans.  *Id*. at ¶19.  Approved plans included advertising that consumers would pay only the retail price, cash price, "90 day cash option," "or "same as cash" price by using Progressive's plans (excluding any reference to additional fees, charges, or costs) or by explicitly stating that no additional fees, charges, or costs existed.  *Id.*

74.     Progressive's application and signing process via Progressive's proprietary "Approve.Me" platform also deceptively preyed on vulnerable customers.  *Id*. at ¶¶26-38.  Approve.Me forced consumers through multiple web pages with various links and fine-print, none of which fully and conspicuously disclosed the total cost that a consumer was paying for a product via a Progressive plan.  *Id*. at ¶¶32-38.

75.     These practices propelled Progressive's revenues and related financials, thereby increasing Aaron's overall growth leading up to and throughout the Class Period.

76.     Because the Company's predatory conduct deceived customers into thinking they were paying less than they actually were, it resulted in increased

- 31 -

customer non-payment or default.  As a result, the Company's accounts receivables, and resulting bad debt, steadily trended upwards from 2016 throughout the Class Period, which negatively impacted Progressive's and the Company's financial position.  As demonstrated in the chart below, Aaron's consolidated accounts receivables as a percentage of lease revenues consistently increased year-over-year, for a total increase of 95.7% from 1Q16 to 4Q19.  Likewise, Aaron's bad debt as a percentage of revenues increased consistently year-to-year, for a total increase of 107.9% from 1Q16 to 4Q19, and Progressive's bad debt as a percentage of revenues increased 42% from 1Q16 to 4Q19 and remained elevated throughout the Class Period.[7]

---

[7]   These calculations are based on the Company's financial results.  *See* ¶113, *infra*. Starting January 1, 2019, the Company adopted Accounting Standards Codification ("ASC") 842, *Leases*, which resulted in the Progressive Leasing provision for returns and uncollectible renewal payments being recorded as a reduction of lease revenues and fees within Aaron's condensed consolidated statements of earnings. Prior to 2019, the Progressive provision for returns and uncollectible renewal payments was reported as part of bad debt expense within the operating expenses in the condensed consolidated statement of earnings.  The percentage calculations for 1Q19 to 4Q19 for the three charts were adjusted to a pre-ASC 842 basis for comparison purposes with periods prior to 2019.

| Calculation of Accounts Receivable Provision Divided By Adjusted Reported Lease Revenue | | | |
|---|---|---|---|
| | *2019* | *2018* | *2017* | *2016* |
| *1Q* | 6.3% | 5.9% | 4.9% | 4.7% |
| *2Q* | 7.7% | 7.3% | 6.4% | 5.9% |
| *3Q* | 9.2% | 8.6% | 8.0% | 6.6% |
| *4Q* | 9.2% | 8.7% | 7.8% | 7.1% |

| Calculation of Consolidated Bad Debt Divided By Consolidated Lease Revenue | | | |
|---|---|---|---|
| | *2019* | *2018* | *2017* | *2016* |
| *1Q* | 5.7% | 5.4% | 4.3% | 3.8% |
| *2Q* | 6.2% | 5.9% | 5.0% | 4.1% |
| *3Q* | 8.0% | 7.3% | 6.7% | 5.3% |
| *4Q* | 7.9% | 7.4% | 6.6% | 5.4% |

| Calculation of Progressive Bad Debt Divided By Progressive Lease Revenue | | | |
|---|---|---|---|
| | *2019* | *2018* | *2017* | *2016* |
| *1Q* | 9.7% | 9.6% | 8.7% | 9.0% |
| *2Q* | 10.3% | 10.4% | 9.7% | 9.5% |
| *3Q* | 12.9% | 12.7% | 12.7% | 11.4% |
| *4Q* | 12.7% | 12.8% | 12.1% | 11.3% |

77.     As a result of its predatory conduct, Progressive received thousands of complaints from consumers – 15,000 complaints from May 2017 through July 2018 alone – saying they were provided inaccurate or misleading information about Progressive's terms or charges.  Ex. E at ¶¶11, 48.

78.     Aaron's deceptive and predatory conduct was in direct violation of the FTC Act, which prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. §45; Ex. E at ¶53.  Because Aaron's and Progressive were

engaged in the marketing, offering for sale, or sale of RTO goods, and failed to clearly conspicuously disclose the total cost of products purchased through Progressive's plans in a manner easily understandable by ordinary customers, they were in direct violation of the FTC Act.  15 U.S.C. §45(a); Ex. E at ¶¶55-57.

79.     This illicit activity helped Aaron's to achieve "record" revenues of over $3.2 billion, thanks to Progressive's $1.2 billion in revenues for 2016, an 18% increase from the prior year.  Despite management changes, restructuring, and anti-competitive conduct, however, the Company's "core" segment still reported an 8.5% decrease in revenues for 2016.

80.     In 2017, leading into the start of the Class Period, while still attempting to rebuild AB (and to continue hiding illicit conduct), Defendants initiated yet another "restructuring program" to "*further* review" the Company's Aaron's stores and "continue rationalizing its store base to better align with marketplace demand."

81.     By 3Q17, the Company reported that Progressive's revenues were up 29.1%, from 3Q16 to $398.3 million, due in part to the Company's undisclosed predatory scheme.  Despite two management changes, various "initiatives," and unlawful conduct to suppress competition, AB continued to report negative results, including a 4.9% decline in revenues to $431.7 million, compared to 3Q16.

E.   **Throughout the Class Period, Aaron's Concealed Two Unlawful Schemes and Misled the Market About the Company's Profitability and Growth Prospects**

82.   By the start of the Class Period, it became clear to Defendants that Progressive, and Progressive alone, was the new avenue for the Company's growth. Any management changes or future initiatives would only prolong the inevitable: AB would never return to sustainable growth.

83.   As a means to maintain Aaron's appearance of continuous growth and mask the inevitable decline of AB, throughout the Class Period, Defendants consistently touted both the Company's and Progressive's positive financial results and consistent growth, while knowing and/or recklessly disregarding that Progressive, and therefore the Company's, overall growth was rooted in predatory practices.  Defendants further gave investors the false impression that AB would "return to sustainab[l]e growth," while knowing and/or recklessly disregarding that AB's declining growth was inevitable in the long-term.  In light of the heightened scrutiny of the RTO industry, Defendants continuously confirmed that Aaron's was operating lawfully, pursuant to standard business practices, and to its customers' benefit (even after the Company received CIDs from the FTC), while failing to disclose and/or recklessly disregarding that the Company's anti-competitive and predatory practices subjected the Company to an increased risk of government

- 35 -

scrutiny and a negative impact on the Company's financial position and growth prospects.

84.   The Class Period begins on February 15, 2018, when the Company reported its fourth quarter 2017 ("4Q17") and full-year 2017 ("FY17") financial results, and the Company's illicit practices were in full swing, and known and/or recklessly disregarded by Defendants.

85.   By this time, Defendants had received thousands of customer complaints stemming from their confusion on Progressive's lease terms.  In addition, in 2018, Progressive conducted a review of its retailers' online advertising and determined that 18% misrepresented that Progressive's plans offer "90 Days Same as Cash" in its advertisements, while failing to disclose additional fees and costs. *See* Ex. E at ¶21.

86.   Due in part to Progressive's undisclosed predatory and deceptive practices, the 4Q17 press release reported "record revenues" of $3.4 billion for FY17.   Defendants further highlighted the success and prospects of AB's "transformation program," created to mask and pro-long AB's inevitable decline. For example, Robinson told investors that AB was "beginning to reap the benefits from" its initiatives, focused on "revenue growth and cost improvement."

87.    Defendants further assured investors that Aaron's was operating a lawful, consumer-focused, business model.  For example, in the Company's Annual Report on Form 10-K for the quarter and year ended December 31, 2017, filed with the SEC on March 1, 2018 ("2017 10-K"), Defendants claimed that Aaron's focus on "[c]hampion compliance" "with all laws and regulations governing our company's behavior" (including the FTC) to "position us for success over the long-term" and that the Company was appropriately "disclos[ing] the terms of our lease purchase transactions."  The 2017 10-K also falsely stated that Aaron's "ensures customer satisfaction is critical" and that its rental agreements "result in a lower cost to own" than its competitors.  In so doing, Defendants concealed from investors that the Company was engaged in anti-competitive and deceptive conduct within its two largest segments that would subject Aaron's to increased risk of governmental scrutiny, which would negatively impact the Company's financial position in the long term.

88.    To conceal its illicit conduct at Progressive, during the 4Q17 conference call, Woodley misleadingly blamed increasing bad debt on standard business practices, such as "a shift in invoice mix" and "optimized decisioning."

89.    Defendants also gave investors the false impression that store closures at AB were the result of Aaron's unilateral decision to "better align with marketplace

demand," when, in truth, they stemmed from AB's anti-competitive swap agreements with RAC and Buddy's.

90.     The market believed Defendants' statements.  In a February 15, 2018 analyst report, Jefferies LLC ("Jefferies") commented on the "ongoing strength at Progressive and a recovery in the core [AB]."

91.     Throughout the next two quarters, Defendants reiterated their positive statements about the Company's "strong" growth, transformational initiatives at AB, and "[c]hampion compliance," while failing to disclose that unlawful conduct was an integral part of the Company's success.  Indeed, the first quarter 2018 ("1Q18") press release credited Progressive's 33% increase in revenue as the "drive[r]" of the Company's "significant revenue and earnings growth in 2018."  Defendants also continued to mislead the market about AB's growth prospects.  For example, on the 1Q18 conference call, Robinson highlighted that the "results" of the "transformation initiatives give us confidence" in driving future revenue growth.  In the Company's Form 10-Q for 1Q18 ("1Q18 10-Q") and Form 10-Q for 2Q18 ("2Q18 10-Q"), Defendants also falsely attributed AB's "store closures" throughout 2016 to 2018 to standard business practices.

92.     As a result of Progressive's "record" growth (caused by Defendants' undisclosed deceptive practices) and surmounting complaints, Aaron's soon caught

the attention of the FTC.  In July 2018, the FTC served the Company with CIDs related to the Company's disclosure practices, which the Company publicly disclosed in its 2Q18 10-Q after the market closed.  The FTC CIDs "requested documents and answers to written questions to determine whether disclosures related to financial products offered by the Company through [AB] and [Progressive] are in violation of the [FTC Act]."  Defendants assuaged any investor concerns over the CIDs by stating Aaron's was "fully cooperating with the FTC" and "in compliance with the FTC Act."

93.   Notably, by this point in time, unknown to investors, Progressive and Defendants had already received at least 15,000 consumer complaints relating to deceptive information about Progressive's charges for RTO products.  *See* Ex. E at ¶¶11, 48.

94.   Following the Company's disclosure regarding the CIDs, the price of Aaron's common stock fell 11%, or $5.38 per share, to close at $43.47 per share on July 27, 2018.

95.   By 3Q18, Defendants continued to tout the Company's positive financial results, crediting Progressive's 26.6% increase in revenues and AB's "[b]usiness transformation initiatives" for "driving stronger financial performance" at AB.  At the same time, however, the FTC investigation into the Company's

predatory and deceptive practices took a minor toll on the Company's profitability.

96.    Aaron's reported a 12% increase in operating expenses, which Aaron's attributed in part to "expense and legal fees" surrounding the FTC investigation.  To temper investor concern, however, in the Company's Form 10-Q for its 3Q18 ("3Q18 10-Q"), Defendants continued to tout the Company's "[c]hampion compliance" and downplay any negative impact from the FTC investigation, reiterating the Company's "compliance with the FTC Act."

97.    On news of the Company's higher-than-expected operating expenses, due in part to expenses managing the CIDs, Aaron's stock price fell 8.7%, or $4.16 per share, to close at $43.89 per share on October 25, 2018, on increased trading volume.

98.    Despite this small blip, the Company's growth soared over the next few quarters due to the Company's illicit but undisclosed conduct, reassurances of FTC compliance and cooperation, and AB's supposed growth prospects.  For example, during the fourth quarter 2018 ("4Q18") conference call, Robinson highlighted that Progressive's revenue "doubled from $1 billion in 2015 to $2 billion in 2018 while maintaining consistently strong profitability."  On that call, Robinson also falsely assured the market that the Company's various initiatives would "help [AB] *get back to sustainable growth*."

99.    In January 2019, and as a means to disguise and prolong AB's inevitable decline, the Company began yet another "restructuring initiative" to continue to close underperforming stores, "poising [AB] for more growth."  By 1Q19, the Company reported "over $1 billion in quarterly revenues for the first time," as "a result of continued strong invoice growth at Progressive [and] improvements in [AB's] same-store revenue trends[.]"  Progressive's predatory practices, however, continued to impact the Company's bad debt and accounts receivables, with receivables as a percentage of revenues reaching 6.5%, up 5.5% compared to 1Q18.

100.    The Company's 1Q19 Form 10-Q ("1Q19 10-Q") also disclosed that the Company was under yet another FTC investigation, this time related to AB and whether "certain transactions involving the [swap] of customer lease agreements . . . violated the FTC Act."  The Company doubled-down on its efforts to conceal its unlawful practices.  Defendants again minimized any negative impact of the CIDs by noting the Company's cooperation with the investigation and confirming "compliance with the FTC Act."  Defendants' statements worked, with Jefferies issuing an analyst report noting, "robust Progressive growth" and AB's "recovery."

101.    During a June 12, 2019 investor conference, Michaels highlighted Progressive as an "outstanding acquisition and a great growth vehicle" and

emphasized the "exciting" initiatives to "reinvigorat[e]" AB.

102.   Defendants raised guidance in the second quarter 2019 ("2Q19") due to "strength" in Progressive, and Lindsay falsely assured the market that AB was "rebound[ing]."  Despite being under investigation by the FTC for CIDs (regarding conduct the Company had been committing for multiple years), Defendants continued to reiterate their "compliance" with the FTC Act to investors and customer-centric business model.  Knowing, but failing to disclose, that the FTC was on the verge of putting a stop to Aaron's anti-competitive activity surroundings store closures, Defendants decided to cease any "large scale closures between now and the end of the year[.]"  In total, Defendants had closed approximately 277 stores from 2016 to 2Q19.

103.   Taking advantage of the Company's artificially inflated stock price, Defendants sold substantial amounts of Aaron's common stock.  Robinson sold 14.6% of his holdings for proceeds of *$6,581,195*; Woodley sold 26.7% of his holdings for proceeds of more than *$4,272,316*; Michaels sold 18.9% of his holdings for proceeds of *$1,975,564*; and Lindsay sold 15.1% of his shares for proceeds of more than *$790,000*.

104.   Defendants' misstatements and omissions had their intended effect, as the price of Aaron's common stock was artificially inflated throughout the Class

Period, reaching as high as $78.14 per share on October 29, 2019.

### F. Aaron's Suffers Multiple Stock Declines as Its True Financial Condition Is Revealed Through a Series of Partial Disclosures

105. On November 4, 2019, the Company revealed that despite the Company's year-plus of downplaying the negative financial impact of the July 2018 CIDs, the FTC was commencing an enforcement action against Progressive. The Company also disclosed that in August 2019, the Company had entered into a Consent Decree with the FTC regarding its anti-competitive swap agreements at AB.

106. On this news, Aaron's stock price fell 11.38%, or $8.41 per share, to close at $65.46 per share on November 5, 2019, on increased trading volume.

107. Then, on February 20, 2020, Aaron's shocked the market by announcing it reached a $175 million settlement with the FTC regarding Progressive's predatory practices, poor 4Q19 and FY19 results for AB, and 2020 guidance below analyst expectations.

108. Aaron's revealed that the FTC settlement, which resulted in "a $179 million pre-tax charge" had a direct and negative impact on the Company's 4Q19 financial performance. Despite the Company's positive statements touting AB's return to sustainable growth, AB reported a 5.4% decrease in revenues for the quarter, and Defendants revealed that the segment "entered 2020 with a lower portfolio balance than 2019." After steady growth, the Company now reported a net

- 43 -

loss of $107.1 million for the quarter, down 273.6%, from the prior year's period, and an EPS decrease of $2.49 per share, or 279.8% compared to prior year's period. The Company would also have to undertake significant compliance reforms, to the tune of $15 million. Importantly, Robinson admitted it had been "tough" to manage "transformation" in the Company's "core" to maintain "near-term profitability" and that going forward, the Company would take a more "prudent approach" to investing in AB.

109. On this news, the price of Aaron's stock tumbled, falling 19.06%, or $10.70 per share, from a closing price of $56.15 per share on February 19, 2020, to $45.45 per share on February 20, 2020, on unusually heavy trading volume.

110. Analysts were stunned by the Company's disclosures and reacted negatively. In a February 20, 2020 analyst report, for example, Janney Montgomery Scott LLC ("Janney") stated that Aaron's "lost $1.60 per share in 4Q:19," in large part due to the $175 million settlement. SunTrust Robinson Humphrey, Inc. ("SunTrust") noted that "the company could have done a better job communicating the issues with the core business[.]"

111. In total, Aaron's stock fell *nearly 42%* from its Class Period high of $78.14 per share on October 29, 2019, to close at $45.45 on February 20, 2020.

## V.   MATERIALLY FALSE OR MISLEADING STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD

112.  Throughout the Class Period, Defendants misrepresented and concealed the true extent of the negative impact that Progressive's predatory and deceptive practices would have on the Company's operations, financial results, and business prospects.  Similarly, Defendants' statements also gave investors the false impression that AB would "return to profitability" and misrepresented and concealed that the Company was engaged in anti-competitive conduct at AB to suppress competition in certain geographic areas.  Defendants also misrepresented that the Company's and Progressive's respective growth, and various initiatives in AB, were the result of lawful and diligent business practices, but failed to disclose that, in truth, the Company's undisclosed illicit practices were integral to the Company's success and business prospects.  When Defendants chose to inform investors of the Company's strategies, growth, and future business prospects, they were under a duty to disclose that their unlawful conduct within the Company's two largest business segments further subjected the Company to an increased risk of regulatory scrutiny that would (and did) negatively impact the Company's financial performance.  Defendants, however, failed to reveal this material information and, instead, omitted and concealed it from investors.

## A.    Aaron's and Progressive's False and Misleading Financial Results

113.   The Class Period begins on February 15, 2018.  On that date, Aaron's issued a Form 8-K, signed by Michaels, that enclosed a press release announcing 4Q17 and FY17 results.  Throughout the Class Period, the Company issued Aaron's consolidated financial results and separate financial results for each business segment, including Progressive, for each quarterly period and FY17 and full-year 2018 ("FY18"), as referenced in the charts below:

| Aaron's | | | | | |
|---|---|---|---|---|---|
| | **4Q17**<br>**(% change)** | **FY17**<br>**(% change)** | **1Q18**<br>**(% change)** | **2Q18**<br>**(% change)** | **3Q18**<br>**(% change)** |
| Revenue | $884.6 M | $3.38 B<br>(+5.5%)[1] | $954.8 M<br>(+13%) | $927.9 M | $953.1 M<br>(+13.6%) |
| Net Earnings | $177.6 M | $292.5 M | $52.2 M | $38.5 M | $43.7 M<br>(+72.5%) |
| Non-GAAP Net Earnings | $47.0 M | $184.7 M | $58.3 M | $59.6 M | $48.642 M |
| Diluted EPS | $2.46 | $4.06 | $0.73 | $0.54 | $0.62<br>(+77.1%) |
| Adj. EBITDA | $89.9 M<br>(+21.7%) | $362.7 M | $94.1 M | $97.0 M | $82.5 M<br>(+21.8%) |
| Non-GAAP Diluted EPS | $0.65 | $2.56 | $0.81 | $0.84 | $0.69<br>(+60.5%) |
| Consolidated Lease Revenue ("CLR") | $783.202 M<br>(+15.7%) | $3.0 B<br>(+7.9%) | $870.067 M<br>(+17.0%) | $845.938 M<br>(+17.8%) | $880.871 M<br>(+16.6%) |

*1. Where Defendants' statements of reported financial results included a percentage comparison to the prior years period, that percentage change is noted.*

| Aaron's | | | | | |
|---|---|---|---|---|---|
| | **4Q18**<br>**(% change)** | **FY18**<br>**(% change)** | **1Q19**<br>**(% change)** | **2Q19**<br>**(% change)** | **3Q19**<br>**(% change)** |
| Revenue[1] | $993.2 M<br>(+12.3%)[2] | $3.828 B | $1.012 B<br>(+11.4%) | $968.1 M<br>(+10.3%) | $963.8 M<br>(+8.4%) |
| Net Earnings | $61.7 M<br>(-65.2%) | $196.210 M | $56.1 M | $42.7 M | $39.8 M |
| Non-GAAP Net Earnings | $70.762 M | $237.474 M | $74.311 M | $63.905 M | $50.067 M |
| Diluted EPS | $0.89<br>(-63.8%) | $2.78 | $0.82 | $0.62 | $0.58 |
| Adj. EBITDA | $112.7 M<br>(+25.3%) | $386.239 M | $115.2 M<br>(+22.4%) | $107.4 M<br>(+10.7%) | $87.1 M<br>(+5.6%) |
| EBITDA as a % of Revenue | 11.3% | N/A | 11.4%[3] | 11.1% | 9.0% |
| Non-GAAP Diluted EPS | $1.02<br>(+56.9%) | $2.78 | $1.08<br>(+33.3%) | $0.93<br>(+10.7%) | $0.73<br>(+5.8%) |
| Consolidated Lease Revenue ("CLR")[4] | $909.542 M<br>(+16.1%) | $3.506 B | $944.157 M<br>(+14.6%) | $907.565 M<br>(+14.0%) | $906.776 M<br>(+11.0%) |

*1. Starting in 2019, the Company adopted ASC 842 related to lease accounting and provided Aaron's revenue numbers and revenue percentage changes for 1Q19, 2Q19 and 3Q19 consistent with that new accounting standard.*

*2. Where Defendants' statements of reported financial results included a percentage comparison to the prior years period, that percentage change is noted.*

*3. For 1Q19, 2Q19 and 3Q19, the Company provided Aaron's EBITDA as a percentage of revenue consistent with the 2019 adoption of ASC 842.*

*4. For 1Q19, 2Q19 and 3Q19, the Company provided CLR numbers and percentage changes consistent with the 2019 adoption of ASC 842.*

| Progressive | | | | | |
|---|---|---|---|---|---|
| | 4Q17 (% change) | FY17 (% change) | 1Q18 (% change) | 2Q18 (% change) | 3Q18 (% change) |
| Revenue | $428.5 M (+32.3%)[1] | $1.57 B (+26.6%) | $486.5 M (+32.9%) | $483.7 M (+29.5%) | $504.4 M (+26.6%) |
| Earnings | $38.5 M | $140.2 M | $35.0 M | $44.6 M | $40.839 M |
| EBITDA | $50.0 M | $187.8 M | $46.2 M | $55.8 M | $51.7 M (+31.6%) |
| EBITDA as a % of Revenue | 11.7% | 12.0% | 9.5% | 11.5% | 10.3% |
| Progressive Lease Revenue ("PLR")[3] | $428.517 M | $1.566 B | $486.517 M | $483.666 M | $504.407 M |

*1. Where Defendants' statements of reported financial results included a percentage comparison to the prior years period, that percentage change is noted.*

| Progressive | | | | | |
|---|---|---|---|---|---|
| | 4Q18 (% change) | FY18 (% change) | 1Q19 (% change) | 2Q19 (% change) | 3Q19 (% change) |
| Revenue[1] | $524.4 M (+22.4%)[2] | $1.999 B | $523.3 M (+19.0%) | $516.3 M (+19.1%) | $528.9 M (+20.1%) |
| Earnings | $54.6 M | $175.015 M | $55.4 M | $58.4 M | $53.5 M |
| EBITDA | $65.5 M (+31.2%) | $219.277 M | $65.3 M (+41.2%) | $68.2 M (+22.3%) | $62.9 M (+21.5%) |
| EBITDA as a % of Revenue | 12.5% | N/A | 12.5%[3] | 13.2% | 11.9% |
| Progressive Lease Revenue ("PLR")[4] | $524.391 M | $1.998 B | $523.401 M | $516.333 M | $528.850 M |

*1. Starting in 2019, the Company adopted ASC 842 related to lease accounting and provided Progressive's revenue numbers and revenue percentage changes for 1Q19, 2Q19 and 3Q19 consistent with that new accounting standard.*

*2. Where Defendants' statements of reported financial results included a percentage comparison to the prior years period, that percentage change is noted.*

*3. For 1Q19, 2Q19 and 3Q19, the Company provided Progressive's EBITDA as a percentage of revenue consistent with the 2019 adoption of ASC 842.*

*4. For 1Q19, 2Q19 and 3Q19, the Company provided PLR numbers consistent with the 2019 adoption of ASC 842, but did not provide PLR percentage changes consistent with that new standard.*

114.   Defendants' statements on February 15, 2018 (4Q17 and FY17), April 25, 2018 (1Q18), July 26, 2018 (2Q18), October 25, 2018 (3Q18), February 14, 2019 (4Q18 and FY18), April 25, 2019 (1Q19), July 25, 2019 (2Q19), and November 4, 2019 (3Q19), as set forth above in ¶113, were materially false or misleading or omitted material facts.  Specifically, Defendants' statements reporting Aaron's and Progressive's respective financial performances for 4Q17, FY17, 1Q18, 2Q18, 3Q18, 4Q18, FY18, 1Q19, 2Q19, and 3Q19 misrepresented and concealed that Aaron's was using illegal, predatory, and deceptive practices at Progressive, in violation of the FTC Act, to artificially inflate the Company's and Progressive's revenues, earnings, and earnings before interest, taxes, depreciation, and amortization ("EBITDA"), and to give investors the false impression of continuous growth.  In reality, but for Defendants' illegal practices, Aaron's and Progressive's financial results would have been much lower.  In addition, Defendants' unlawful practices at Progressive subjected the Company to increased risk of government intervention that would, and did, negatively impact the Company's profitability and financial performance, including a $175 million monetary penalty by the FTC at the end of the Class Period.  *See* ¶¶67-111, *supra*.

**B.      Fourth Quarter and Full-Year 2017**

115.   In addition to Aaron's and Progressive's false financial results, beginning on February 15, 2018 and continuing throughout the Class Period, Defendants also regularly misled investors through issuance of press releases and SEC filings such as Forms 10-Q and 10-K, and during conference calls and at investor conferences.

116.   As noted above in ¶113, in the February 15, 2018 release, both Aaron's and Progressive reported positive financial results in 4Q17 and FY17.  In contrast, AB reported mixed financial results including a revenue decline of 3.6% to $446.9 million and 8.4% to $1.78 billion for 4Q17 and FY17, respectively; same store sales revenue decreases of 5.4% and 7% for 4Q17 and FY17, respectively; and increased EBITDA compared to prior years periods.[8]

117.   In the Company's release, Robinson highlighted that the Company "delivered *record* revenues, EBITDA and non-GAAP diluted EPS for the full year while making strategic investments in *each of our businesses to support long-term growth*."

---

[8]   Throughout this section, AB's financial results and metrics are not alleged to be false and misleading, but instead are included for context.

118.   Despite the mixed financial results at AB, in the release, Robinson assured the market of the success of the Company's transformation "initiatives" that were focused on "*revenue growth and cost improvement*," noting, "*we are beginning to reap the benefits from our transformation program.*"

119.   The release further reported that AB "closed or consolidated eleven Company-operated stores" and "sold one Company-operated store to a third party[,]" as a result of the Company's restructuring "*program to identify, close and consolidate underperforming stores and right size the Company's store footprint in existing markets*."

120.   On February 15, 2018, Aaron's hosted a conference call with analysts and investors to discuss the Company's 4Q17 and FY17 financial results and 2018 outlook.   During the call, Robinson, Woodley, Lindsay, and Michaels spoke positively about the Company's financial results and operations.   For example, Robinson spoke of the "*exceptional growth from Progressive*."   Woodley added that Progressive "deliver[ed] [its] *strongest revenue growth in 2017*[.]"   He further stated, "*We finished 2017 with bad debt expense of 10.9% and expect 2018 to be higher as a result of a shift in invoice mix and the further optimized decisioning*[.]"

121.   Robinson further stated that "*many of our leading indicators are positive, which gives us increasingly optimistic expectations about the [AB] business*

*going forward*."  Notably, Robinson stated that the Company was "moving forward with operating initiatives" to "*improve our competitive position*."

122.   Lindsay reiterated that the Company had "*solid momentum in our transformation initiatives*" at AB, with "*significant potential to drive top line growth*, [and] *improve customer experience*[.]"

123.   In response to an analyst's question, Robinson specifically discussed Aaron's competitive landscape, including RAC.  He falsely told investors that "the competitive environment continues to be *robust* from both sides of the business," and confirmed that Defendants "*haven't honestly seen any difference from Rent-A-Center. They're a good competitor and remain that in the market*," while failing to disclose that at the time, the Company, through AB, was engaged in unlawful conduct with RAC to suppress competition.

124.   Analysts were quick to comment on Progressive's strong revenue growth for 4Q17 and AB's return to long-term profitability.  For example, on February 15, 2018, Jefferies highlighted "ongoing strength at Progressive and a recovery in the core Aaron's business."  On the same day, SunTrust issued an analyst report stating, "we believe the legacy Aaron's business has stabilized" and we expect "ongoing acceleration for Progressive[.]"  Likewise, on February 16, 2018, Northcoast Research Partners, LLC ("Northcoast") issued a report stating Aaron's

"performance crushed our forecast" and that "Progressive once again stole the show[.]"

125.   After the market closed on March 1, 2018, Aaron's filed its 2017 10-K, which was signed by Robinson and Michaels.  The 2017 10-K included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by both Robinson and Michaels, which stated that:

> *Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;* ("SOX Statements").

126.   The 2017 10-K confirmed the Company's previously announced financial results and financial position for 4Q17 and FY17.

127.   In the 2017 10-K, Defendants acknowledged that the Company was extensively regulated by, among others, the FTC, and made materially false and misleading statements and/or omitted material facts concerning the Company's compliance with such regulations.  For example, the 2017 10-K highlighted that in response to changing market conditions, including "increased competition," Defendants were "executing a strategic plan that *focuses on . . . [c]hampion compliance*" to "*position us for success over the long-term*," stating:

> *Champion compliance* - Aaron's, Inc. is a large and diverse company with thousands of daily transactions that are extensively regulated and

subject to the requirements of various federal, state, and local laws and regulations. *We continue to believe and set expectations that long-term success requires all associates to behave in an ethical manner and to comply with all laws and regulations governing our company's behavior.* ("Compliance Statements")

128.   In the 2017 10-K, Defendants also falsely assured investors that the

Company was adequately disclosing the "terms of [its] lease purchase transactions,"

stating:

> *Our long-established policy in all states is to disclose the terms of our lease purchase transactions as a matter of good business ethics and customer service.* We believe we are in material compliance with the various state lease purchase laws.

129.   The 2017 10-K also falsely assured investors of the Company's

"commitment" to its customers and the consumer focused nature of Aaron's business

model, stating:

> A critical component of the success in our operations *is our commitment* to developing good relationships with our customers. The Company consistently monitors consumer interests and trends to *ensure that our business model is aligned with our customer's needs. The Company believes that building a relationship with the customer that ensures customer satisfaction is critical* because customers of Progressive Leasing and Aaron's store-based and e-commerce operations have the option of returning the leased merchandise at any time. *Our goal*, therefore, *is to develop positive associations about the Company and our products, service, and support in the minds of our customers* from the moment they enter our showrooms and the showrooms of our retail partners. *We demonstrate our commitment to superior customer service by providing customers with access to* product through multiple channels, including *Progressive Leasing's . . . network of retail partner*

- 54 -

*locations*, and *Aaron's store-based operations*.   (collectively, "Customer Service Statements").

130.   Also, in the 2017 10-K, the Company "distinguish[ed]" itself from "competitors" by "*offering high levels of customer service*" and "*offering lease ownership agreements that result in a lower cost to own*" (collectively, "Strategy Statements").

131.   Discussing store closings at AB, the 2017 10-K further commented on the Company's 2017 and 2018 restructuring programs and made false and misleading statements and/or omissions regarding the Company's supposedly unilateral decision to close underperforming Aaron's stores.  For example, the 2017 10-K stated that "*the Company closed 123 underperforming Company-operated stores throughout 2016 and 2017*" and "*closed 15 underperforming Company-operated stores during 2017 and anticipates closing an additional eight stores in the first six months of 2018*."  The 2017 10-K also misleadingly attributed the closure of under-performing Aaron's stores to "*opportunities for rationalization*" and "*cost-reduction initiatives*."

132.   Defendants' statements on February 15, 2018 and March 1, 2018, as set forth above in ¶¶117-123, 125-131 were materially false or misleading or omitted material facts.  Specifically:

(a)     Defendants' statements regarding Aaron's and Progressive's respective financial performances for 4Q17 and FY17, such as that the Company "delivered record revenues, EBITDA, and non-GAAP diluted EPS for the full year" and that Progressive experienced "exceptional growth," misrepresented and concealed that Aaron's was using illegal, predatory, and deceptive practices at Progressive, in violation of the FTC Act, to artificially inflate the Company's and Progressive's financial results and to give investors the false impression of continuous growth.  In reality, but for Defendants' illegal practices, Aaron's and Progressive's 4Q17 and FY17 financial results would have been much lower.  In addition, Defendants' unlawful practices at Progressive subjected the Company to increased risk of government intervention that would, and did, negatively impact the Company's profitability and financial performance, including a $175 million monetary penalty by the FTC at the end of the Class Period.  *See* ¶¶67-111, *supra*.

(b)     Defendants' statements concealed that Aaron's was engaging in illegal, anti-competitive activity at AB related to store closures in violation of the FTC Act.  For example, Defendants' statements gave investors the false impression that AB's restructuring plan and consequent closure of underperforming Company-operated stores were the result of the Company's unilateral decision to "consolidate underperforming stores" and "right size the Company's store footprint" when in

truth, these activities were part of Aaron's illicit, anti-competitive, reciprocal, swap agreements.  *See* ¶¶62-66, 82-111, *supra*.

(c)     Defendants' statements, including that we saw "solid momentum in our transformation initiatives" and are "reap[ing] the benefits from our transformation program," gave investors the false impression that AB would return to sustainable growth in the long term, while concealing that despite the Company's numerous initiatives (that may have resulted in short-term buoying of AB's performance), AB's growth was declining and would impact the Company's overall profitability and financial performance in the long term.

(d)     Defendants' statements misrepresented that the Company "ensure[s] that [its] business model is aligned with [its] customer's needs," "offer[s] high levels of customer service," and is committed to offering "superior customer service."  Contrary to their statements, Defendants employed illegal practices to deceive credit-challenged consumers to enter into rental agreements with Progressive, and were engaged in unlawful swap agreements that minimized price and quality competition.  *See* ¶¶62-11, *supra*.

(e)     Defendants' statements failed to disclose that Progressive's reported and expected increase in bad debt expense for 2018 was the result of

Aaron's illegal, predatory, and deceptive practices at Progressive in violation of the FTC Act.

(f)    Defendants' statements misrepresented that Aaron's was operating in compliance with all relevant government regulations, including the FTC Act, and concealed that the Company was engaging in illegal, deceptive, predatory, and anti-competitive conduct in its two largest business segments.

(g)    Defendants' SOX Statements, certified by Robinson and Michaels, were false and misleading because they represented that the Company disclosed all material information to investors, when in fact, it did not.

### C.    First Quarter 2018

133.   On April 26, 2018, Aaron's issued a Form 8-K, signed by Michaels, that enclosed a press release announcing its financial results for 1Q18.  As noted above in ¶113, both Aaron's and Progressive reported positive 1Q18 financial results.  In contrast to Progressive, however, AB reported minimal growth, including a 2.4% decrease in total revenue to $458.8 million in 1Q18, a 4.4% decrease in same store revenues, lower EBITDA, and a 4.2% decrease in customer counts on a same store basis.

134.   In the release, Robinson highlighted the Company's 13.1% revenue growth and touted Progressive's exceedingly positive "*invoice volume, revenue and*

*profitability in the quarter*."   Robinson emphasized Progressive's role as the "*drive[r]* [of the Company's] significant *revenue and earnings growth* in 2018."

135.   Also in the release, Robinson tempered AB's minimal growth by noting that "the quarter reflects increased spending to *strengthen . . . Aaron's Business's long-term competitive position*" and further stated, "*we remain optimistic about the initiatives underway to grow our omnichannel business*."

136.   On April 26, 2018, Aaron's hosted a conference call with analysts and investors to discuss the Company's 1Q18 financial results and 2018 outlook.  During the call, Robinson, Woodley, Lindsay, and Michaels spoke positively about the Company's financial results and operations.  For example, in his prepared remarks, Robinson stated, "We achieved 13% revenue growth in the first quarter with both Progressive and [AB] exceeding our top line expectations[.]"   Robinson praised Progressive for "another quarter of *outstanding execution* and . . . *strong invoice and revenue growth*."

137.  In response to an analyst's question, Woodley falsely attributed Progressive's 20% increase in new invoice per active door to "effort[s]" to motivate sales associates "behind the scenes," instead of disclosing that Defendants directed Progressive's sale associates to engage in predatory and deceptive practices, stating:

*The team spends a lot of time motivating retail sales associates to get better at completing the progressive transaction and a lot of that effort behind the scenes drives what you're seeing and increases here.*

138.   In response to an analyst question regarding AB, Robinson stated that "*[w]e're making significant progress optimizing this existing model,*" "*turning the tide on comparable store revenues*[,]" and "*the results we are seeing from our transformation initiatives give us confidence*[.]"   Lindsay also commented in response and noted that AB's "transformation" initiatives were focused on "*Aaron's customer experience and driving future revenue growth.*"

139.   Finally, in response to an analyst's question regarding the "higher average ticket" (the increase in price per customer purchase) reported at both AB and Progressive for the quarter, Robinson attributed growth to the Company's "specific strategies" in each segment, while failing to disclose that these strategies included deceptive, predatory, and anti-competitive practices, stating that:

*the changes that have happened in our P&L and the changes that have happened to our ticket . . . are related directly to company specific strategies that we've been proactive about initiating this last quarter and the prior quarters.*

140.   On the same day, April 26, 2018, after the market closed, Aaron's filed its 1Q18 10-Q with the SEC, which was signed by Michaels, and included SOX certifications signed by Robinson and Michaels, reiterated the Company's SOX

Statements and Compliance Statements, and confirmed the Company's previously announced financial results and financial position.

141.   The 1Q18 10-Q falsely attributed the closure of 138 under-performing Aaron's stores throughout 2016 and 2017, including "*15 underperforming Company-operated stores during 2017*" and the "*anticipate[d] closing an additional eight stores during the remainder of 2018*" to its unilateral decision to "*continue rationalizing its store base to better align with marketplace demand.*"  The 1Q18 10-Q also misleadingly attributed the store closures to "*opportunities for rationalization*" and "*cost-reduction initiatives*[.]"

142.   Analysts were once again quick to comment on Progressive's continued strong revenue growth.  For example, on April 25, 2018, Jefferies issued a report commenting that "[w]e believe Progressive is one of the best positioned companies we follow in terms of its long-term growth outlook."  The report further noted that "we continue to favor AAN from a long-term perspective."

143.   Defendants' statements on April 25, 2018, as set forth above in ¶¶134-141 above, were materially false or misleading or omitted material facts.  Specifically:

(a)     Defendants' statements regarding Aaron's and Progressive's respective financial performances for 1Q18, such as that the Company had achieved

- 61 -

13.1% revenue growth and that Progressive was experiencing "another quarter of outstanding execution and . . . strong invoice and revenue growth," misrepresented and concealed that Aaron's was using illegal, predatory, and deceptive practices at Progressive, in violation of the FTC Act, to artificially inflate the Company's financial results and to give investors the false impression of continuous growth.  In reality, but for Defendants' illegal practices, Aaron's and Progressive's 1Q18 financial results would have been much lower.  In addition, Defendants' unlawful practices at Progressive subjected the Company to increased risk of government intervention that would, and did, negatively impact the Company's profitability and financial performance, including a $175 million monetary penalty by the FTC at the end of the Class Period.  *See* ¶¶67-111, *supra*.

> (b)     Defendants' statements concealed that Aaron's was engaging in illegal, anti-competitive activity at AB related to store closures in violation of the FTC Act.  For example, Defendants' statements gave investors the false impression that AB's restructuring plan and consequent closure of underperforming Company-operated stores or the sale of stores to third parties was the result of the Company's unilateral decision to "rationaliz[e] its store base to better align with marketplace demand[,]" when in truth, these activities were part of anti-competitive reciprocal swap agreements.  *See* ¶¶62-66, 82-111, *supra*.

(c)     Defendants' statements, including that "[w]e're making significant progress optimizing this existing model" and "turning the tide on comparable store revenues," gave investors the false impression that AB would return to sustainable growth in the long term, while concealing that despite the Company's numerous initiatives (that may have resulted in short-term buoying of AB's performance), AB's growth was declining and would impact the Company's overall profitability and financial performance in the long term.

(d)     Defendants' statements misrepresented that Aaron's was operating in compliance with all relevant government regulations, including the FTC Act, and concealed that the Company was engaging in illegal, deceptive, predatory, and anti-competitive conduct in its two largest business segments.

(e)     Defendants' SOX Statements, certified by Robinson and Michaels, were false and misleading because they represented that the Company disclosed all material information to investors, when in fact, it did not.

### D.     Second Quarter 2018: the Disclosure of the CIDs from the FTC Relating to Progressive's Predatory and Deceptive Practices

144.   On July 26, 2018, Aaron's issued a Form 8-K, signed by Michaels, that enclosed a press release announcing its 2Q18 financial results.  As noted above in ¶113, both Aaron's and Progressive reported positive financial results for 2Q18.  In contrast, AB reported mixed results, including a minor 0.3% increase in total

revenues for 2Q18 to $435.0 million, a decrease in EBITDA, and a 1.8% and 4.3%

decrease in same store revenues and customer counts, respectively.

145.   In the release, Robinson credited the Company's "*strategic*

*investments*" for the Company's 2Q18 growth, noting, "*We served a record number*

*of customers across our platforms, achieved a double-digit gain in consolidated*

*revenue and increased adjusted EBITDA compared to the prior year*."

146.   Commenting on Progressive, Robinson touted, "*outstanding revenue*

*and profit growth*" and stated, "The team continues to *optimize performance* across

a large base of existing retail doors which is *positively impacting revenue and*

*profitability*."

147.   Robinson further stated that AB "*continued to see improvement in a*

*number of key metrics in the quarter*" and that "*we're encouraged by the progress*

*of our business transformation initiatives*[.]"

148.   On July 26, 2018, Aaron's hosted a call with analysts and investors to

discuss the Company's 2Q18 financial results and 2018 outlook.   Robinson,

Woodley, Lindsay, and Michaels spoke positively about the Company's financial

results and operations.   In his prepared remarks, Robinson stated that we "*achieved*

*record revenues, led by exceptional growth at Progressive and an increase in*

*revenues at [AB]*" and that the Company "served *a record number* of customers in the quarter."

149.   Robinson also represented that the AB segment was "*making continued progress*" and stated that AB's "key metrics . . . are *benefiting* from our business transformation initiatives."   Lindsay further highlighted the success of the Company's "transformation initiatives" that were focused on restoring AB to profitability, stating, "*Our business transformation strategy is on track*[,]" "*we continue to make investments to improve our customer experience and lower our cost to serve*[,]" and "*we continued to see positive trends in key leading indicators*."

150.   After the close of business, on July 26, 2018, Aaron's filed its 2Q18 10-Q with the SEC, which was signed by Michaels, included SOX certifications signed by Robinson and Michaels, reiterated the SOX Statements and Compliance Statements, and confirmed the Company's previously announced financial results and financial position.

151.   Importantly, in the 2Q18 10-Q, Defendants disclosed for the first time that "[i]n July 2018, the Company received [CIDs] from the [FTC] . . . request[ing] the production of documents and answers to written questions to determine whether disclosures related to financial products offered by the Company through the Aaron's Business and Progressive . . . are in violation of the [FTC] Act."

152.    Despite the fact that the FTC was digging into Aaron's scheme, Defendants significantly downplayed the full extent of Aaron's liability with respect to the FTC's investigation into Progressive and AB, as well the Company's violations of the FTC Act.  Defendants assured the market that "[t]he Company is fully cooperating with the FTC in responding to these inquiries."

153.    Most notably, Defendants falsely stated, "*we believe we are in compliance with the FTC Act*," and disingenuously warned that "these inquiries *could lead* to an enforcement action and/or a consent order, and substantial costs, including legal fees, fines, penalties, and remediation expenses[,]" (collectively, "FTC Compliance Statements"), while failing to disclose that the Company had been engaged in illegal, deceptive, and predatory practices since 2016 and an enforcement action or consent order was inevitable.

154.    The 2Q18 10-Q further falsely attributed "the closure and consolidation of 139 underperforming Company operated stores throughout 2016, 2017, and 2018" and the anticipated closure of "an additional seven stores during the remainder of 2018" to the unilateral decision to "*rationalize its Company-operated Aaron's store base portfolio to better align with marketplace demand*."  The 2Q18 10-Q further misleadingly attributed the store closures to "*opportunities for rationalization*" and "*cost-reduction initiatives*[.]"

- 66 -

155.   On news of the Company's receipt of the CIDs from the FTC regarding the adequacy of the Company's disclosures, Aaron's stock price dropped 11%, or $5.38 per share, to close at $43.47 per share on July 27, 2018.  Despite this drop, Aaron's common stock continued to trade at artificially inflated prices as a result of Defendants' continued misstatements and/or omissions.

156.   In response to the disclosure of the CIDs and Defendants' efforts to downplay the FTC's investigation, analysts had mixed reactions.  For example, on July 27, 2018, Janney issued a report stating that the "CID [w]eighs on the [s]tock[,]" and Jefferies issued a report stating, "At the end of the day, it is difficult to say how this will work out while we will continue to monitor the situation."  On the same day, Northcoast issued a report stating that "[w]e believe that the CID's are related solely to the disclosures required by the FTC and have nothing to do with the underlying business practice of lease-to-own."

157.   Defendants' statements on July 26, 2018, as set forth above in ¶¶145-154 above, were materially false or misleading or omitted material facts.  Specifically:

   (a)   Defendants' statements regarding Aaron's and Progressive's respective financial performances for 2Q18, such as that the Company "achieved record revenues, led by exceptional growth at Progressive[,]" misrepresented and

concealed that Aaron's was using illegal, predatory, and deceptive marketing and lending practices at Progressive, in violation of the FTC Act, to artificially inflate the Company's financial results, and to give investors the false impression of continuous growth.  In reality, but for Defendants' illegal practices, Aaron's and Progressive's 2Q18 financial results would have been much lower.  In addition, as partially disclosed on July 26, 2018, Defendants' unlawful practices were already subjecting the Company to increased government intervention that would negatively impact the Company's profitability and financial performance.  Ultimately, as disclosed at the end of the Class Period, the FTC issued a permanent injunction against, and a monetary judgment of $175 million as penalty for such deceptive practices. *See* ¶¶67-111, *supra*.

(b)     Defendants' statements concealed that Aaron's was engaging in illegal, anti-competitive activity at AB related to store closures in violation of the FTC Act.  For example, Defendants' statements gave investors the false impression that AB's restructuring plan and consequent closure of underperforming Company-operated stores or the sale of stores to third parties was the result of the Company's unilateral decision to "rationalize its Company-operated Aaron's store base portfolio to better align with marketplace demand[,]" when in truth, these activities were part

of Aaron's anti-competitive reciprocal swap agreements.  *See* ¶¶62-66, 82-111, *supra*.

(c)     Defendants' statements such as "we're encouraged by the progress of our business transformation initiatives" and "our business transformation strategy is on track" gave investors the false impression that AB would return to sustainable growth in the long term, while concealing that despite the Company's numerous initiatives (that may have resulted in short-term buoying of AB's performance), AB's growth was declining and would impact the Company's overall profitability and financial performance in the long term.

(d)     Defendants misrepresented that Aaron's was operating in compliance with all relevant government regulations, including the FTC Act, and concealed that the Company was engaging in illegal, deceptive, predatory, and anti-competitive conduct in its two largest business segments.

(e)     Defendants' SOX Statements, certified by Robinson and Michaels, were false and misleading because they represented that the Company disclosed all material information to investors, when in fact, it did not.

### E.     Third Quarter 2018: Higher Operating Expenses from the CIDs

158.    On October 25, 2018, Aaron's issued a Form 8-K, signed by Michaels, that enclosed a press release announcing its financial results for 3Q18.  As noted

above in ¶113, Aaron's and Progressive both reported positive financial results for 3Q18.  AB, however, once again reported mixed results for the quarter, including a small 1.7% increase in total revenues to $439.2 million in 3Q18, increased EBITDA, flat same store revenues, and a 5.3% decline in customer count on same store basis.

159.   Despite these seemingly positive results, the release also reported a $46 million (or 12% increase) in operating expenses to $420.60 million, compared with the same period in 2017.

160.   In the release, Robinson stated that "*[t]his quarter demonstrates the strength of our model as we achieved solid growth in both revenue and earnings while we continued to invest in the future growth of our business*[.]"  Robinson added, "*We continue to be encouraged by the improvements we are seeing in the business and the results of these initiatives*."

161.   On October 25, 2018, Aaron's hosted a conference call with analysts and investors to discuss the Company's 3Q18 financial results and outlook.  During the call, Robinson, Woodley, Lindsay, and Michaels spoke positively about the Company's financial results, but acknowledged that the ongoing CIDs had negatively impacted the Company's operating costs for the quarter.

162.   In his prepared remarks, Woodley commented on Progressive, stating, "Progressive continues to execute on *our strategy to drive profitable growth* as we pursue a large and under-served market."  He further stated:

> As we look to the balance of 2018, we're encouraged by the sustained momentum and invoice volume, and we're excited about our ability to continue to driving strong growth as we innovate our product to best serve our customers and retail partners.

163.   Robinson further discussed the success of AB's "*transformation initiatives*" crediting them for "*driving stronger financial performance, and we continue to expect the same-store revenues will turn positive in the fourth quarter*."

164.   Lindsay noted, "*we're encouraged by the underlying trends in our [AB] business*."  In addition, in response to an analyst's question concerning 2019 outlook for AB, Robinson told investors, "*we feel like it's going to be a really solid year*[,]" and that "*[w]e got good momentum in all our businesses, we have a big market opportunity in front of us*."

165.   On the call, Defendants revealed that the Company's 12%, or $46 million, increase in operating expenses resulted from increased bad debt at Progressive and legal fees accrued in defending the CIDs.  Specifically, Michaels stated:

> A bit more than half of the dollar increase was driven by *the expected year-over-year increase in bad debt expense* and write-offs *at Progressive.* Approximately 2/3 of the remaining increase was driven

by the addition of personnel, occupancy, delivery and selling costs from the franchise stores acquired by the Aaron's Business. . . .  The balance of the increase is spread across investments in both our businesses as well as *intangible amortization expense and legal fees resulting from our response to the previously disclosed FTC CIDs*.

166.   Also, in response to an analyst question, Robinson discussed the Company's supposed consumer-centric model, representing that the Company's investment in "resources to drive customer engagement and lower our cost to serve . . . *will improve the customer experience* for existing and new shoppers[.]"

167.   In response to an investor question, Defendants also spoke about the competitive landscape of the RTO industry and Aaron's competitive advantages. For example, Woodley falsely claimed that Defendants' "price discipline" and "experience" gave it a leg-up on its competitors, while failing to disclose that AB was engaged in illegal, anti-competitive swap agreements with competitors to stifle competition, stating:

> *20 years of experience and millions of leases puts us in a place where we know when to play that game and when not to. And we try to maintain that discipline with each new opportunity that we see. So broad strokes continues to be very competitive and we continue to be price-disciplined.*

168.   Likewise, in discussing Progressive's competitive advantages in response to a question from an analyst, Robinson failed to disclose that Progressive's growth was rooted in predatory and deceptive practices, instead attributing

Progressive's "great results" to its "better" product and "*providing great service to our customer[s]*."

169.   After the market closed on October 25, 2018, Aaron's filed its 3Q18 10-Q with the SEC, which was signed by Michaels, included SOX certifications signed by Robinson and Michaels, reiterated the SOX Statements and Compliance Statements, and confirmed the Company's previously announced financial results.

170.   In the 3Q18 10-Q, Defendants continued to assuage any investor concerns regarding the FTC's investigation into the adequacy of Progressive's and AB's disclosures by reiterating the FTC Compliance Statements.

171.   The 3Q18 10-Q also falsely attributed Aaron's closure and consolidation of "139 underperforming Company operated stores throughout 2016, 2017, and 2018" to its unilateral decision to "*rationalize its Company-operated Aaron's store base portfolio to better align with marketplace demand*." The 3Q18 10-Q further misleadingly attributed the store closures to "*opportunities for rationalization*" and "*cost-reduction initiatives*[.]"

172.   On news of the Company's unexpected higher operating expenses due, in part, to expenses associated with the CIDs, Aaron's stock price fell 8.7%, or $4.16 per share, to close at $43.89 per share on October 25, 2018, on increased trading volume. Despite this drop in Aaron's stock price following this disclosure, Aaron's

common stock continued to trade at artificially inflated prices as a result of Defendants' continued misstatements and/or omissions.

173.   Analysts were quick to comment on the Company's unexpected earnings miss.  For example, on October 25, 2018, SunTrust issued a report citing a "major miss vs our expectations came on the expense line" and further noted that "expenses were negatively impacted by . . . 3) higher legal costs associated with current FTC inquiry."  On the same day, Jefferies also issued a report noting, "3Q18 trends exhibited . . . strong top-line growth being more than offset by higher op[erating] ex[penses.]"

174.   Defendants' statements on October 25, 2018, as set forth in ¶¶159-171 above, were materially false or misleading or omitted material facts.  Specifically:

(a)   Defendants' statements regarding Aaron's and Progressive's respective financial performances for 3Q18, such as that the Company "achieved solid growth" and that Progressive continued "to drive profitable growth," misrepresented and concealed that Aaron's was using illegal, predatory, and deceptive marketing and lending practices at Progressive, in violation of the FTC Act, to artificially inflate the Company's financial results and to give investors the false impression of continuous growth.  In reality, but for Defendants' illegal practices, Aaron's and Progressive's 3Q18 financial results would have been much

lower.  In addition, and, as partially disclosed on July 26, 2018, Defendants'
unlawful practices were already subjecting the Company to increased government
intervention that, as of October 25, 2018, was beginning to negatively impact the
Company's profitability and financial performance.  Ultimately, as disclosed at the
end of the Class Period, the FTC issued a $175 million judgment against the
Company as penalty for such deceptive practices.  *See* ¶¶67-111, *supra*.

(b)      Defendants' statements concealed that Aaron's was engaging in
illegal, anti-competitive activity at AB related to store closures in violation of the
FTC Act.  For example, Defendants' statements gave investors the false impression
that AB's restructuring plan and consequent closure of underperforming Company-
operated stores or the sale of stores to third parties was the result of the Company's
unilateral decision to "rationalize its Company-operated Aaron's store base portfolio
to better align with marketplace demand[,]" when in truth, these activities were part
of Aaron's anti-competitive reciprocal swap agreements.  *See* ¶¶62-66, 82-111,
*supra*.

(c)      Defendants' statements, including that "[w]e continue to be
encouraged by the improvements we are seeing in the business and the results of
these initiatives," gave investors the false impression that AB would return to
sustainable growth in the long term, while concealing that despite the Company's

numerous initiatives (that may have resulted in short-term buoying of AB's performance), AB's growth was declining and would impact the Company's overall profitability and financial performance in the long term.

(d)    Defendants' statements misrepresented, for example, that the Company was "providing great service to our customer[s]."  Contrary to their statements, Defendants employed illegal practices to lure credit-challenged consumers to enter into rental agreements with Progressive by misrepresenting the total price consumers would pay for such products.  *See* ¶¶62-111, *supra*.

(e)    Defendants failed to disclose that Aaron's bad debt expense increased as a result of Aaron's illegal, predatory, and deceptive marketing and lending practices at Progressive in violation of the FTC Act.

(f)    Defendants' statements misrepresented that Aaron's was operating in compliance with all relevant government regulations, including the FTC Act, and concealed that the Company was engaging in illegal, deceptive, predatory, and anti-competitive conduct in its two largest business segments.

(g)    Defendants' SOX Statements, certified by Robinson and Michaels, were false and misleading because they represented that the Company disclosed all material information to investors, when in fact, it did not.

**F.      Fourth Quarter and Full-Year 2018**

175.    On February 14, 2019, Aaron's issued a Form 8-K, signed by Michaels, that enclosed a press release announcing its financial results for the quarter and year ended December 31, 2018.  As noted above in ¶113, Progressive reported positive results for 4Q18 and FY18.  In contrast to Progressive's profitability, AB reported a mere 2.9% increase in total revenues to $459.7 million, an increase in EBITDA, a 0.5% decline in same store revenues, and a 5% decline in customer count on a same store basis.

176.    The release credited Progressive's 22.4% increase in revenues as one of the "*primary*" drivers of the Company's growth.

177.    On February 14, 2019, Aaron's hosted a conference call with analysts and investors to discuss the Company's 4Q18 and FY18 financial results and 2019 outlook.  During the call, Robinson, Woodley, Lindsay, and Michaels commented on the Company's results and operations.  More specifically, Robinson highlighted Progressive's rapid growth "[o]ver the last several years" noting that Progressive's revenue "*doubled* from $1 billion in 2015 *to $2 billion in 2018 while maintaining consistently strong profitability.*"   He further noted that "Progressive is *well positioned to continue to profitably grow*."

178.   Robinson further assured investors that AB "*made significant progress*

over the past few years on transformational initiatives that we believe will help the

business *get back to sustainable growth*."  He further stated:

> The results we have seen in our business transformation initiatives give
> us the confidence to continue making strategic investments in the
> Aaron's Business. *The investments we intend to make will be centered
> around improving our customer experience,* operating efficiencies,
> *compliance* and employee engagement. *We expect these investments
> will put the Aaron's Business on a path to sustainable long-term growth
> and revenue and earnings.*

179.   Lindsay reiterated that AB's "*initiatives continue to be centered around*

*improving the customer experience, driving demand and lowering our cost to serve*."

Michaels further commented on the Company's initiation of yet another

restructuring program to "further *align*" Aaron's store-based portfolio "*with*

*marketplace demand*."  He credited the Company's closure of "approximately 85

underperforming" Aaron's stores to "*management's strategic review of the existing*

*store portfolio*."

180.   Michaels stated that the Company was again reporting an increase in

operating expenses, by 15%, or $49 million, one-third of which was due to rising

"*bad debt expense* and write-offs at Progressive," with the balance being attributed

to, among other things, "legal fees resulting from our responses to the previously

disclosed FTC CIDs."

181.   After the market closed on February 14, 2019, Aaron's filed its Annual Report on Form 10-K ("2018 10-K") with the SEC, which was signed by Michaels and Robinson, included SOX certifications signed by Michaels and Robinson, reiterated the SOX Statements, and confirmed the Company's previously announced financial results and financial position for the quarter and year ended December 31, 2018.

182.   In the 2018 10-K, Defendants continued to downplay the FTC's investigation into the adequacy of Progressive's and AB's disclosures by repeating the FTC Compliance Statements.

183.   The 2018 10-K also restated the Compliance Statements from the 2017 10-K and assured investors that the Company was adequately disclosing the "terms of [its] lease purchase transaction *as a matter of good business ethics and customer service.*"

184.   Further commenting on the "distinguishing characteristics" of Aaron's sales and lease ownership model, the 2018 10-K once again touted that "*[o]ur agreement terms generally provide a lower cost of ownership to the customer*."  The 2018 10-K also reiterated the Customer Service Statements and the Strategy Statements from the 2017 10-K.

- 79 -

185.   The 2018 10-K also falsely attributed the Company's closure and consolidation of "139 underperforming Company operated stores throughout 2016, 2017, and 2018" and the "announced plans to close and consolidate approximately 85 additional Company-operated stores during 2019" to its unilateral decision to "rationalize its Company-operated Aaron's store base portfolio to better align with marketplace demand" and to "cost-reduction initiatives."

186.   Defendants' statements on February 14, 2019, as set forth in ¶¶176-185 above, were materially false or misleading or omitted material facts.  Specifically:

(a)     Defendants' statements regarding Aaron's and Progressive's respective financial performances for 4Q18 and FY18, such as that Progressive's 22.4% increase in revenues was one of the "primary" drivers of the Company's growth, misrepresented and concealed that Aaron's was using illegal, predatory, and deceptive marketing and lending practices at Progressive, in violation of the FTC Act, to artificially inflate the Company's financial results, and to give investors the false impression of continuous growth.  In reality, but for Defendants' illegal practices, Aaron's and Progressive's 4Q18 and FY18 financial results would have been much lower.  In addition, and, as partially disclosed on July 26, 2018, Defendants' unlawful practices were already subjecting the Company to increased government intervention that, as of October 25, 2018, was beginning to negatively

impact the Company's profitability and financial performance. Ultimately, as disclosed at the end of the Class Period, the FTC issued a $175 million judgment against the Company as penalty for such deceptive practices. *See* ¶¶67-111, *supra*.

(b)     Defendants' statements concealed that Aaron's was engaging in illegal, anti-competitive activity at AB related to store closures in violation of the FTC Act. For example, Defendants' statements gave investors the false impression that AB's restructuring plan and consequent closure of underperforming Company-operated stores or the sale of stores to third parties was the result of the Company's unilateral decision to "rationalize its Company-operated Aaron's store base portfolio to better align with marketplace demand[,]" when in truth, these activities were part of Aaron's anti-competitive reciprocal swap agreements. *See* ¶¶62-66, 82-111, *supra*.

(c)     Defendants' statements, such as that AB "made significant progress over the past few years on transformational initiatives" that will "help the business get back to sustainable growth," gave investors the false impression that AB would return to sustainable growth in the long term, while concealing that despite the Company's numerous initiatives (that may have resulted in short-term buoying of AB's performance), AB's growth was declining, which would impact the Company's overall profitability and financial performance in the long term.

(d)     Defendants failed to disclose that Aaron's bad debt expense increased as a result of Aaron's illegal, predatory, and deceptive marketing and lending practices at Progressive in violation of the FTC Act.

(e)     Defendants' statements misrepresented, for example that the Company "ensure[s] that [its] business model is aligned with [its] customer's needs" and that Aaron's "offer[s] high levels of customer service" and is committed to offering "superior customer service."   Contrary to their statements, Defendants employed illegal practices to deceive credit-challenged consumers to enter into rental agreements with Progressive, and were engaged in unlawful swap agreements that minimized price and quality competition.  *See* ¶¶62-111, *supra*.

(f)     Defendants' statements misrepresented that Aaron's was operating in compliance with all relevant government regulations, including the FTC Act, and concealed that the Company was engaging in illegal, deceptive, predatory, and anti-competitive conduct in its two largest business segments.

(g)     Defendants' SOX Statements, certified by Robinson and Michaels, were false and misleading because they represented that the Company disclosed all material information to investors, when in fact, it did not.

**G.     First Quarter 2019: the Disclosure of a Second CID**

187.   On April 25, 2019, Aaron's issued a Form 8-K, signed by Michaels, that enclosed a press release announcing 1Q19 results.  As noted above in ¶113, both Aaron's and Progressive reported positive financial results.   AB also reported positive financial results including revenue increase of 4.6% to $480.1 million, same store sales revenue increase of a mere 0.7% for 1Q19, and a 7% increase in adjusted EBITDA, compared to prior year periods.

188.   In the release, Robinson noted the Company's "*achieving over $1 billion in quarterly revenues for the first time and 33% growth in non-GAAP earnings per share[.]*"

189.   On April 25, 2019, Aaron's hosted a conference call with analysts and investors to discuss the Company's 1Q19 financial results and 2019 outlook.  During the call, Robinson, Woodley, Lindsay, and Michaels discussed the Company's results.  For example, Robinson primarily attributed the Company's $1 billion in revenue for the quarter to the "*continued strong invoice growth at Progressive* [and] *improvements in the [AB] same-store revenue trends*[.]"

190.   Woodley cited Progressive's "record" increases in volume for active door growth, to "*more deals, more transactions, more leases per door, . . . and just*

*execution going extremely well* on the part of our partners and our teams working with those partners out in the field."

191.   Discussing Progressive's competitive advantages, Woodley failed to disclose that Progressive's growth was based on predatory and deceptive practices in violation of the FTC Act, instead highlighting Progressive's "*prioritization and focus on compliance*" and its "*relentless focus on the customer experience*[,]" which allows Defendants to "have a great win rate" in this "very competitive market." Woodley also touted the "significant effort the team has made toward providing the *best possible experience for our customers*."

192.   Lindsay continued emphasizing AB's transformation's initiative's "focus" on "*driving more new customer traffic*" and how the Company's new platforms "*are poising us for more growth there*."

193.   Robinson further noted that AB's "lease portfolio was somewhat smaller than planned as we enter the second quarter," but gave investors the false impression that such declines resulted from matters outside of Aaron's control such as "the government shutdown."

194.   Michaels also represented that "[d]uring the first quarter, the Company *closed 84 Aaron's store locations* resulting from *management's strategic review of the existing store portfolio*."

195.   Further commenting on same-store sales at AB, Lindsay assured the market that any "deficit at the end of the quarter *will be made up for in the traction we get going with a lot of our business transformation initiatives*[.]"

196.   On the same day, April 25, 2019, Aaron's filed its 1Q19 10-Q with the SEC, which was signed by Michaels, and included SOX certifications signed by Robinson and Michaels.   The 1Q19 10-Q reiterated the SOX Statements and Compliance Statements, and confirmed the Company's previously announced financial results and financial position.

197.   The 1Q19 10-Q continued to appease investor concerns regarding the FTC investigation into Progressive's and AB's disclosures by reiterating the FTC Compliance Statements.

198.   The 1Q19 10-Q also revealed that in April 2019, the Company received another "unrelated CID from the FTC focused on certain transactions involving the purchase and sale of customer lease agreements, and whether such transactions violated the FTC Act."   Despite having engaged in illegal, anti-competitive swap agreements since 2015, the 1Q19 10-Q stated that Defendants "believe such transactions were *in compliance* with the FTC Act," that "[t]he Company is fully cooperating with the FTC in responding to this inquiry" and provided the calculated

warning that "this inquiry *could* lead to an enforcement action and/or a consent order, and substantial costs," (collectively, "AB FTC Compliance Statements").

199.   The 1Q19 10-Q also commented that in response to "increased competition," Defendants "are executing a strategic plan that focuses on" "*[i]nvest[ing] and innovat[ing] to provide a superior customer experience* while lowering our costs to serve," which they "believe positions us for success over the long-term."

200.   As to AB, the 1Q19 10-Q also noted that "*[a]ccelerat[ing] our vision of business transformation in [AB] at a larger scale*" would position the Company for "success over the long-term."

201.   The 1Q19 10-Q further commented that "under a new restructuring program announced in January 2019[,]" "the Company *closed and consolidated 84 Company-operated stores* during the first three months of 2019" "*to further align its Company-operated Aaron's store base portfolio with marketplace demand*."

202.   Analysts reacted positively, noting Progressive's "strength" and AB's "recovery":

(a)     On April 25, 2019, Jefferies issued a report commenting that the strong 1Q19 results were driven by the "robust Progressive growth" and a "recovery in the Aaron's business";

- 86 -

(b)     On April 29, 2019, Janney issued a report noting that "[w]ith the first positive same store comp in the Aaron's Business in six years, it's clear that management's business transformation initiatives are having an impact"; and

(c)     On May 17, 2019, Zacks Equity Research ("Zacks") issued a report, commenting that "Aaron's outperformed the industry in a year driven by strength in the Progressive business" and "is also witnessing positive trends in the Aaron's business for the last few quarters as the transformation initiatives bode well."  The report continued, "This business is likely to experience *sustainable growth* through investments to improve customer experience, operating efficiencies and *compliance*."

203.   As a result of Defendants' efforts to downplay the FTC's investigation into AB's customer lease agreements, analysts did not appear "overly concerned." For example, on April 25, 2019, SunTrust issued a report commenting that "[t]he company believes its transactions are in compliance and is fully cooperating with the inquiry."  SunTrust noted, "We believe the company is taking a conservative approach in disclosing all FTC inquiries and we are not overly concerned with this disclosure."

204.   Defendants' statements on April 25, 2019, as set forth above in ¶¶188-201 above, were materially false or misleading or omitted material facts. Specifically:

(a)   Defendants' statements regarding Aaron's and Progressive's respective financial performances for 1Q19, such as that the Company's $1 billion in revenue was driven by the "continued strong invoice growth at Progressive," misrepresented and concealed that Aaron's was using illegal, predatory, and deceptive marketing and lending practices at Progressive, in violation of the FTC Act, to artificially inflate the Company's financial results and to give investors the false impression of continuous growth.  In reality, but for Defendants' illegal practices, Aaron's and Progressive's 1Q19 financial results would have been much lower.  In addition, Defendants' unlawful practices at Progressive subjected the Company to increased government intervention that would, and did, negatively impact the Company's profitability and financial performance, including, as ultimately disclosed at the end of the Class Period, a $175 million monetary judgment by the FTC as penalty for such deceptive practices.  *See* ¶¶67-111, *supra*.

(b)   Defendants' statements concealed that Aaron's was engaging in illegal, anti-competitive activity at AB related to store closures in violation of the FTC Act.  For example, Defendants' statements gave investors the false impression

that AB's restructuring plan and consequent closure of underperforming Company-operated stores or the sale of stores to third parties was the result of the Company's unilateral decision "to further align its Company-operated Aaron's store base portfolio with marketplace demand," when in truth, these activities were part of Aaron's illicit anti-competitive reciprocal swap agreements. *See* ¶¶62-66, 82-111, *supra*.

(c)     Defendants' statements, such as that "[a]ccelerat[ing] our vision of business transformation in the Aaron's Business at a larger scale" would position the Company for "success over the long-term" and that any "deficit at the end of the quarter will be made up for by, among other things, in the traction we get going with a lot of our business transformation initiatives"[,] gave investors the false impression that AB would return to sustainable growth in the long term, while concealing that despite the Company's numerous initiatives (that may have resulted in short-term buoying of AB's performance), AB's growth was declining, which would impact the Company's overall profitability and financial performance in the long term.

(d)     Defendants' statements misrepresented, for example, that the Company "relentless[ly] focus[es] on the customer experience" and is committed to providing "the best possible experience for our customers" and "a superior customer experience."  Contrary to their statements, Defendants employed illegal practices to

deceive credit-challenged consumers to enter into rental agreements with Progressive, and were engaged in unlawful swap agreements that minimized price and quality competition. *See* ¶¶62-111, *supra*.

(e)    Defendants' statements misrepresented that Aaron's was operating in compliance with all relevant government regulations, including the FTC Act, and concealed that the Company was engaging in illegal, deceptive, predatory, and anti-competitive conduct in its two largest business segments.

(f)    Defendants' SOX Statements, certified by Robinson and Michaels, were false and misleading because they represented that the Company disclosed all material information to investors, when in fact, it did not.

### H.    Stifel Cross Sector Insight Conference

205.   On June 12, 2019, Michaels gave a presentation at the Stifel Cross Sector Insight Conference in Boston, Massachusetts.  Michaels emphasized that Progressive has "been an *outstanding acquisition and a great growth vehicle* for the Company."

206.   Michaels touted the "exciting" initiatives to "*reinvigorat[e]*" AB, including "*[w]e'll close more stores* . . .  [t]he goal is to have – serve the same or more customers out of *less stores* with a truly omnichannel approach."  Michaels

also stated, "we're not abandoning markets[,]" but "[w]e're closing stores, we're *optimizing and rationalizing our store footprint, but we want to control markets*."

207.  When asked about the FTC CIDs, Michaels continued to diminish investor concerns by referencing the Company's cooperation with the FTC and long-standing focus on "compliance" stating:

> Yes, we've got two FTC CIDs that we've disclosed. . . .  *We've complied or are complying with data requests and answering questions . . . so we are complying with that.  We have a very robust government relations department and . . . we feel really good about what we do and how we treat the customer . . . .  We take compliance very seriously. We think it's an actual competitive advantage of ours with Progressive and the Aaron's business.  And over the last five years we've invested a ton in compliance. . . .  And so, it's on the top of our minds* and these are – we are a regulated environment – or a regulated industry, so sometimes you have to deal with these things.

208.  Defendants' statements on June 12, 2019, as set forth above in ¶¶205-207 above, were materially false or misleading or omitted material facts. Specifically:

(a)     Defendants' statements touting Progressive as an "outstanding acquisition and a great growth vehicle for the Company" misrepresented and concealed that Aaron's was using illegal, predatory and deceptive marketing and lending practices at Progressive, in violation of the FTC Act, to artificially inflate the Company's financial results and to give investors the false impression of continuous growth.  In reality, but for Defendants' illegal practices, Aaron's and

Progressive's financial results would have been much lower.   In addition, Defendants' unlawful practices at Progressive subjected the Company to increased government intervention that would, and did, negatively impact the Company's profitability and financial performance, including, as ultimately disclosed at the end of the Class Period, a $175 million monetary judgment by the FTC as penalty for such deceptive practices.  *See* ¶¶67-111, *supra*.

(b)     Defendants' statements concealed that Aaron's was engaging in illegal, anti-competitive activity at AB related to store closures in violation of the FTC Act.  For example, Defendants' statements gave investors the false impression that AB's restructuring plan and consequent closure of underperforming Company-operated stores or the sale of stores to third parties was the result of the Company's unilateral decision to "optimiz[e] and rationaliz[e] our store footprint" when in truth, these activities were part of Aaron's illegal, anti-competitive reciprocal swap agreements.  *See* ¶¶62-66, 82-111, *supra*.

(c)     Defendants' statements misrepresented that Aaron's was operating in compliance with all relevant government regulations, including the FTC Act, and concealed that the Company was engaging in illegal, deceptive, predatory, and anti-competitive conduct in its two largest business segments.

## I.       Second Quarter 2019

209.    On July 25, 2019, Aaron's issued a Form 8-K, signed by Michaels, that enclosed a press release announcing 2Q19 results.  As noted above in ¶113, both Aaron's and Progressive reported positive financial results.  In contrast, AB reported mixed financial results, including revenue increase of only 1.6% to $442.2 million, same store sales revenues increases of a mere 0.1%, and a 6.4% decrease in adjusted EBITDA, compared to prior years periods.

210.    In the release, the Company announced updated 2019 guidance, including higher Company adjusted EBITDA (from $415-442 million to $430-452 million) and diluted non-GAAP EPS (from $3.65-$3.85 per share to $3.85-$4.00 per share).  Robinson commented on the Company's "strong second quarter results" and noted that "Progressive performed at a high level, *continuing its trend of growing revenues and profits through increasing invoice volume*."

211.    On July 25, 2019, Aaron's hosted a conference call with analysts and investors to discuss the Company's 2Q19 financial results and updated 2019 outlook. During the call, Robinson, Woodley, Lindsay, and Michaels spoke positively about the quarter.

212.    Further touting Progressive's growth, Michaels stated that the Company was raising EPS guidance "primarily reflecting *the strength* in our

Progressive segment."  Woodley commented that Defendants are "pleased with the significant effort the team has made toward providing *the best possible experience for credit-challenged consumers*."

213.  Lindsay emphasized to the market that AB was "rebound[ing]."  He noted, "What I'm most excited about is that *we rebounded* on our key leading indicator of recurring revenue written into the portfolio, which was up this quarter and *continues that streak* from last year that we were seeing."

214.  In discussing the Company's reaffirming its prior guidance of AB's 2019 same store revenues of 0% to 2%, Lindsay stated, "*What's driving a lot of that right now is this reinvestment . . . and marketing and sales training and incentive programs, along with these merchandising strategies that continue to get traction, and of course we talked about e-com*, . . . 67% and the revenue we put into the portfolio year-over-year."  He continued, "[s]o those are all *helping us with comps considerably*."

215.  Michaels again attributed the closure of approximately 70 underperforming Aaron's store locations to "*management's strategic review of the existing store portfolio*."

216.  Lindsay further noted that while "[o]ur first half of 2019 *store closures are a continuation of our market repositioning strategy*, . . . we don't expect any

large scale closures between now and the end of the year."  Lindsay, however, failed to disclose that the Company's decision to cease store closures was in direct response to the FTC CID related to its illicit swap agreements.

217.   On July 25, 2019, Aaron's filed its 2Q19 Form 10-Q ("2Q19 10-Q") with the SEC, which was signed by Michaels and included SOX certifications signed by Robinson and Michaels.  The 2Q19 10-Q reiterated the SOX Statements and Compliance Statements and confirmed the Company's previously announced financial results and financial position.

218.   The 2Q19 10-Q continued to downplay any negative impact of the FTC inquires of both Progressive and AB.  Again, with regard to the Progressive FTC CID, Aaron's repeated the FTC Compliance Statements.   Similarly, Aaron's repeated the AB FTC Compliance Statements.

219.   The 2Q19 10-Q contained the same representation as the 1Q19 10-Q concerning Defendants' "focus on" "*[i]nvest[ing] and innovat[ing] to provide a superior customer experience*."

220.   The 2Q19 10-Q also noted that "*[a]ccelerat[ing] our vision of business transformation in the Aaron's Business at a larger scale*" would position the Company for "*success over the long-term*."

- 95 -

221.   The 2Q19 10-Q further commented that under the new restructuring program announced in January 2019 "*to further optimize its Company-operated Aaron's store base portfolio*" and "*better align with marketplace demand*," "[d]uring the second quarter of 2019, the Company identified an *additional 70 stores to be closed*, consolidated, or relocated, with the majority of the stores closing during the three months ended June 30, 2019."

222.   Analysts were quick to comment on the Company's 2Q19 results and Aaron's "strength."  For example, on July 25, 2019, SunTrust issued a report stating, "We continue to believe in the underlying strength of the business and would not be surprised to see the company come in at the upper end of its EPS guidance for the year."

223.   Defendants' statements on July 25, 2019, as set forth above in ¶¶210-221 above, were materially false or misleading or omitted material facts. Specifically:

(a)   Defendants' statements regarding Aaron's and Progressive's respective financial performances for 2Q19, such as that the Company experienced a "strong second quarter results" and that "Progressive performed at a high level, continuing its trend of growing revenues and profits through increasing invoice volume[,]" misrepresented and concealed that Aaron's was using illegal, predatory,

- 96 -

and deceptive marketing and lending practices at Progressive, in violation of the FTC Act, to artificially inflate the Company's financial results and to give investors the false impression of continuous growth.  In reality, but for Defendants' illegal practices, Aaron's and Progressive's financial results would have been much lower. In addition, Defendants' unlawful practices at Progressive subjected the Company to increased government intervention that would, and did, negatively impact the Company's profitability and financial performance, including, as ultimately disclosed at the end of the Class Period, a $175 million monetary judgment by the FTC as penalty for such deceptive practices.  *See* ¶¶67-111, *supra*.

(b)     Defendants' statements concealed that Aaron's was engaging in illegal, anti-competitive activity at AB related to store closures in violation of the FTC Act.  For example, Defendants' statements gave investors the false impression that AB's restructuring plan and consequent closure of underperforming Company-operated stores or the sale of stores to third parties was the result of the Company's unilateral decision "to further optimize its Company-operated Aaron's store base portfolio" and "better align with marketplace demand," when in truth, these activities were part of Aaron's illicit anti-competitive reciprocal swap agreements. *See* ¶¶62-66, 82-111, *supra*.

(c)     Defendants' statements, such as that AB had "rebounded" and that AB's various initiatives were positioning it for "success over the long-term" gave investors the false impression that AB would return to sustainable growth in the long term, while concealing that despite the Company's numerous initiatives (that may have resulted in short-term buoying of AB's performance), AB's growth was declining, which would negatively impact the Company's overall profitability and financial performance in the long term.

(d)     Defendants' statements misrepresented for example, that the Company is committed to offering "a superior customer experience."  Contrary to their statements, Defendants employed illegal practices to deceive credit-challenged consumers to enter into rental agreements with Progressive, and were engaged in unlawful swap agreements that minimized price and quality competition.  *See* ¶¶62-111, *supra*.

(e)     Defendants' statements misrepresented that Aaron's was operating in compliance with all relevant government regulations, including the FTC Act, and concealed that the Company was engaging in illegal, deceptive, predatory, and anti-competitive conduct in its two largest business segments.

(f)    Defendants' SOX Statements, certified by Robinson and Michaels, were false and misleading because they represented that the Company disclosed all material information to investors, when in fact, it did not.

**J.    Third Quarter 2019: Reduced 2019 Outlook and AB's Consent Decree with the FTC**

224.   On November 4, 2019, Aaron's issued a Form 8-K, signed by Michaels, that enclosed a press release announcing 3Q19 results.  As noted above in ¶113, both Aaron's and Progressive reported positive financial results.  In contrast, AB reported negative financial results, including revenue decrease of 3% to $426.3 million, same store sales revenues decline of 2.9%, and a decrease in EBITDA of 7%, compared to prior years periods.

225.   In the release, Robinson stated, "While the third quarter was challenging, both *Progressive and the Aaron's Business accomplished key objectives, which we believe significantly improve our long-term prospects for growth*."  He represented that "[g]iven the *positive momentum* we are seeing *in both businesses*, we remain optimistic that we can continue to deliver long-term earnings growth[.]"

226.   On November 4, 2019, Aaron's filed its 3Q19 Form 10-Q ("3Q19 10-Q") with the SEC, which was signed by Michaels and included SOX certifications signed by Robinson and Michaels.  The 3Q19 10-Q reiterated the SOX Statements

and confirmed the Company's previously announced financial results and financial position.

227.   The 3Q19 10-Q revealed numerous updates about the July 2018 FTC CIDs.  The 3Q19 10-Q revealed for the first time that the FTC was commencing an enforcement action against Progressive, stating:

> In October 2019, the staff of the FTC informed us that it had recommended to the FTC that it *commence an enforcement action against Progressive Leasing* for alleged violations of the FTC Act and the Restore Online Shoppers' Confidence Act ("ROSCA") with respect to Progressive Leasing's marketing and sales of its lease-to-own products.

228.   The 3Q19 10-Q further noted that the enforcement action could "possibl[y]" result in a monetary penalty and changes to Progressive's business practices, stating, "Notwithstanding this recommendation, the staff of the FTC continues to engage with us on terms for a possible settlement with the FTC, including with respect to the scope of possible monetary relief as well as various changes in the manner in which Progressive Leasing markets its lease-to-own products."

229.   Tempering such negative news, the 3Q19 10-Q continued to falsely assert, "We believe that we conduct our Progressive Leasing business *in compliance* with the FTC Act and ROSCA and are prepared to vigorously defend our position."

It also continued downplaying the negative repercussions of the FTC inquiries, by failing to disclose that such consequences were imminent, stating:

> Any settlement of this matter, or defense against any enforcement action, *could* involve substantial costs to the Company, including legal fees, fines, penalties, and remediation expenses, as well as changes in the manner in which Progressive Leasing markets its lease-to-own products, which *could* have a material adverse impact on our results of operations, cash flows or financial position.

230.   The 3Q19 10-Q further stated, "While the Company believes it is probable that it will incur a loss from this matter, in view of the complexity and ongoing nature of the matter, *we are unable to estimate the reasonably possible loss or range of loss that we may incur* to settle this matter or defend against any enforcement action potentially brought by the FTC."

231.   Additionally, the 3Q19 10-Q also revealed for the first time that Aaron's had reached an agreement with the FTC regarding the April 2019 CID, stating, "in August 2019, the Company reached a *proposed consent agreement with FTC* staff that prohibits such contingent purchases and sales in the future" regarding AB and that "[t]he Company is awaiting final approval of the consent agreement by the FTC."

232.   Defendants reiterated that "we believe such transactions were *in compliance* with the FTC Act[.]"

- 101 -

233.   The 3Q19 10-Q also contained the same representation as the 1Q19 10-Q and 2Q19 10-Q concerning Defendants' focus on" "*[i]nvest[ing] and innovat[ing] to provide a superior customer experience*."

234.   The 3Q19 10-Q also noted that "*[a]ccelerat[ing] our vision of business transformation in the Aaron's Business at a larger scale*" would position the Company for "success over the long-term."

235.   On November 4, 2019, Aaron's hosted a conference call with analysts and investors to discuss the Company's 3Q19 financial results and 2019 outlook. During the call, Robinson, Woodley, Lindsay, and Michaels spoke positively about the quarter.  During the call, Robinson commented on consolidated results, stating that "[w]hile the third quarter was challenging, both Progressive and the Aaron's Business accomplished key objectives, which we believe *significantly improve our long-term prospects for growth.*"

236.   Michaels stated that Defendants "*narrowed our outlook for 2019 primarily in response to the shortfall in the third quarter*, resulting in a revised 2019 non-GAAP EPS outlook of $3.75 to $3.85 compared to our previous outlook of $3.85 to $4."

237.   Regarding Progressive, Woodley stated that the increase in revenue growth "was generated by the year-over-year increase in the lease portfolio resulting

from consistently *strong growth in invoice volume* over the last several quarters."

Woodley also represented that the "significant increase in invoice per active door

was due to *strong year-over-year increases in lease transactions* per location in

nearly every vertical, contributing *to an all-time high level of productivity* across the

portfolio."

238.   Woodley noted he was "pleased with the significant ongoing effort the

team is making toward providing the *best possible experience for credit-challenged

consumers*."

239.   Lindsay assured the market that despite a challenging quarter at AB,

Defendants were confident in the segment's long-term profitability, stating, "Long

term, I see . . . *sustained delivery growth in the [AB] business*, which is really

exciting."

240.   Continuing the discussion on AB, Lindsay credited the segment's

increased "recurring revenue per store" to the "*success*" of the various "*initiatives*"

and falsely attributed the 2.9% decline in same-store revenues growth and lowered

same store revenues outlook to "collections performance," as opposed to AB's

unsustainability.

241.   In response to an analyst's question on AB asking "how much of the

[AB] misstep this quarter is maybe execution of some of the initiatives you have

rolling out versus the end market being a bit more challenging today," Lindsay falsely assured investors that any negative impact on AB was the result of the Company's "internal" collections issues, and nothing related to the external market forces, stating:

> *So we feel good about the outlook*. . . .  It's reflective of getting back in balance through the end of the year and putting through some cost savings that we've put in as well.  So we feel like this all on us.  *The good news is we've really broken through and found a way to convert the traffic that's coming into our stores and found more productive ways to go acquire the customer*.  The bad news is it had a short-term impact on collections, which we are reacting to right now.  *So in terms of external impact, I would say there's nothing there.  It's all really internal*.

242.  Commenting on the decrease in customer count at AB, Lindsay stated, "it's moving in the right direction" and that he "fully believe[s] that when we get our comps back in line and *we begin to build on the portfolio* and really *leverage everything we've learned from our sales initiatives*, that *has really good outlook for the future as we go forward*."

243.  On news of Aaron's disclosures regarding the FTC CIDs – notably that the FTC had commenced an enforcement action against Progressive – and the Company's lowered 2019 guidance, Aaron's stock price fell 11.38%, or $8.41 per share, to close at $65.46 per share on November 5, 2019, on increased trading volume.  Despite this drop in Aaron's stock price following these disclosures,

Aaron's common stock continued to trade at artificially inflated prices as a result of Defendants' continued misstatements and/or omissions.

244.   Analysts were quick to comment on Aaron's FTC disclosures and the Company's lowered guidance.

(a)   On November 5, 2019, Stephens Inc. ("Stephens") issued a report stating, "While the explanation for Aaron's Business weakness makes sense . . . this segment has nevertheless been a significant driver to earnings volatility for several years, and distracting from the bull case at the other Progressive segment."

(b)   On November 14, 2019, Zacks issued a report noting that the "company reported lower-than-expected results in third-quarter 2019."  However, the report stated that "[s]trength in the Progressive segment on robust invoice volume and solid customer base is aiding top-line growth" and AB's "transformational initiatives to bring Aaron's Business back to sustainable growth are impressive."

(c)   On November 18, 2019, Stephens issued a report noting that "[w]hile some investors took away that the investigation may jeopardize Progressive's ability to sell at third-party retailers, our take is that an adjustment to marketing/sales practices are all that's required."

245.   Defendants' statements on November 4, 2019, as set forth above in ¶¶225-242, were materially false or misleading or omitted material facts. Specifically:

(a)   Defendants' statements regarding Aaron's and Progressive's respective financial performances for 3Q19, such as that Progressive "accomplished key objectives," which "significantly improve our long-term prospects for growth," misrepresented and concealed that Aaron's was using illegal, predatory and deceptive marketing and lending practices at Progressive, in violation of the FTC Act, to artificially inflate the Company's financial results and to give investors the false impression of continuous growth.   In reality, but for Defendants' illegal practices, Aaron's and Progressive's financial results would have been much lower. In addition, Defendants' unlawful practices at Progressive subjected the Company to increased government intervention that would, and did, negatively impact the Company's profitability and financial performance, including, as ultimately disclosed at the end of the Class Period, a $175 million monetary judgment by the FTC as penalty for such deceptive practices.  *See* ¶¶67-111, *supra*.

(b)   Defendants' statements, such as that in the "[l]ong term," they see a "sustained delivery growth in the [AB] business" and that they are "[a]ccelerat[ing] our vision of business transformation in the Aaron's Business at a

- 106 -

larger scale[,]" gave investors the false impression that AB would return to sustainable growth in the long term, while concealing that despite the Company's numerous initiatives (that may have resulted in short-term buoying of AB's performance), AB's growth was declining, which would impact the Company's overall profitability and financial performance in the long term. *See* ¶¶62-66, 82-111, *supra*.

(c)     Defendants' statements misrepresented for example, that the Company is committed to offering "a superior customer experience" and "the best possible experience for credit-challenged consumers." Contrary to their statements, Defendants employed illegal practices to deceive credit-challenged consumers to enter into rental agreements with Progressive, and were engaged in unlawful swap agreements that minimized price and quality competition. *See* ¶¶62-111, *supra*.

(d)     Defendants' statements misrepresented that Aaron's was operating in compliance with all relevant government regulations, including the FTC Act, and concealed that the Company was engaging in illegal, deceptive, predatory, and anti-competitive conduct in its two largest business segments.

(e)     Defendants' SOX Statements, certified by Robinson and Michaels, were false and misleading because they represented that the Company disclosed all material information to investors, when in fact, it did not.

### K.     The Truth Emerges

246.    Additional truth about the negative financial impact of Aaron's illicit practices and AB's inability to return to sustainable growth was revealed to investors before the market opened on February 20, 2020.  On that day, Aaron's shocked the market by announcing that despite 18 months of downplaying the July 2018 CID, Progressive "reached an agreement in principle" with the FTC whereby "Progressive will make a payment of $175 million" and "enhance certain compliance-related activities, including monitoring, disclosure and reporting requirements."   Aaron's also reported dismal AB 4Q19 and FY19 results and lower-than-anticipated 2020 guidance.

247.    The $175 million settlement, which resulted in "a $179 million pre-tax charge," had a direct and negative impact on the Company's and Progressive's 4Q19 financial performance, including:

- a Company net earnings decrease of $168.8 million, or 273.6%, *to a net loss of $107.1 million for the quarter* from net earnings of $61.7 million in the prior year period;

- a Company EPS decrease of $2.49 per share, or 279.8%, *to losses per share of $1.60* for the quarter, from EPS of $0.89 in the prior year period;

- Progressive *losses before income taxes of $111.6 million*; and

- Progressive's EBITDA as a percentage of revenues of 13.8%, a decrease of 50 basis points compared to 4Q18.

248.   The release further revealed that despite the Company's assurances to the market regarding AB's return to sustainable growth, AB reported poor 4Q19 financial performance, including:

- *a 5.4% decrease in total revenues* to $435 million, from $459.7 million in the prior year period;

- declining customer count, including a *4.8% decrease* on a same-store basis, and *a 8.9% decrease* on a Company-operated stores basis, compared with 4Q18; and

- lease revenue and fees *decreased 1.2%* compared with 4Q18.

249.   Contrary to the Company's previous statements touting the benefits of AB's restructuring initiatives, Defendants attributed AB's declining revenues to, among other things, "the net reduction of 145 stores during 2019."

250.   Aaron's also issued its 2020 Company outlook, below analyst expectations, with revenues expected to grow only 5% to 9% year-over-year, EPS expected to remain flat year-over-year, EBITDA expected to grow only 2.1% at the midpoint, margin compression at Progressive with adjusted EBITDA expected below the 25% growth reported in 2019, AB's revenues implying a 10% decline, AB's adjusted EBITDA implying a 20% year-over-year decline, and AB's same store sales performance expected to decline to negative 2% to 4%.

251.   On February 20, 2020, Aaron's held an investor call with analysts to discuss the FTC settlement and disappointing financial results and outlook.  During

the call, Woodley admitted that the Company's disclosure efforts were sub-par, requiring Progressive to undertake significant compliance reforms as a result of the FTC settlement.  For example, in response to a question regarding "any changes to the economics of the Progressive transaction" resulting from the FTC settlement, Woodley acknowledged that "a lot of people" in Progressive's product and tech department are "working on enhancing the application process . . . trying to get more information directly into the hands of customers as possible" to "facilitate a frictionless process both online and at the point of sale."  Woodley further explained:

> A big part of that is innovating new ways to continue to provide a fully transparent experience for our customers, presenting disclosures to them throughout the process.  And we spend a lot of time on innovation there.  We expect to continue to spend a lot of time on that.  We think it'll result in a very seamless, strong experience for our customers[.]

252.   Woodley also revealed that Progressive had to invest $15 million in 2020 "to support enhanced compliance initiatives related to our tentative agreement with the FTC" and "further enhance the customer experience and strengthen Progressive's competitive position."

253.   Discussing AB's poor performance in 4Q19, Lindsay further disclosed that in addition to declines in revenue and same store metrics, "[r]ecurring revenue written into the portfolio declined 3.3%" in 4Q19.  Against the Company's positive statements touting AB's return to sustainable growth, Lindsay stated that AB

"entered 2020 with a lower portfolio balance than 2019" and "[a]s we look to our 2020 outlook, we expect the business to be challenged by the lower portfolio size[.]"

254.   Commenting on the consolidated 2020 outlook, Michaels revealed that despite years of Progressive's continuous growth (previously rooted in its now banned illicit practices), the Company now "expect[ed] lower gross margin, and therefore, lower adjusted EBITDA margin in the first half of 2020."  He also revealed that "[d]ue to the higher buyout activity at Progressive and lower year-over-year results in [AB], first quarter adjusted EBITDA and non-GAAP EPS is expected to be the lowest quarter of the year."

255.   Woodley discussed Progressive's 2020 outlook, and noted that Progressive's "EBITDA margin in 2020 is expected to be below 2019[.]"

256.   When asked specifically about why AB was projecting negative 2% to 4% of same store sales performance for 2020, as opposed to prior years of increases or flat same store sales, Lindsay blamed AB's lower 2019 portfolio size and a declining consumer electronics business.  This answer did not suffice, and analysts continued to dig deeper into the significant decline in AB's 4Q19 and 2020 profitability.

257.   An analyst at Raymond James & Associates, Inc. commented that consumer electronics had been "weak all year" and that as a result, the market was

*still* "*struggling* to understand" what changed since the end of 3Q19 to have "core" profitability go from "flattish to slightly down . . . all of a sudden" and "down $35-plus million in EBITDA for next year[.]"  Lindsay again blamed, among other things, lower loan portfolio beginning balances for "put[ting] pressure on the overall earnings."

258.  At odds with Defendants' prior statements touting the success of the Company's initiatives to poise AB for profitability, Robinson admitted it had been "tough" to manage yet another "transformation" in the Company's "core" to maintain "near-term profitability" and that going forward, the Company would be taking a more "prudent approach" to how much investment they would be willing to make in the segment.

259.  On February 20, 2020, Aaron's filed its Annual Report on Form 10-K with the SEC for the quarter and year ended December 31, 2019 ("2019 10-K"), which further discussed the FTC settlement and revealed that Progressive and the FTC "agreed in principle on the terms of a related consent order" a month prior to the negative news, in January 2020.

260.  While both Aaron's and Progressive reported positive financial performance for FY19, for AB, "revenue growth was nearly flat," with the segment

reporting a minor revenue decline from $1.792 billion in 2018 to $1.784 billion for FY19.

261.  On this news, the price of Aaron's stock tumbled, falling 19.06%, or $10.70 per share, from a closing price of $56.15 per share on February 19, 2020, to $45.45 per share on February 20, 2020, on unusually heavy trading volume.

262.  Analysts were quick to comment on this news.  For example:

(a)  On February 20, 2020, Janney issued a report stating that "the company's new 2020 guidance came in well short of expectations" "illustrat[ing] a weak core segment [*i.e.*, AB]" as AB "continues to struggle, which is expected to bleed into 2020."  With regard to Progressive, the report stated that on a GAAP basis, Aaron's "lost $1.60 per share in 4Q:19," in large part due to the "$175 million accrual to settle an FTC investigation."

(b)  SunTrust also issued a report, noting that "[t]he biggest surprise out of the initial 2020 guidance was the expectation for total EBITDA to grow +2.1% at the midpoint vs. our prior estimate of +9.9% growth" which could be "attributed" to AB's "~$30M-$40M YoY decline in EBITDA[.]"  The analyst further commented that "the company could have done a better job communicating the issues with the core business[.]"

(c)     Also, on February 20, 2020, Stephens commented that "[t]he weak guide is centered on slower revenue growth than we anticipated.  As Stephens applicably noted, "We do wonder, however, if there were incremental business changes required by the settlement that is driving the lower revenue guide."

(d)     On February 21, 2020, Jefferies issued a report, noting that "[g]uidance was 12% below our forecast given Progressive EBITDA margin compression and ongoing underperformance at the Aaron's segment."  The analyst noted that "the majority of the variance [in the 2020 guidance] is from underperformance in the Aaron's segment."  As to Progressive, the analyst stated that the guidance "reflects YoY EBITDA margin compression (~60 bps)" resulting from, among other things, "compliance costs related to the FTC CID resolution[.]"

263.  All told, Aaron's stock fell *nearly 42%* from its Class Period high of $78.14 per share on October 29, 2019, to its closing price of $45.45 per share on February 20, 2020.  As a result of Defendants' wrongful acts and omissions and the precipitous decline in the market value of Aaron's common stock as the artificial inflation was removed, Plaintiff and other Class members suffered significant losses and damages.

## VI.   POST-CLASS PERIOD REVELATIONS

264.   On February 25, 2020, Aaron's filed a Form 8-K with the SEC, attaching as an exhibit a copy of the February 21, 2020 AB Consent Decree requiring Aaron's "to cease and desist from engaging in such anticompetitive practices" and a February 21, 2020 press release announcing Aaron's approval of the decree.   In the Decision and Order accompanying the AB Consent Decree, the FTC stated it "had reason to believe that [Aaron's] has violated" Section 5 of the Federal Trade Commission Act, as amended, 15 U.S.C. §45; prohibited Aaron's from directly or indirectly entering into Reciprocal Purchase Agreements[9] with any third party; and required Aaron's to submit annual and additional compliance reports to the FTC upon request.   *See* Ex. A at 7, 9.

265.   On April 13, 2020 and May 5, 2020, Aaron's issued a joint proxy statement/prospectus announcing that based on the recommendation of its Board of Directors (including Robinson), it would request approval of "a proposal to implement a holding company structure for Aaron's" at the Company's 2020 Annual

---

[9]   "Reciprocal Purchase Agreement" means a contingent agreement or series of contingent agreements through which Aaron's or an Aaron's franchisee agrees to close an RTO retail center and sell its consumer rental contracts to a competitor or its franchisee, and that competitor or its franchisee agrees to close a different RTO retail center and sell its consumer rental contracts to Aaron's or an Aaron's franchisee.

Meeting of Shareholders.  The joint proxy statement noted that implementing a holding company structure for Aaron's "could facilitate future corporate actions and provide us with greater operational and financing flexibility for the Progressive . . . and [AB] segments."

266.   Analysts had positive reactions to Aaron's holding company formation. For example, on April 14, 2020, an analyst for Stephens noted that "[t]he new holdco structure discussed . . . is a positive" and "it also makes it more difficult for issues in one segment to legally infect the other."  On the same day, an analyst for Jefferies stated that "the Holdco formation would effectively silo the three segments, enhancing the company's financial flexibility from both an acquisition and/or divestiture standpoint" and that "[g]iven the varying performances of the three segments, we consider this an important development/alternative and believe the Holdco structure would ease the process of a potential separation of the businesses via a spin, divestiture, or exchange."

267.   On April 24, 2020, Aaron's filed a Form 8-K with the SEC, attaching as exhibits a copy of the Consent Order between Progressive and the FTC dated April 22, 2020 and an April 22, 2020 press release announcing Progressive's "final settlement" with the FTC, "related to the adequacy of consumer disclosures," under which it was required to pay $175 million to the FTC.  *See* Ex. B at Ex. 99.1 (press

release dated April 20, 2020).  In the Consent Order, the FTC noted that Progressive was "permanently restrained and enjoined from" making any misrepresentations regarding, for example, the "costs, including the total cost to own any item," "fees[,]" "charge[s,]" or "interest," of products "without [c]learly and [c]onspicuously disclosing the total cost[.]"  *See* Ex. B at 5.

268.   Then, on May 7, 2020, Aaron's issued a release announcing poor 1Q20 results, which shed additional light on AB's failure to return to long-term growth. Specifically, the release revealed that AB's "business goodwill was fully impaired" and that the Company was taking "a $446.9 million goodwill impairment charge for [AB]."  The Company stated that the impairment was "triggered for the Aaron's Business segment as of March 31, 2020, primarily as a result of a significant decline in the Company's stock price and market capitalization in March 2020 as well as other factors."

269.   Analysts were quick to comment on the goodwill impairment.  For example, on May 8, 2020, an analyst for Janney commented that "AAN's store-based operations (the Aaron's Business) started struggling well before COVID-19" and that "[t]hese struggles drove the company to recognize a $449 million goodwill impairment charge in 1Q:20."

270.   On June 19, 2020, Aaron's filed a Form 8-K with the SEC, which revealed that the proposal for effecting a holding company formation was approved at the Company's 2020 Annual Meeting of Shareholders on June 18, 2020.

## VII.   BY FAILING TO DISCLOSE THE IMPACT OF PREDATORY, DECEPTIVE, AND ANTI-COMPETITIVE PRACTICES ON AARON'S GROWTH, DEFENDANTS VIOLATED SEC DISCLOSURE RULES

271.   Securities and Exchange Commission rules and regulations explicitly required Defendants to disclose the financial ramifications associated with the Company's use of illegal, predatory, and deceptive practices at Progressive and illegal, anti-competitive activity at AB, all in violation of the FTC Act.  In response to increased competition that was threatening its leadership role in the RTO industry, Aaron's engaged in these unlawful practices to maintain overall Company growth and mask AB's long-term growth decline.   Thus, Defendants were required to disclose that the Company's engaging of illegal conduct within its two largest business segments, Progressive and AB, subjected Aaron's to increased risk of government scrutiny and intervention that threatened to negatively impact the Company's profitability and performance.

272.   Item 303 required Aaron's quarterly Forms 10-Q and annual Forms 10-K to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales

or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii).

This regulation mandates that the Forms 10-Q and 10-K Aaron's filed with the SEC

during the Class Period disclose "any unusual or infrequent events or transactions or

any significant economic changes that materially affected the amount of reported

income from continuing operations and, in each case, indicate the extent to which

income was so affected." 17 C.F.R. §229.303(a)(3)(i).

273.   The instructions to Item 303(a) explain that Aaron's Management's

Discussion and Analysis ("MD&A") disclosures during the Class Period were to

"focus specifically" on material events and uncertainties that would cause the

Company's reported financial information not to be necessarily indicative of future

operating results, including "matters that would have an impact on future operations

and [matters that] have not had an impact in the past" stating, in pertinent part:

> The discussion and analysis shall *focus specifically on material events
> and uncertainties known to management that would cause reported
> financial information not to be necessarily indicative of future
> operating results or of future financial condition. This would include
> descriptions and amounts of (A) matters that would have an impact on
> future operations and have not had an impact in the past*, and (B)
> matters that have had an impact on reported operations and are not
> expected to have an impact upon future operations.

274.   Concerning material events and uncertainties, in 1989, the SEC issued

interpretative guidance on Item 303, which states, in pertinent part:

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

\*          \*          \*

Events that have already occurred or are anticipated often give rise to known uncertainties.  For example, a registrant may know that a material government contract is about to expire.  The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed.  More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed.  The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant.  *In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.*

*Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, SEC Release No. 6835, 1989 WL 1092885 (May 18, 1989).

275.  In December 2003, the SEC issued additional interpretative guidance on Item 303 ("2003 Interpretive Release").  This guidance makes clear that Aaron's MD&A disclosures during the Class Period were required to provide disclosures about known demands, events, or uncertainties, including, for example, that Progressive's illegal, predatory, and deceptive practices, and AB's illegal, anti-

competitive activity which violated FTC regulations, would lead to increased scrutiny and, ultimately, a financial penalty and consent order preventing Defendants from continuing their unlawful practices which negatively impacted the Company's profitability and financial performance unless management determined: (a) they were not reasonably likely to occur; or (b) they would not have a material effect on the Company's profitability and financial performance.   The 2003 Interpretive Release states, in pertinent part:

> As we have explained in prior guidance, disclosure of a trend, demand, commitment, event or uncertainty *is required unless* a company is able to conclude either that it is not reasonably likely that the trend, uncertainty or other event will occur or come to fruition, or that a material effect on the company's liquidity, capital resources or results of operations is not reasonably likely to occur.

276.   As detailed herein, Aaron's derives a substantial portion of its revenue from Progressive, a "leading" virtual-lease-to-own company, and AB, the Company's "core" legacy business.  *See, e.g.*, ¶¶48-49.

277.   Prior to the start of the Class Period, Defendants understood that competition in the RTO industry was increasing and Aaron's core brick-and-mortar model was becoming increasingly outdated and negatively impacting the Company's growth.  Recognizing this, prior to the beginning of the Class Period, Defendants began engaging in unlawful activity to maintain the Company's growth. First, Defendants began to enter into illegal, anti-competitive swap agreements with

- 121 -

Aaron's major competitors, RAC and Buddy's, to close underperforming stores in a given geographic region and suppress such increasing competition. *See, e.g.*, ¶¶50-66.

278.   Second, recognizing that the Company's long-term growth was dependent on Progressive, Defendants implemented a strategy to artificially inflate Progressive's growth through illegal practices, orchestrated to lure vulnerable customers into purchasing Progressive's plans by misrepresenting the exorbitant prices paid for its products. *See, e.g.*, ¶¶67-81.

279.   Defendants closely monitored the Company's financial performance and position in the RTO industry, the increasing regulatory environment, and competition.  As such Defendants *knew*, but failed to disclose, that the Company's engaging in unlawful conduct within its two largest business segments, Progressive and AB, subjected Aaron's to increased risk of government scrutiny and intervention that threatened to (and eventually did) negatively impact the Company's profitability and performance.   Indeed, if (and when) Defendants' unlawful conduct was discovered, not only would it subject Aaron's to monetary penalties, but it would force the Company to cease the very conduct intended to artificially inflate the Company's overall growth and mask AB's unsustainability.

280.   This was particularly true because during the Class Period, Progressive and AB accounted for a material amount of the Company's profitability.  *See, e.g.*, ¶49.

281.   On November 4, 2019, Defendants disclosed that Aaron's reached a proposed consent agreement with the FTC prohibiting AB from engaging in its anti-competitive swap agreements, and that the FTC was initiating an enforcement action against Progressive due to it disclosure practices.  At the end of the Class Period, on February 20, 2020, Defendants disclosed the $175 million FTC settlement related to Progressive's deceptive practices, and that complying with its mandates would require an additional $15 million in compliance initiatives.  On May 7, 2020, the Company revealed a $446.9 million goodwill impairment related to AB.  These admissions, along with the AB's dismal 4Q19 and full-year 2020 ("FY20") financial results and lower-than-expected 2020 outlook, provide further evidence that the Company's Forms 10-Q and 10-K filed during the Class Period failed to disclose material information that Aaron's was required to disclose under Item 303.

## VIII.  ADDITIONAL SCIENTER ALLEGATIONS

282.   The following additional facts, when considered collectively with those alleged elsewhere herein, support a strong inference that Defendants knowingly

made materially false or misleading statements and/or omissions, or acted recklessly in doing so, during the Class Period.

### A.   The Importance of Progressive and AB to the Company's Operations

283.   Progressive and AB were the Company's two largest segments and accounted for material portions of the Company's business.  More specifically, AB, the Company's "core" legacy business, reported revenues of $1.8 billion and Progressive reported revenues of $1.99 billion in FY18, which accounted for 46% and 52% of the Company's total revenues, respectively.  *See* ¶¶48-55, *supra*. Defendants knew leading up to the Class Period, that competition in the RTO industry was increasing and that Aaron's "core" traditional, outdated model had the potential to materially negatively impact the Company's revenues and growth prospects.  Defendants also knew at the start of the Class Period that Progressive would be the Company's growth mechanism.   As such, Defendants closely monitored each segment's financial metrics, operating strategies, and business prospects and spoke about them in the Company's press releases and SEC filings. Defendants also discussed Progressive's financial success and AB's various "initiatives" during their prepared remarks during earnings calls, and were asked and answered detailed questions about these topics by analysts.

284.   During each quarter, Defendants discussed Progressive's "growth rate" and credited it as the "driver" of Aaron's success.  Defendants also made numerous veiled references to their fraudulent practices by highlighting the import of various "initiatives" designed to "optimize" and "rationaliz[e]" Aaron's for growth.  For example, the Company's Forms 10-K discussed a "strategic plan" to "position us for success over the long-term," and noted a "critical component" of Aaron's success "is our commitment to developing good relationships with our customers."  During the 1Q18 conference call, Robinson discussed "company specific strategies" in Progressive and AB focused on each segment's growth and profitability.  In the July 26, 2018 press release, Robinson noted that Progressive's continued "optimize[d] performance" was "positively impacting revenue and profitability."  Defendants undertook a "rigorous evaluation" of AB's underperforming stores and during the 4Q18 earnings call, Robinson assured investors that "[AB] made significant progress . . . on transformational initiatives" to help AB "get back to sustainable growth."  On June 21, 2019, Michaels stated "we're optimizing and rationalizing our store footprint" at AB.  These facts support an inference that Defendants each had personal knowledge of the specifics of Progressive's and AB's performances and the strategies and initiatives underlying those performances.

285.   Given the importance of AB and Progressive to the Company, it is reasonable to infer that Defendants were closely involved in these segments' illegal practices in violation of the FTC Act and, therefore, knew or were reckless in disregarding the full extent of liability that Aaron's would face when it was forced to cease such practices, and the negative impact that they would (and did) have on Aaron's operations and growth prospects.

**B.     The FTC's Findings Support an Inference of Defendants' Scienter**

286.   In the Company's Forms 10-K, Defendants acknowledged that the FTC was "increasingly focused" on Aaron's and the RTO industry.  Moreover, the Company received CIDs from the FTC during the Class Period related to Aaron's long-standing illegal, predatory, and deceptive marketing at Progressive and illegal, anti-competitive activity in AB.  Defendants repeatedly noted their "cooperation" with the investigations (including providing documents), and assured the market both in SEC filings and on conference calls that they were "in compliance with the FTC Act."  Due to the importance of both segments, and Defendants' involvement in cooperating with and evaluating the strengths of the FTC inquiries, it is reasonable to infer that Defendants knew or were reckless in disregarding that Progressive was engaged in illegal, predatory, and deceptive practices and that AB was engaged in illegal, anti-competitive conduct.

287.   Furthermore, an inference of scienter is supported by the fact that FTC staff ultimately determined that Aaron's "violated the [FTC] Act" and Progressive was "in violation of . . . the FTC Act[.]"  *See* Exs. A at 7 and B at 2.  Specifically, the FTC found that since at least June 2015, AB was engaged in illegal, anti-competitive swap agreements with RAC and Buddy's that deprived consumers of the benefits of price and quality competition.  *See* Ex. A at 7; Ex. C at 1, ¶¶15, 17-20, 23-24; Ex. D at 1-2.

288.   In the Progressive Consent Decree, the FTC found that since at least 2016, Progressive was engaged in deceptive practices designed to mask the full price of Progressive's products in violation of the FTC Act.  As a result, the FTC fined Progressive $175 million in monetary penalties for its unlawful conduct.  *See* Ex. B at 8.

289.   The FTC also found clear evidence of Progressive's knowledge and disregard of widespread confusion by its customers regarding the ultimate pricing of its products.  *See* Ex. E at ¶47.  For example, between May 2017 and July 2018 alone, Progressive received more than 15,000 complaints relating to the amount charged for Progressive's RTO products.  *Id*. at ¶48.  In 2018, Progressive conducted a review of 200 of its retailers' online advertising and determined that 37, or 18%, misrepresented that Progressive's plans offer "90 Days Same as Cash" in its

advertisements, while failing to disclose additional fees and costs. *Id*. at ¶21. Progressive also tracked the categories of complaints it received, including a category titled, "Wrong Information Given." *Id*. at ¶49. Commissioner Slaughter noted her belief that "[b]ased on the facts" of the FTC investigation, Progressive's CEO, Woodley, "participated directly in the illegal practices or had authority to control them" because the "deception was carried on through multiple aspects of Progressive's business: sales training, marketing, and the application and agreement." *See* Ex. F at 4.

290. Defendants' scienter is further supported by their knowledge of Aaron's prior misconduct, including a 2014 settlement with the FTC for violations of the FTC Act. Specifically, in March 2014, the Company entered into a Consent Decree with the FTC relating to its "direct and vital role" in its franchisees' installation and use of software on rental computers that secretly monitored consumers, including by taking webcam pictures of them in their homes, in violation of FTC regulations. This prior settlement with the FTC, and Defendants' knowledge that the RTO industry is highly regulated by the FTC, should have put Defendants on notice that the Company's practices were at risk of additional scrutiny that would result in increased compliance measures, or monetary penalties.

291.   Moreover, Aaron's and its representatives were subject to significant litigation for misconduct over the past few years.   For example, an Aaron's franchisee operating three RTO businesses under the Aaron's name was sued by the West Virginia Attorney General in June 2019 for improperly collecting on past due accounts in violation of the West Virginia Consumer Good Rental Protection Act. Similarly, the State of California sued Aaron's in 2014 for harm the Company caused customers in violation of the California Karnette Rental-Purchase Act, which provides the nation's strongest state RTO law.   The complaint alleged that Aaron's "turned a blind eye as its franchisees installed spyware on computers rented to unsuspecting customers," allowing the capture of sensitive and personal information.   Aaron's and its franchises' robo-calling practices have also subjected the Company to numerous lawsuits for violations of the Telephone Consumer Protection Act of 1991. While the misconduct underlying these actions is not the focus of this litigation, it demonstrates Aaron's prevalent culture of flouting applicable regulations, which further supports the inference that Defendants knew or were reckless in disregarding unlawful practices at Progressive and AB.

### C.   The Individual Defendants' Substantial Experience, Significant Access to Data, and Monitoring of the Company's Business

292.   The Individual Defendants collectively had years of experience in the RTO industry and maintained their executive level roles (*i.e.*, running the day-to-

- 129 -

day operations of Aaron's, Progressive, and AB), leading up to and throughout the Class Period.  Robinson has been CEO of the Company since November 2014, when the Company began its transformation initiatives.  Prior to this, Robinson served as Executive Vice President of Aaron's and was CEO of Progressive at the time it was acquired.

293.   Michaels had been with Aaron's since 1995 and was paramount in the Company's transition away from its brick-and-mortar model, spearheading Progressive's 2014 acquisition.   As Aaron's CFO, Michaels had oversight of "analytics, [and] business development" and was responsible for developing and implementing strategies to strengthen AB, including launching its e-commerce site.

294.   Lindsay, as President of AB, was "responsible for overseeing" the AB segment leading up to and throughout the Class Period, and Woodley was CEO of Progressive since January 2015, when the "core" began its imminent decline.  Given their experience and leadership roles at Aaron's, AB, and Progressive, leading up to and throughout the Class Period, it is reasonable to infer that each of the Individual Defendants knew and/or were reckless in disregarding the desperate and illegal attempts that the Company was making to maintain growth (and the appearance of growth) at Progressive and AB, and that their misstatements and/or omissions

relating to the Company's operations and business practices were made knowingly or with recklessness.

295.   Importantly, the Individual Defendants had access to highly relevant information at Progressive and AB, and regularly monitored the Company and each segment's performance, as well as insight into various strategies and "tests" to increase growth.  For example, Robinson commented on the Company's decisioning strategies to increase growth during the 4Q17 call, stating, "we have a very fast feedback loop" and "a lot of visibility into the performance."  Woodley also noted during the April 25, 2019 call, that "we have 10 years of data [to] work with" and "we've got an excellent team focused on delivering incremental improvements to our decisioning."   During the 4Q17 earnings call, Robinson explained that Progressive makes "very incremental changes" in its strategies, and that "we understand and then we watch, and we make sure that we test it out or validate it with results."

296.   Defendants were also specifically involved in AB's store closures and monitoring the initiatives to prolong its inevitable unsustainability.  For example, during the 2Q18 earnings call, Lindsay noted that "[o]ur business transformation strategy is on track and we have multiple test concepts in flight."  On multiple conference calls Michaels confirmed that Aaron's closed AB's underperforming

- 131 -

stores due to "management's strategic review."  Throughout 2017 and 2018, the Company engaged an impartial auditor to conduct semi-annual and annual audits of Aaron's stores.  From May 2019 through September 2019, the Company hired McKinsey & Company to help increase AB's profitability, who visited Aaron's stores, and implemented overly aggressive quotas on sales associates.  Also, during the June 12, 2019 investor conference, Michaels discussed the success of AB's initiatives to return the segment to sustainable growth and confirmed that "we've got a few tests that are showing promise."  Further, during the 4Q18 earnings call, Michaels admitted that driving customers into Aaron's stores is "our biggest focus internally."

297.   Further, Defendants guided and monitored Progressive's deceptive and predatory training initiatives.  For example, in the Company's Forms 10-K, Aaron's stated that the Company provides, "extensive, on-going, hands-on training" to its retail associates that sell Progressive's products.  Defendants also noted that Aaron's developed a robust leadership development curriculum for Progressive's leaders and provided online curriculum covering specific business-related needs.  Also in 2018, Progressive's Customer Analytics Group analyzed prevalent consumer confusion, by, among other things, listening to phone call recordings from Progressive's "voice-call IDR system" and reviewing Google and Apple app ratings.  This review found

that customers widely misunderstood the full amount they were ultimately paying for their lease.

298.   Defendants further touted the "integration of ideas" throughout the Company and between segments.  Progressive's customer service hubs were guided by knowledge obtained from AB, and AB's e-commerce platform was "largely enabled" by experience obtained from Progressive.  Robinson mentioned during the 4Q18 earnings call that the Company "benefit[s] substantially" from the advantage created by the existence of "synergies" from the information that we "port over from Progressive to Aaron's from a decisioning standpoint[.]"   Where a Progressive customer defaulted, it was also customary for AB to pick up the defaulted-on product and sell it in a Aaron's store.  Based on this type of information, it is clear that the Individual Defendants were intimately involved in overseeing Progressive and AB, and that the Individual Defendants, whether technically working for Aaron's corporate, AB, or Progressive, shared relevant data amongst the segments, making it reasonable to infer they were aware of each segment's operations.

299.   Additionally, the Individual Defendants monitored the Company's compliance with relevant regulations.  For example, the Company's Forms 10-K dedicate a section to "Government Regulation," and state that Aaron's is "*extensively regulated* by . . . various federal, state and local law and regulations,

- 133 -

and . . . oversight [by] various governmental agencies," including the FTC, which is "increasingly focused" on the RTO industry.  Defendants routinely discussed the Company's regulatory environment on conference calls.  For example, during the June 12, 2019 analyst conference, Michaels discussed Aaron's "*very robust* government relations department" and stated that Defendants "[a]re always reaching out to state AGs and other regulators just to really do education[.]"  Further, at the end of the Class Period, Robinson admitted that Defendants knew that as a "leader in the industry," Aaron's was subjected to a heightened level of regulatory scrutiny.

300.   After the Company received the CIDs from the FTC, Defendants "cooperated" with the FTC and provided quarterly updates to investors on their status.  Thus, based on the Individual Defendants' repeated comments about the Company's compliance with applicable laws and regulations, it is reasonable to infer that each of them knew or were severely reckless in disregarding that the Company's two largest segments were not in compliance with the FTC Act.

301.   Defendants also regularly spoke about Aaron's increasingly competitive environment and noted their monitoring of industry changes.  For instance, Aaron's 2017 10-K and 2018 10-K included a section on the Company's "Business Environment and Company Outlook," wherein Defendants highlighted that in response to changing market conditions, including "increased competition[,]"

Defendants were "executing a strategic plan that focuses on . . . [c]hampion compliance" to "position[] us for success over the long-term."  Woodley also explained during the October 25, 2018 earnings call that Aaron's had "20 years of experience and millions of leases" which "puts [Defendants] in a place where we know when to play that game and when not to," when discussing the dynamics of increasing competition.  Accordingly, the Individual Defendants' comments on, and monitoring of, the competitive environment in the RTO industry further supports an inference of scienter.

302.   An additional indicia of scienter results from Robinson and Michaels signing SOX certifications and undertaking the affirmative obligation to ensure the Company's disclosures to the market were true, including statements regarding the Company's compliance with all state and federal regulations.  In fact, by signing the SOX certifications, Robinson and Michaels falsely certified that based on their knowledge, the Forms 10-Q and 10-K filed during the Class Period, did "not contain any untrue statement of material fact or omit to state material facts required to make the statements" true.

### D.    The Magnitude of the Fraud

303.   The magnitude of Aaron's unlawful conduct and misstatements surrounding AB's growth prospects further supports Defendants' scienter.  At the

end of the Class Period, after 18 months of downplaying the FTC's investigation, Aaron's was fined a $175 million monetary penalty, which caused the Company to report a 273.6% and 279.8% decline in net earnings and EPS, respectively, for the quarter compared to prior year periods.  AB reported a 5.4% decrease in revenues for 4Q19, compared to the prior year period.  Moreover, the cessation of the Company's illegal activity resulted in underwhelming 2020 outlook.  As a direct result of Defendants' partial revelations of their fraud, Aaron's stock price fell nearly 42%.  *See* ¶¶246-263, *supra*.

### E.   The Individual Defendants' Motivation to Conceal Their Fraudulent Conduct

304.   The Individual Defendants were motivated to conceal the truth regarding their illegal conduct and declining long-term growth at AB for several reasons.  First, the Individual Defendants were motivated by greed.  Each of the Individual Defendants sold substantial amounts of Aaron's common stock at artificially inflated prices while in possession of material, non-public information regarding Aaron's non-compliance with the FTC Act and the negative impact that increased regulatory scrutiny and the cessation of the illicit practices would have on the Company's financial position.[10]

---

[10]   The fact that the Individual Defendants' stock sales were made pursuant to a 10b5-1 insider trading plan, as noted in the Forms 4 detailing their trades, does not

305.   In total, Robinson sold 132,500 shares of Aaron's common stock for proceeds of more than *$6,581,195* during the Class Period.   These proceeds amounted to eight times Robinson's base salary ($784,615 for 2018 and 2019) and corresponded to *14.6%* of his common stock holdings.   In contrast, in the two years leading up to the Class Period, Robinson sold 58,750 shares, worth $2,181,254. Specifically, Robinson made the following Class Period sales, taking advantage of artificially inflated prices at numerous times, as follows:

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| 4/30/2018 | 17,500 | $42.43 | $742,525 |
| 7/30/2018 | 17,500 | $43.31 | $757,925 |
| 8/2/2018 | 2,500 | $45.00 | $112,500 |
| 10/29/2018 | 9,932 | $44.69 | $443,861 |
| 10/29/2018 | 10,068 | $45.43 | $457,389 |
| 3/21/2019 | 39,579 | $51.10 | $2,022,487 |
| 3/21/2019 | 5,421 | $51.29 | $278,043 |
| 4/30/2019 | 2,250 | $56.15 | $126,338 |
| 4/30/2019 | 12,750 | $55.59 | $708,773 |
| 7/30/2019 | 9,000 | $62.67 | $564,030 |
| 7/30/2019 | 2,975 | $60.53 | $180,077 |
| 7/30/2019 | 3,025 | $61.90 | $187,248 |
| **TOTAL** | **132,500** | | **$6,581,195** |

---

negate an inference of scienter.  Here, the 10b5-1 plans were adopted during the Class Period, on or about February 14, 2018 (just prior to Defendants announcing receipt of the first CID) and March 2, 2019 (just prior to receipt of the second CID). When the Individual Defendants entered into their 10b5-1 plans in 2019, the Company was already under investigation for Progressive's predatory and deceptive practices, the Individual Defendants were already under an obligation to monitor and investigate the Company's compliance with the FTC Act, and Defendants claimed to be "cooperating" with the FTC.  Accordingly, they each knew or were reckless in disregarding that the Company was engaged in illegal practices when they entered into the plans.

306.   The inference of Robinson's scienter is further bolstered with the timing of his Class Period sales, which coordinate with relevant events, as follows:

- 87% of sales occurred after the Company received the July 2018 CIDs regarding Progressive's deceptive and predatory practices, including 13% on July 30, 2018.

- 15% of sales occurred on October 29, 2018, after the Company revealed its 3Q18 financials were adversely affected from higher expenses due in part to the FTC CIDs.

- 11% of sales occurred on April 30, 2019, after the Company received the April 2019 CID from the FTC regarding the purchase and sale of lease agreements at AB.

- 11% of sales occurred on July 30, 2019, before the Company announced the FTC's enforcement action against Progressive on November 4, 2019.

307.   Similarly, Woodley and Michaels made substantial sales of Aaron's common stock at artificially inflated prices during the Class Period.  Specifically, Woodley sold 88,000 shares of Aaron's common stock for proceeds of more than *$4,272,316*.  This amount was almost 14 times Woodley's base salary ($574,616 for 2018 and 2019) and corresponded to *26.7%* of his holdings.  However, in the two years prior, he sold $300,177 worth of Aaron's common stock, representing only 6.4% of his holdings.  Specifically, Woodley's Class Period sales, taking advantage of artificially inflated prices at numerous times, are shown below:

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| 4/30/2018 | 12,500 | $42.35 | $529,375 |
| 7/30/2018 | 1,100 | $43.63 | $47,993 |
| 7/30/2018 | 11,400 | $42.95 | $489,630 |
| 8/2/2018 | 12,500 | $45.00 | $562,500 |
| 10/29/2018 | 12,500 | $45.20 | $565,000 |
| 3/25/2019 | 131 | $50.73 | $6,646 |
| 3/25/2019 | 13,869 | $49.83 | $691,092 |
| 4/30/2019 | 14,000 | $55.72 | $780,080 |
| 6/10/2019 | 10,000 | $60.00 | $600,000 |
| **TOTAL** | **88,000** | | **$4,272,316** |

- 86% of Woodley's sales occurred after the Company received the July 2018 CID, including 14% on July 30, 2018.

- 14% of sales occurred on October 29, 2018, after the Company revealed its 3Q18 financials were adversely affected due, in part, to the FTC CIDs.

- Over 16% of sales occurred on April 30, 2019, after the Company received the April 2019 CID from the FTC regarding the purchase and sale of lease agreements at AB.

- 11% of sales occurred on July 30, 2019, before the Company announced the FTC's enforcement action against Progressive.

308. Michaels also sold 39,250 shares of Aaron's common stock for proceeds of more than *$1,975,564*, which was over three times Michaels' base salary ($625,000 for 2018 and 2019) and corresponded to *18.9%* of his holdings. Michaels' Class Period sales are detailed below:

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| 4/30/2018 | 10,000 | $42.56 | $425,600 |
| 3/21/2019 | 21,250 | $51.05 | $1,084,813 |
| 4/30/2019 | 5,000 | $55.89 | $279,450 |
| 7/30/2019 | 1,300 | $62.60 | $81,380 |
| 7/30/2019 | 600 | $60.33 | $36,198 |
| 7/30/2019 | 1,100 | $61.93 | $68,123 |
| **TOTAL** | **39,250** | | **$1,975,564** |

309.  Notably, 74.5% of Michaels' sales occurred after the Company received the July 2018 CIDs, but before the Company announced the FTC's enforcement action against Progressive.  In contrast, in the two years prior to the Class Period, Michaels sold only 20,567 shares totaling $739,755.

310.  Finally, during 2019, Lindsay sold 14,798 shares of Aaron's common stock for proceeds of more than *$791,615*, which corresponded to *15.1%* of his holdings, as shown below:

| Date of Sale | Shares Sold | Sales Price Per Share | Sales Proceeds |
|---|---|---|---|
| 3/21/2019 | 9,798 | $50.79 | $497,640 |
| 4/30/2019 | 2,500 | $55.91 | $139,775 |
| 7/30/2019 | 800 | $60.53 | $48,424 |
| 7/30/2019 | 800 | $62.56 | $50,048 |
| 7/30/2019 | 900 | $61.92 | $55,728 |
| **TOTAL** | **14,798** | | **$791,615** |

311.  All of Lindsay's Aaron's common stock sales during the Class Period occurred after the Company received the July 2018 CIDs and before the Company announced the FTC enforcement action.  Notably, in the two years prior to the Class Period, Lindsay sold none of his Aaron's common stock.

312.  These lucrative stock sales show that the Individual Defendants were looking to cash out a significant portion of their holdings before the truth regarding Aaron's various FTC violations and the negative financial impact resulting from the cessation of their unlawful practices was revealed, causing the Company's stock price to plummet.

- 140 -

313.   Defendants were also motivated by a desire to keep their jobs.  Leading up to the Class Period, the Company went through two revamps of its executive structure.  In July 2014, in response to investor concern, including a threatening letter by the Company's second largest shareholder, COO Buck and CEO Allen left the Company within a two-month span.  Robinson was named CEO two months later.

314.   Then, in January 2016, Michaels replaced CFO Danielson, and Lindsay became the President of AB.  Robinson directly addressed the leadership changes and highlighted the need for "new perspectives and relevant outside expertise." Defendants were hired to "improve" the Company's financial results and for their respective "expertise" at a time when the Company was facing significant pressure and transformation.  As such, the Individual Defendants were motivated to appear as though their actions were successful and driving sustainable long-term growth for the Company.  The Individual Defendants were also hoping to avoid yet another management over-haul.

315.   The Individual Defendants were further motivated to downplay the impact of the FTC CIDs due to the adverse impact that the disclosure of the Company's two illegal schemes would have on Aaron's long-term profitability, reputation, and stock price.  Defendants knew that by disclosing they were deceiving vulnerable clients into entering into exorbitant rental agreements, or that they were

- 141 -

suppressing price and diversity competition, it would severely undermine prior statements regarding the Company's record growth, "compliance," and "superior customer service."  The Individual Defendants also knew that should Aaron's illicit practices be disclosed, it would jeopardize Aaron's partnerships with major retailers, such as Best Buy, which would further negatively Aaron's overall profitability, as well as its stock price.

## IX.    LOSS CAUSATION/ECONOMIC LOSS

316.   As detailed herein, Defendants' fraudulent scheme artificially inflated the price of Aaron's common stock during the Class Period by misrepresenting and concealing: (a) the true extent of the negative impact that Aaron's unlawful deceptive, predatory, and anti-competitive activity within its two largest segments would have on the Company's operations, financial results, and 2020 guidance; and (b) that AB would never return to sustainable growth in the long term, and would continue to, and in fact did, negatively impact the Company's profitability, financial results, and 2020 guidance.

317. Defendants' false and misleading statements and omissions, individually and collectively, concealed Aaron's true business prospects and risks, resulting in Aaron's stock being artificially inflated until, as indicated herein, the relevant truth about the Company was revealed through several partial disclosures.

These false and misleading statements and omissions had the intended effect of preventing the market from learning the truth and keeping the price of Aaron's stock artificially inflated throughout the Class Period.   Indeed, Defendants' false statements and omissions caused, or were a substantial contributing cause of, Aaron's stock trading at artificially inflated prices, with the price of Aaron's stock reaching $78.14 during the Class Period on October 29, 2019.  As the truth began to leak out, the price of Aaron's stock declined dramatically, inflicting significant financial harm on the Class.

### A.     July 26, 2018

318.   The truth began to emerge after the market closed on July 26, 2018.  On that day, Aaron's reported its 2Q18 financial results, hosted a conference call, and filed its 2Q18 10-Q.  The Company reported that in July 2018, Aaron's received CIDs from the FTC requesting the production of documents and answers to written questions to determine whether AB's and Progressive's disclosures related to financial products were in violation the FTC Act.  *See* ¶¶150-154, *supra*.

319.   As a result of the information provided to the market, the price of Aaron's stock dropped 11.01%, falling $5.38 from a close of $48.85 per share on July 26, 2018, to a closing price of $43.47 per share on July 27, 2018.

320.   The decline in the price of Aaron's stock on July 26, 2018 was the direct result of the nature and extent of the partial revelations made to the market regarding the FTC CIDs.  The partial removal of artificial inflation from the price of Aaron's stock would have been greater had Defendants fully disclosed the truth.  But, because of Defendants' materially false and misleading statements and omissions, including statements that Aaron's was "in compliance" with the FTC Act, and touting Aaron's and Progressive's positive financial results, and the success of growth initiatives at AB, the price of Aaron's stock remained artificially inflated.

**B.    October 25, 2018**

321.   Additional problems at Aaron's caught investors by surprise on October 25, 2018, when Defendants reported Aaron's 3Q18 financial results and revealed that the Company had incurred higher operating expenses in 3Q18 due, in part, to expenses associated with the FTC CIDs.  *See* ¶¶158-171, *supra*.

322.   As a result of the information provided to the market, the price of Aaron's stock dropped 8.7%, falling $4.16 from a close of $48.05 per share on October 24, 2018, to a closing price of $43.89 per share on October 25, 2018.

323.   The decline in the price of Aaron's stock on October 25, 2018 was the direct result of the nature and extent of the partial revelations made to the market regarding the higher operating expenses associated with the FTC CIDs.  The partial

removal of artificial inflation from the price of Aaron's stock would have been greater had Defendants fully disclosed the truth. But, because of Defendants' materially false and misleading statements and omissions, including statements that Aaron's was "in compliance" with the FTC Act, and touting Aaron's and Progressive's positive financial results, and the success of growth initiatives at AB, the price of Aaron's stock remained artificially inflated.

### C.    November 4, 2019

324.   To the dismay of investors, after the market closed on November 4, 2019, Defendants reported 3Q19 financial results and revealed that the FTC had commenced an enforcement action against Progressive regarding the July 2018 CIDs for alleged violations of the FTC Act and ROSCA and that Aaron's had reached an agreement in principle with the FTC staff in August 2019 to resolve the April 2019 CID regarding AB's anti-competitive conduct related to its swap agreements. *See* ¶¶224-242, *supra*.

325.   On this news, additional artificial inflation was removed from the price of Aaron's stock, which declined 11.38%, falling $8.41 from a close of $73.87 per share on November 4, 2019, to close at $65.46 per share on November 5, 2019.

326.   The partial removal of artificial inflation from the price of Aaron's stock on November 5, 2019 was the direct result of the nature and extent of the

partial revelations made to the market regarding the FTC's enforcement action against Progressive and the Consent Order it entered into with Aaron's regarding AB.  The partial removal of artificial inflation from the price of Aaron's stock would have been greater had Defendants fully disclosed the truth.   But, because of Defendants' materially false and misleading statements and omissions, including statements highlighting Progressive's and AB's "long-term prospects for growth," and downplaying the negative impact of Aaron's non-compliance with the FTC Act, and assuring investors that Aaron's was "in compliance with the FTC Act" and that it would "vigorously defend [its] position" as to Progressive, the price of Aaron's stock remained artificially inflated.

### D.    February 20, 2020

327.   Additional negative news regarding Aaron's shocked investors on February 20, 2010, when, before the market opened, Defendants reported 4Q19 and FY19 financial results and revealed that: (a) Progressive had reached a $175 million settlement with the FTC and was required to make $15 million in enhanced compliance activities, resulting in Aaron's reporting a 273.6% decline in net earnings and a 279.8% loss in EPS for 4Q19, compared to 4Q18; (b) AB experienced poor financial results for 4Q19 and FY19 including a lower portfolio balance in 2019 that would continue to drive negative results for 2020, including negative 2% to 4%

in same store sales; and (c) the Company's 2020 outlook with regard to Aaron's consolidated revenues, consolidated non-GAAP EPS, consolidated diluted EPS, consolidated EBITDA, and Progressive adjusted EBITDA were below analyst expectations. *See* ¶¶246-260, *supra*.

328.   On this news, the price of Aaron's stock plummeted.  After closing at $56.15 per share on February 19, 2020, the price of Aaron's stock fell more than 19.06%, or $10.70 per share, to close at $45.45 on February 20, 2020.

329.   All told, Aaron's stock fell *nearly 42%* from its Class Period high of $78.14 per share on October 29, 2019, to its closing price of $45.45 on February 20, 2020.

330.   While each of Defendants' misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate the Company's stock price or maintain the artificial inflation in Aaron's stock and give the market the false notion that the Company and its two largest segments were operating in compliance with all relevant government regulations, that both the Company and Progressive were experiencing strong growth, and that AB would return to sustainable growth.  Defendants' false and misleading statements and omissions had their intended effect and caused, or were

a substantial contributing cause of, Aaron's stock trading at artificially inflated levels, reaching as high as $78.14 per share on October 29, 2019.

331.   The timing and magnitude of the stock price declines identified above negate any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.   The point is supported by the performance graph below, which demonstrates the clear divergence of the price of Aaron's stock from the stock prices of Aaron's self-identified peer index as the revelations of the truth became known.   Notably, Aaron's stock *fell 19.06%* on February 20, 2020, while the Company's peer index *increased 1.4%*:



332.   In sum, the rapid declines in the price of Aaron's stock on the dates identified herein were the direct and foreseeable consequence of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market.  Thus, the revelations of truth, as well as the resulting clear market reactions, support a reasonable inference that the market understood that Defendants' prior statements were misleading.   In short, as the truth about Defendants' prior misrepresentations and concealments was revealed, the price of Aaron's stock quickly sank, the artificial inflation came out of the stock, and Plaintiff and other Class members were damaged, suffering true economic losses.

333.   Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiff and other Class members on July 26, 2018, October 25, 2018, November 4, 2019, and February 20, 2020 were the direct and proximate result of Defendants' misrepresentations and omissions that artificially inflated the price of Aaron's stock and the subsequent significant declines in the value of the stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## X.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

334.   At all relevant times, the market for Aaron's stock was an efficient market for the following reasons, among others:

- 149 -

(a)     Aaron's common stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient, electronic stock market;

(b)     as a regulated issuer, Aaron's filed periodic public reports with the SEC and the NYSE;

(c)     Aaron's regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Aaron's was followed by numerous securities analysts employed by major brokerage firms, including Stephens, Jefferies, SunTrust, Northcoast, Zacks, and Janney, who wrote reports that were distributed to those brokerage firms' sales forces and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

335.   As a result of the foregoing, the market for Aaron's stock promptly digested current information regarding Aaron's from all publicly available sources and reflected such information in the price of the stock.  Under these circumstances, all purchasers of Aaron's stock during the Class Period suffered similar injury through their purchase of Aaron's stock at artificially inflated prices and the losses

they suffered when the artificial inflation was removed, and a presumption of reliance applies.

336.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.   Because this action involves Defendants' failure to disclose material, adverse information regarding Aaron's business and operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XI.   NO SAFE HARBOR

337.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false or misleading statements alleged herein.   Many of the statements alleged were not identified as "forward-looking" when made, and, to the extent any statements were forward-looking, there were no meaningful cautionary statements identifying important

factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

338.   Indeed, the risk warnings that were provided by Defendants in their Class Period SEC filings included boilerplate statements, such as:

- We are subject to various existing federal and state laws and regulations which may require us to incur significant compliance costs and expenses associated with government investigations, enforcement actions and private litigation, and we may be subject to new or additional federal and state laws and regulations (or changes in interpretations of existing laws and regulations) that could expose us to government investigations, significant compliance costs or burdens or force us to change our business practices in a manner that may be materially adverse to our operations, prospects or financial condition.

- Our Aaron's Business faces many challenges which could materially and adversely affect our overall results of operations, including increased competition from traditional retailers, e-commerce retailers and virtual rent-to-own companies and the impact of unfavorable and uncertain economic conditions on segments of our customers.

- We continue to implement a strategic plan and there is no guarantee that the strategic plan will produce results superior to those achieved under the Company's prior plan. [11]

339.   These or other materially similar risk disclosures were disseminated throughout the Class Period and did not serve to adequately inform the market of the true risks and actual operational experience of the Company.  Indeed, that these

---

[11]  *See* Aaron's 2017 10-K, Part 1, Item 1A (Risk Factors).  The 2017 10-K was incorporated by reference into the Company's 1Q18 10-Q to its 4Q18 10-Q.

stated warnings were inadequate and provided no new, meaningful information is evident from the market's reaction to the revelation of Defendants' untrue and/or misleading statements. *See, e.g.*, ¶¶316-333.

340.   More specifically, with respect to the risk warning regarding the existence of "regulations" that "could expose us to government investigations," "require us to incur significant compliance costs and expenses[,]" and "force us to change our business practices in a manner that may be materially adverse to our operations, prospects or financial condition," this supposed risk warning failed to mention that the Company was engaged in illegal, predatory, and anti-competitive conduct in its two largest business segments in violation of the FTC Act.  The generic nature of this disclosure is further illustrated by the fact that this disclosure was repeated in the 2018 10-K (after the Company received the July 2018 CIDs) during a time when Defendants knew or were reckless in disregarding that Aaron's was engaging in unlawful deceptive and anti-competitive conduct at Progressive and AB, and that as a result, the Company faced a material negative impact on the Company's finances and/or operations.

341.   Alternatively, to the extent that the statutory safe harbor applies to any forward-looking statements alleged, Defendants are liable for such statements because, at the time they were made, the speaker knew that the particular forward-

looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Aaron's who knew that the statement was false when made.  Moreover, to the extent that Defendants issued any disclosures designed to warn or caution investors of certain purported risks, those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material, adverse facts undermining such disclosures.

## XII.   CLASS ACTION ALLEGATIONS

342.   Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased Aaron's common stock between February 15, 2018 and February 19, 2020, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants; the officers and directors of the Company; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any Defendants have or had a controlling interest.

343.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Aaron's stock was actively traded on the NYSE.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that the number of Class members is at

least in the thousands and that they are geographically dispersed.  Record owners and other Class members may be identified from records maintained by Aaron's or its transfer agent and may be notified of the pendency of this action by mail using the form of notice similar to that customarily used in securities class actions.

344.   Plaintiff's claims are typical of the claims of the other members of the Class because all Class members are, and were, similarly affected by Defendants' wrongful conduct in violation of federal law, as alleged herein.

345.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

346.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

347.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)     whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)     whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted knowingly or with severe recklessness in omitting and/or misrepresenting material facts;

(f)     whether the market prices of Aaron's stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## COUNT I:

## VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

348.   Plaintiff repeats and re-alleges the allegations set forth in ¶¶1-347 above, as if fully set forth herein.

349.   During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

350.   Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock during the Class Period.

351.   In addition to the duties of full disclosure imposed on Defendants as a result of their affirmative false and misleading statements to the public, Defendants had a duty to promptly disseminate truthful information with respect to Aaron's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to risk, earnings, and revenue trends, so that the market prices of Aaron's stock would be based on truthful, complete, and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

352.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other Class members have suffered damages in connection with their respective purchases of Aaron's stock during the Class Period because, in reliance on the integrity of the market, they paid artificially inflated prices for Aaron's stock and experienced losses when the artificial inflation was released from Aaron's stock as a result of the revelations and price decline detailed herein.  Plaintiff and other Class members would not have purchased Aaron's stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Aaron's and the Individual Defendants' misleading statements.

353.   By virtue of the foregoing, Defendants have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II:

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

354.   Plaintiff repeats and re-alleges the allegations set forth in ¶¶1-347 above, as if fully set forth herein.

355.   The Individual Defendants acted as controlling persons of Aaron's within the meaning of Section 20(a) of the Exchange Act.

356.   By virtue of their high-level positions as officers and/or directors of Aaron's and/or their substantial ownership of Aaron's stock; participation in,

awareness of, and ability to control the Company's policies and operations; and/or their intimate knowledge of the false and misleading statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.   The Individual Defendants (either directly or through their representatives on the Board of Directors) were provided with, or had unlimited access to copies of, the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

357.   As set forth above, Aaron's and the Individual Defendants violated Section 10(b) and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, and as a result of their aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the Section 10(b) violation alleged herein.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other Class members suffered damages in connection with their

purchases of Aaron's stock during the Class Period, as evidenced by, among others, the stock price decline alleged above, when the artificial inflation was released from the price of Aaron's stock.

358. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.    Determining that this action is a proper class action, certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure, and designating Lead Counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  July 17, 2020

ROBBINS GELLER RUDMAN
 & DOWD LLP

*s/ Jack Reise*

JACK REISE (admitted *pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com

ROBBINS GELLER RUDMAN
 & DOWD LLP
ARTHUR C. LEAHY
(admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
artl@rgrdlaw.com

*Lead Counsel for Lead Plaintiff and the Putative Class*

HERMAN JONES LLP
JOHN C. HERMAN
  (Georgia Bar No. 348370)
CARLTON R. JONES
  (Georgia Bar No. 940540)
3424 Peachtree Road, N.E., Suite 1650
Atlanta, GA  30326
Telephone:  404/504-6555
404/504-6501 (fax)
jherman@hermanjones.com
cjones@hermanjones.com

*Local Counsel*

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on July 17, 2020, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, and a copy of the foregoing pleading has been electronically mailed to all attorneys of record.

*s/ Jack Reise*
_____
JACK REISE
