THE FOLLOWING IS THE PDF OF AN OFFICIAL TRANSCRIPT. OFFICIAL TRANSCRIPTS MAY ONLY BE FILED IN CM/ECF BY THE OFFICIAL COURT REPORTER AND WILL BE RESTRICTED IN CM/ECF FOR A PERIOD OF 90 DAYS. YOU MAY CITE TO A PORTION OF THE ATTACHED TRANSCRIPT BY THE DOCKET ENTRY NUMBER, REFERENCING PAGE AND LINE NUMBER, ONLY AFTER THE COURT REPORTER HAS FILED THE OFFICIAL TRANSCRIPT; HOWEVER, YOU ARE PROHIBITED FROM ATTACHING A FULL OR PARTIAL TRANSCRIPT TO ANY DOCUMENT FILED WITH THE COURT.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


SHIVA STEIN, ET AL,                    )
                                       )
     PLAINTIFFS,                       )
                                       ) DOCKET NO. 1:20-CV-0230-JPB
     -VS-                              )
                                       )
AARONS, INC., ET AL,                   )
                                       )
     DEFENDANTS.                       )


**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE J.P. BOULEE**
**UNITED STATES DISTRICT JUDGE**
**OCTOBER 14, 2021**

APPEARANCES:

ON BEHALF OF THE PLAINTIFF - LABORERS PENSION TRUST FUND FOR
NORTHERN NEVADA:

     STEPHEN ASTLEY, ESQ.
     KATHLEEN B. DOUGLAS, ESQ.
     BAILIE L. HEIKKINEN, ESQ.
     ROBBINS GELLER RUDMAN & DOWD, LLP

ON BEHALF OF THE DEFENDANT - AARONS, INC., ET AL

     MICHAEL R. SMITH, ESQ.
     BRIAN BARNES, ESQ
     B. WARREN POPE, ESQ.
     KING & SPALDING, LLP

     PETER JONES, ESQ.
     HERMAN JONES, LLP


STENOGRAPHICALLY RECORDED BY:

                    PENNY PRITTY COUDRIET, RMR, CRR
                       OFFICIAL COURT REPORTER
                     UNITED STATES DISTRICT COURT
                         ATLANTA, GEORGIA


UNITED STATES DISTRICT COURT - OFFICIAL CERTIFIED TRANSCRIPT

(PROCEEDINGS HELD IN OPEN COURT AT 10:05 A.M., ATLANTA, GEORGIA)

COURTROOM DEPUTY CLERK:  This is case 20-CR-2030, Stein v. Aarons, Inc., et al.

THE COURT:  Thank you.  Counsel.

MR. ASTLEY:  Good morning, your Honor.  Stephen Astley, joined by my colleagues Kathleen Douglas and Bailie Heikkinen. We're with Robbins, Geller, Rudman & Dowd Law Firm on behalf of the lead plaintiff.  And I also note our colleague Peter Jones from Herman Jones, local counsel, sitting in the back there.

THE COURT:  Great.  Good to see all of you.

MR. ASTLEY:  Good to see you, sir.

MR. SMITH:  Good morning, your Honor.  I'm Michael Smith here for Aaron's and the individual defendants.  And I'm joined at counsel table by Warren Pope and by my associate Brian Barnes, who is here to accept all blame if I screw up the technology.

THE COURT:  Very well.  Good to see all of you this morning as well.

I think we've got this down for an hour a side.  If you need that long, you're welcome to it.

And, Mr. Smith, your motion, so you have the floor.

MR. SMITH:  Thank you, your Honor.

So, your Honor, just after Aarons announced they had reached a no-admission settlement with the FTC in February of 2020, a shareholder who owned five shares of stock filed a complaint against Aarons and its top four executives alleging that

the defendants committed securities fraud.

We've moved to dismiss this action based on failure to meet the elevated pleading requirements under the Federal Rules and the Private Securities Litigation Reform Act, which I'll refer to here today as the PSLRA.

Under the PSLRA the district courts serve as gatekeepers at the motion to dismiss stage and weed out those claims that fail to identify actionable misstatements or plead fraud, scienter with the requisite particularity.

(Interruption by the court reporter)

MR. SMITH:  So, your Honor, there's quite a bit of paper that the parties have submitted to you in this action.  We greatly appreciate you giving us this time here today to hopefully crystalize things for you.  I'm not going to rehash everything that's in our briefs.  I'll try to focus things and emphasize the main points.  I know you don't need the invitation, but I hope you will jump in at any time with questions or to ask me to address anything in particular.

So let's start with the amended complaint.  It's massive.  It's 235 pages.  It's got 358 paragraphs of shotgun pleading.  As best as we can tell, there are 137 different statements that the company made that the plaintiffs challenge are false in the class period from February 2018 to February 2020.

But, your Honor, you should not mistake bulk for active pleading under the PSLRA.  We contend that plaintiffs have failed

to meet the most basic elements.  They haven't pled that any of the statements were false just because the company entered into the two FTC settlements that we'll discuss.

In addition to not showing a false statement, most of the statements are inactionable because they're either forward-looking statements, statements of puffery, or statements of opinion that are not actionable under the securities laws.

And, finally, the plaintiffs have failed to plead or raise the requisite strong inference of scienter or the mental state of an intent to defraud.

So after some brief background, I will address the PSLRA standards and try to argue to your Honor why the complaint here fails to meet those standards.

Okay.  Aarons.  Aarons is a well-known Atlanta company. It's been around many years.  It's a leader in the industry that provides lease to own or lease-purchase options for consumers with challenged credit for things like furniture, appliances, electronics and many other goods.  Aarons has been publicly traded for almost 40 years.

The time period that this case focuses on is 2018 to 2020.  At that time Aarons had two principal business segments, the Aarons Business segment, also referred to as the AB segment, which primarily offered products through Aarons' brick and mortar stores, almost 1,800 of them depending when the class period. The other business segment is the Progressive Leasing segment.

Progressive is a virtual lease-to-own company that is really more digital in nature. Rather than having the brick and mortar stores, it provides these lease-purchase solutions in partnership with thousands of retailers, big names like Best Buys, and Zales Jewelers, Lowe's, people like that. Aarons acquired Progressive back in 2014 as it saw the rise of digital retailing, and it quickly became the fastest growing segment in Aarons at-large.

Your Honor, why are we here today? Simply put, the plaintiff is trying to transform these two FTC settlements which former -- which focus on consumer protection into a securities fraud case.

Let's talk about the two settlements. In November of 2019 Aarons announced it had entered into a consent decree with the FTC to resolve an investigation that was focused on the purchase and sale of customer lease agreements between Aarons and other lease-purchase companies. So, obviously, there's been a big transition away in all of retail, from brick and mortar stores to more online and digital focus. As a result, Aarons and -- frankly, all kinds of retailers, but particularly Aarons and people in the lease-purchase business have closed hundreds of stores.

So Aarons, a great number of their customers or significant number of their customers actually make payments in the Aarons store, that's where they choose to make their payments

rather than mail them in.  So when Aarons closes a store and it doesn't have another store nearby, it will often sell the lease-purchase agreement to another competing retailer with a store in the area to provide for that convenient in-store payment option.  This is, as the FTC noted, very common in the industry. FTC had no problem with that issue in particular.

The FTC found that in a small -- what it said was a small number of instances the retailers, Aarons and the competitors, would enter into reciprocal lease-purchase agreements and they didn't like some of the reciprocal nature of those agreements and didn't like some of the reciprocal non-competes that were in those agreements between Aarons and the retailers. So while it didn't object to the sale of contracts in particular, it did and the retailers, Aarons and its competitors, resolved the case on a no-admissions basis by stopping the practices that the FTC complained about and then moved on.  So that was the first FTC investigation.

The second one, which a settlement was announced in February of 2020, of a previously disclosed FTC investigation involving Progressive's disclosures to consumers.  The FTC had claimed that the consumer disclosures were not sufficiently clear regarding the total amount the customers would have to pay to end up owning the lease-to-purchase items.

So under this settlement Progressive agreed to clearly and conspicuously disclose the total costs, agreed to review its

retailers' promotional material and pay $175 Million to the FTC Consumer Redress Fund.

THE COURT:  Let me break in and ask you a question about that, $175 Million.  On page 15 of your motion you make the argument that's not a material amount.  And that -- you know, as I was reading through everything, that gave me pause frankly.  I think you've got some good arguments in your motion, but that one I didn't think was so good.  Help me understand how 175 Million wouldn't be considered material.

MR. SMITH:  Well --

THE COURT:  And I know you can take the range of years of the case and take your total sales and it doesn't seem like much compared to that, but still, 175 Million I would think that that was a hit to the bottom line, that quarter at least.

MR. SMITH:  Yeah.  So this case isn't about whether or not we timely disclosed the FTC settlement.  We disclosed it immediately.  And when we knew it was a $175 Million settlement, we disclosed it.  I think the issue that we're talking about in terms of materiality, they have alleged that basically every statement the company made for two years was false or misleading because it didn't disclose that it had -- in what plaintiffs contend, that it was violating the FTC Act.  Okay.

Now, the $175 Million settlement, as we point out in our papers, the time period the FTC focused on was very broad.  The plaintiffs say that it was from at least 2016 through 2019.  If

you look at just that period of time, and we, of course, are accepting their allegation, the FTC investigation was broader. That period of time Aarons had revenues of over $12 Billion.  And as a percent of revenue, that's less than one-and-a-half percent of revenue.  So it's not that the figure 175 was not material and didn't need to be disclosed, we immediately disclosed it.  They're not making any allegation that the -- we failed to disclose the settlement when it was made, we did, but the question of whether that figure shows that somehow the executives at Progressive and Aarons Business knew of illegal acts or acts that were unfair, deceptive and in violation of the FTC Act, prior to that, that's the main point we're asserting there.

THE COURT:  Thank you.

MR. SMITH:  Okay.

So shortly after the Progressive settlement was announced, this action was filed.  The complaint liberally cribs from the FTC complaints that were filed in connection with these no-admission settlements.  And, as I mentioned, they're trying to re-engineer these customer-focused allegations into a securities fraud claim.  They claim that these practices were entered into or were undertaken by Aarons to maintain an appearance of continuous growth and mask the decline of the Aarons Business segment of the company.

And, as I mentioned, they essentially say, well, every time the company opened its mouth and made any statement about its

9

finances, how the business was doing, what its prospects were going forward, what it was doing to try to improve the Aarons Business segment, all of that, those statements, were misleading because the company didn't -- the company didn't accompany those statements with some admission that they were engaging in practices violating the FTC Act.

So now I'll turn to the pleading standards at issue here.  The case is brought under Section 10(b) of the Exchange Act, which makes it unlawful to make misleading statements in connection with a purchase or sale of a security, or to omit information if that information is necessary to avoid making the statements made misleading.

The Eleventh Circuit in the 2019 *Ocwen* decision said that:  In securities cases the plaintiffs face a triple-layered pleading standard.

So you've got three layers:

First layer, Rule 8, plausibility;

Second layer is the heightened particularity standard of Rule 9(b);

And then, finally, the third layer or the heightened special pleading requirements of the PSLRA.

So the PSLRA was enacted in 1995.  In the '80s and '90s these cases were exploding to the point where Congress felt it had to step in and curb what it perceived to be too many abusive and meritless suits, which Congress said had become a litigation tax

on corporate America.

In 1995, as part of Speaker Gingrich's Contract with America, Congress passed the PSLRA.

President Clinton vetoed the bill, but both Houses of Congress came together and overrode the veto and passed the legislation and the new pleading standards into law.  It's almost impossible to conceive of Congress today coming together in a fashion to override a Presidential veto, but that -- it was deemed important enough to reign in these suits in 1995 to pass this legislation.

So the standards here in -- is this coming up on your screen, your Honor?

THE COURT:  It is.

MR. SMITH:  Here are the PSLRA standards.

So, first, it requires for each statement there has to be an explanation for why the statement is misleading.  And if those allegations are made on information and belief, those pleadings must be done with particularity.

Second, on scienter, which is the required state of mind.  9(b), as you know, allows for the plaintiff to aver state of mind generally.  The PSLRA does away with that and says that the plaintiff must state with particularity facts giving rise to a strong inference that the defendants' acted or made the statements with an intent to defraud or severe recklessness.  This is the scienter standard.

11

Third is the PSLRA codified the safe harbor for forward-looking statements and this shields statements of future performance from liability.  Essentially Congress made the judgment that we want to encourage companies to talk about the future and give us a fuller picture, but people were not doing that because they were afraid of having liability in case predictions of the future didn't come through.  So as long as certain requirements are met, this safe harbor protects those forward-looking statements.

So let's see how the courts go about applying these elevated pleading standards to securities fraud complaints.

First, as you see in (b)(1), you're supposed to go through a statement-by-statement review, each statement.  Because plaintiffs' complaint is so long and indiscriminantly claims over 100 statements are false and misleading, I'm not going to go through each one of those here today, although we did in our briefing, particularly in some charts that we filed as exhibits to our motion to dismiss.

Instead what we're going to do is focus on the categories of false statements that the plaintiffs used in its briefing, these three main categories of alleged false statements. And I've put those up on the screen, statements of Aarons' financial performance, statements regarding the AB divisions' return to sustainable growth, and, third, compliance and customer service statements.

12

The plaintiffs' theory, when you boil it down to its essence, is really pretty simple.  All of these statements in each of these categories were false because they failed to accompany the statements with an admission that Aarons was allegedly engaging in unlawful conduct.

So starting with this first category, financial performance.  The plaintiff doesn't claim that the numbers were false, it doesn't claim that there was cooking of the books, that the revenue wasn't there, that sales didn't occur.  What their theory is, well, it was misleading because you didn't say that the revenue was obtained through false and deceptive practices.

Well, courts in the Eleventh Circuit have consistently rejected this theory that revenues can be misleading without a disclosure that some of the revenue may have been illegally obtained.  This was an issue that the Eleventh Circuit faced squarely in the *FindWhat* decision in 2011 that's cited in our brief.

Quickly, *FindWhat*, that was a company that placed Internet ads for advertisers in return for a payment for each click that, you know, somebody on the Internet would make on the ad.

The plaintiff alleged that some of the revenue of *FindWhat* was driven by what's called click fraud, and that's using bots and spyware and other computers to generate non-human traffic to generate the clicks and drive the revenue number up.

The plaintiffs in *FindWhat* challenged a set of statements by *FindWhat* that its revenue was increasing, and they said it was misleading because you didn't accompany that statement with a statement that some of the revenue was driven by click fraud.

The Eleventh Circuit affirmed dismissal as to that statement pointing out that an accurate statement regarding revenue says nothing about its quality or sustainability and was, therefore, not rendered misleading by the omission of this click fraud issue.

And the Court affirmed this even though *FindWhat*, in contrast to what happened here, later admitted that some of its revenue was generated by click fraud.  Here Aarons and Progressive have never admitted to any illegal conduct.  So the same holds true with the second category of statement, the statements regarding AB's return to sustainable growth.

The company, there was no secret that Aarons was struggling with the emergence of online retail.  When I say "Aarons," I mean AB, the AB segment of the brick and mortar stores.  And the company had been trying to right that boat for years, had adopted a number of initiatives to try to reverse that declining performance.  And the plaintiffs here don't maintain that Aarons didn't have these initiatives.  They simply say, well, you -- any statements you made about Aarons was misleading because you didn't -- Aarons Business, you didn't accompany that with an

14

admission that you had engaged in these reciprocal -- the small number of reciprocal lease-purchase agreements with the competitors.

So the plaintiff doesn't explain how omission of that information makes statements like the company was trying to right-size its store footprint, or that -- it doesn't explain how that is rendered misleading by the failure to disclose that the company entered into a small number of these reciprocal agreements.

And then, finally, this third category, compliance and customer service statements.  The plaintiff claims it was misleading to make statements like that it had high levels of customer service, or that it was interested in providing the best possible experience for customers because the plaintiff alleges that the company was deceiving customers with inadequate disclosures and had received customer complaints.

Now, the great majority of these statements, if not all of them, are clearly, in our view, inactionable puffery, which I'll address in a minute.  But more fundamentally, they're not --

THE COURT:  Is that as to Category 3 we're talking about or all of them?

MR. SMITH:  There's puffery throughout these three categories, but these specific statements I just mentioned, about best customer experience and high levels of customer service, we certainly maintain those are puffery.  But those types of

statements are not rendered misleading because the company ended up agreeing to settle with the FTC and, hence, some of its disclosures.

And then on the compliance side they challenged statements such as we believe we are in compliance with the FTC Act.  Plaintiffs have simply not shown that this statement of opinion was false; that, in other words, that the executives did not actually believe the company was in compliance.

But even if you assume a violation of the FTC Act, which has not been proven or adjudicated, the plaintiff doesn't provide any particularized contemporaneous facts showing that defendants knew of the violations and did not actually believe that the company was compliant with the Act.

So that's the first argument, they haven't even established that any of the challenged statements are false or misleading because of the alleged omission of this information.

Going further, the statements are not actionable, as I mentioned, for three other reasons.  They're either forward-looking statements, puffery, or opinion, or some mix of the three.  So let's move to that now.

Forward-looking statements.  So the PSLRA protects such statements from liability as long as they're accompanied -- identified as such, accompanied by meaningful cautionary language, or immaterial, or the statements were made without actual knowledge.  So it's important to note here --

16

THE COURT:  Let me interrupt you before we get into forward-looking, puffery and opinion.  If I understand your argument correctly, your first argument as to the various three categories of statements not being misleading, that's one way you would argue I could grant your motion to dismiss --

MR. SMITH:  Correct.

THE COURT:  -- correct?

And then, secondarily, there's also the forward-looking arguments, the puffery arguments, the opinion arguments, which, if I bought your first argument, I don't even necessarily get to your second detailed arguments about forward-looking, puffery, or opinion, do I?

MR. SMITH:  That's correct, or the scienter argument, because falsity is the number one element.  And even if they show falsity, then they have to show, well, is it otherwise actionable or is it inactionable for the three reasons I'm about to get into.

And then, finally, scienter.  If you don't have a false statement, you don't have scienter.  We've cited cases there.  So, you're right, if you don't find that the statements -- that any statement was rendered false or misleading, then you don't need to get into these other categories.

THE COURT:  Let me ask you kind of the opposite question as far as your arguments about forward-looking, puffery or opinion.  And I've looked at your charts, but I didn't go through line by line of the complaint and try to match them up, I think

you mentioned at the outset 137 statements.  For all 137 of those statements do you argue that they are either forward-looking, puffery, or opinion, or are there some that are left over and that would survive the forward-looking, puffery, or opinion arguments such that for me to grant you complete relief, I would need to go to your main argument about falsity?

MR. SMITH:  Or scienter.

THE COURT:  Right.

MR. SMITH:  That is correct.  Not all of them, the majority of them.  And I think that it's well over -- I think it's over 100 of those statements.  Out of the 137 statements, I think only 28 are not forward-looking, puffery or opinion.

THE COURT:  Okay.  Thank you.

MR. SMITH:  And those are primarily like, for example, statements about our financial performance.  Well, again, they claim that the statements that we made, that we had a record quarter, that our sales were this and increasing, they claim all those statements were misleading because we omitted that the revenue was allegedly illegally obtained or some piece of it was.

So on that, as in *FindWhat*, we argue that's not required to be disclosed, that statement about your revenue -- and, again, they don't challenge that the revenue was actually there.  Just like in *FindWhat*, the revenue statement is not rendered misleading by omitting that some of the revenue may have been illegally obtained.

18

So the answer in short is, yes, there are some statements, a narrow group, that are not inactionable for forward-looking statements, puffery, or opinion grounds, but those, we say, should be dismissed because they're not false and because they haven't shown scienter.

THE COURT:  Thank you.

MR. SMITH:  Okay.

Just quickly on these forward-looking statements, and about half of the statements are clearly forward looking, here are some examples of that.  They talk about expectations.  It's clearly focused on the future.

Now, these statements are protected.  They're identified as forward-looking statements.  They're accompanied by cautionary language.  I don't think we need to spend a great deal of time on that.  We identify the cautionary language that is -- was disclosed by the company in its 10-Ks.  The risk factors are very detailed.  They actually address the whole issue about, look, we're in this consumer challenged-credit area.  The government, the regulators really scrutinized us there.  The laws in this area are evolving, unclear.  And, you know, when the FTC Act just says thou shall not engage in unfair and deceptive practices, it's -- you know, there's a lot of uncertainty in that area.

So we made a number of cautionary statements and even about the Aarons Business.  Again, it's no secret that it faced many challenges and there was many cautionary disclosures about

that.  So they were identified as forward looking.

They talk about the future.  They depend on the future to see whether or not they're going to be true and they're insulated from liability.  I won't -- the plaintiffs come up with a few arguments.  Well, they only devote two pages of their briefing to forward-looking statements, really don't address specific statements and certainly not the half or so that are forward looking.

But they say things like, well, some of the statements have present tense words in them.  And, you know, that's true, but the law in the Eleventh Circuit we cite to you is, look, if you've got a mix of present tense and forward factors, let's just take this middle box, many of our leading indicators are positive, which gives us increasingly optimistic expectations about the business going forward.  Judge Cohen in the *Aquity* case and in other cases that we cite in the Eleventh Circuit, in that kind of mixed situation, the whole statement is still considered forward looking.  They don't challenge, for example, that the leading indicators were not positive, that's not the thrust of their argument, and the statement is forward looking and should be protected.

The *Ocwen* case also discussed forward-looking statements in some detail and also addressed similar meaningful cautionary language in finding that a number of those statements were protected.

So let's go to puffery.  There are a number of statements challenged that we identify that we contend are puffery.  Those are detailed in the chart that we attached to our briefing.  Statements like, Progressive had another quarter of outstanding execution; we're bullish about our pipeline; we have a relentless focus on the customer experience; we have a great win rate; we're pleased with significant effort the team has made toward providing the best possible experience for our customers.  These statements under the law, statements of corporate aspiration, corporate optimism, they're just too vague in general to be relied on.

As Chief Judge Batten wrote in the *Home Bank* case that we cite:  Generalized statements of optimism that are not capable of objective verification are not actionable because reasonable investors do not rely on them in making investment decisions.

So these kinds of statements are simply inactionable even if somehow they could get over that hurdle and convince you that the statements were false because they omitted disclosure of the alleged FTC issues.

Finally on opinions, a number of the challenged statements are in the nature of opinions.  We believe that these initiatives will help the business get back to sustainable growth.  Here's some more opinions.  The third quarter was challenging, but we accomplished key objectives which we believe significantly improve our long-term prospects for growth.  And there was another

one that I mentioned earlier about we believe we are in compliance with the FTC Act.

A statement of opinion is just that, it's only false if they can show that the speaker of the opinion did not genuinely hold it.  Really, there are no allegations to support that the executives did not believe any of these opinions.  And there's no embedded factual assertion in the opinion that they challenge either.

So that brings us to scienter.  And I'm not going to spend significant time on this, your Honor.  The case law is clear that if you can't show a false or misleading statement, you can't show scienter, and that's what we maintain here.

You'll recall from when we looked at the PSLRA standards, the pleading standard for scienter was elevated.  The plaintiff -- it's the plaintiffs' burden to plead particular facts raising a strong inference of fraudulent intent or severe recklessness.  And this is one that's got to be cogent and compelling; that the defendants either knew the statements were false or severely reckless in not knowing.  The allegations of scienter are just way below this standard.

They point to the FTC action, which is the two settlements, which is really the core of the entire case, but none of the individual defendants is mentioned in those settlements, there is no detail about what any of the individual defendants may or may not have known about any of the conduct at issue.  And

essentially the scienter allegations are either based on hindsight or just generic factors that plenty of courts have dismissed as not raising an inference of scienter.

They take the hindsight -- the hindsight is they point to the two settlements and say, well, you agreed to settle even if on a no-admissions basis, and that means that, therefore, you knew before the settlements that you were engaging in conduct that was in violation of the FTC Act.  And that simply does not hold water.

I think it's also significant to quickly point out what the plaintiffs have not alleged here.  In virtually all securities fraud class action cases that survive a motion to dismiss, there are -- there's got to be supporting allegations.  A lot of times these come from confidential witnesses, former employees and other people who are able to provide specific and concrete allegations about the executive's knowledge and participation in wrongful or fraudulent activities.  That's simply not present here.  A company with 12,000 employees, there are no confidential witnesses to back up their claims that the executives knew or believed that the company was violating the law.

There's no internal documents or e-mails or other documents referred to which connect any of the individual defendants to knowledge of or approval of any wrongful practices.

So in *Home Bank* again Chief Judge Batten said that: Plaintiffs' reliance on after-the-fact events to support an inference that statements must have been intentionally misleading

and made with scienter amounts to little more than fraud by hindsight, which is not actionable.

And then quickly, stock sales. That's unavailing. They do refer to certain stock sales by the executives. The law is clear that stock sales standing alone raise no inference of scienter, can only add to an inference that is established through other factual allegations. Here the plaintiffs have completely failed to show that the stock sales were suspicious in either timing or amount.

First on the amounts. The amounts sold by the executives, and this was over a lengthy two-year period, range from 14 percent to 26 percent of their holdings. In the *Rosenberg v. Gold* decision, the Eleventh Circuit said that sales of approximately 39 percent were insufficient to contribute to an inference of scienter.

Moreover, the sales occurred pursuant to -- and the plaintiffs allege this in the complaint, they acknowledge it, they were made pursuant to 10b51 plans. These are plans that the law allows for you to set up and these were set up and disclosed prior to the trades and were announced to the market prior to the trades, saying, hey, over the next so many months or year, I'm going to sell this stock. And we've cited cases to you that show that sales made to the presence of 10b51 plans actually negates any reference of scienter.

Your Honor, in closing --

24

THE COURT:  Before you get to your closing, let me ask you one thing.

MR. SMITH:  Yes.

THE COURT:  There's a reference in one of the briefs to an FTC dissent that named one of the defendants.  Talk to me about that, and what's Aarons or all the defendants' take on that argument?

MR. SMITH:  Right.

So, as I mentioned, the FTC's order, its complaint that it filed does not mention any executive.  One of the dissents -- one commissioner dissented, Commissioner Slaughter.  She said that she felt and she feels that executives should be held accountable.  And her statement was that in her view, her belief was that one of the defendants, Woodley, who ran the Progressive division, either participated in the acts or, or, had the power to control them.  There was no -- this was not accompanied with any detail of what Mr. Woodley may or may not have known.  I think it's clearly ambiguous as to whether she is saying that, well, he actually participated, approved certain actions as opposed to, well, he's the head guy, he can control them.

And I think that it's also fair that given that the other two commissioners didn't do this, I mean, they rejected this notion that Woodley or any of the other defendants should take responsibility for what it deemed to be these practices that they wanted to see changed.  So, in short, that doesn't raise any

inference of scienter as to Woodley.

And I think it's important, I would invite you to look at the *LendingClub* decision that we cited from -- it's a California case but it's a case that says, look, you can't just quote allegations that some third party makes and satisfy your obligations to state a securities claim.  You've got to have some corroborating detail before you can cite third-party complaints such as the FTC's actions.

And that's what's -- another thing that's missing here. They cite the FTC's settlement, they cite the complaints, they cite Commissioner Slaughter's dissent, but there's no corroborating detail.  And just as in *LendingClub*, we maintain that is insufficient to state a claim for raising an inference of scienter.

So, in closing, I'm going to put this quotation up from Judge Newsom's opinion in *Ocwen*, and it's a securities complaint that like this one had a blend primarily of these statements of forward-looking statements, opinions, puffery.  And the inquiry that Judge Newsom focused on here was did *Ocwen* make a material misrepresentation of fact, one that a reasonable investor would have relied on in light of the total mix of the information available.

And as you can see from this quote, the Eleventh Circuit determined here that the answer was clear and that the statements challenged didn't cross the line and they were either not

material, they were not sufficiently alleged to be false or misrepresentation, or they were exempt under the PSLRA. And they dismissed those statements, which were primarily compliance-related statements.

Both the Supreme Court and the Eleventh Circuit have warned that the Court must assure that private securities claims don't transform the federal securities laws into a system of investor insurance that reimburses investors for every decline, no matter how temporary, in the value of their investments.

It's important that the Court play a gatekeeper role in these kinds of cases, hold plaintiffs accountable to the heightened pleading standards. We contend that those have not been met here and that the case should be dismissed.

So thank you for your time and questions and patience, your Honor, and I'll reserve remaining time for rebuttal.

THE COURT: Thank you, Mr. Smith.

Mr. Astley.

MR. ASTLEY: Yes. Good morning, your Honor. May it please the Court.

Thank you for the audience. I know it's been trying for all of us and we're doing our best, but I appreciate the audience in person to represent the interest of my client, which is where I would like to commence my remarks.

Counsel led off his remarks by noting shortly after the announced 175, it was really $190 Million settlement with the FTC,

but we're quibbling, an investor stock suit was filed by someone who owned five shares of the stock.  I'm not sure that matters from a legal standpoint, but suffice it to say that person is not my client.

My client is a pension trust fund who works on behalf of laborers in the state of Nevada, thousands of laborers.  It's a defined pension plan.  Lost close to 200,000 needed dollars to be able to afford those hardworking folks the ability to retire as they were promised through that contribution plan.

Now it's absolutely also true that with the Reform Act your Honor is to function as a gatekeeper in these cases, but as with most things in the securities laws, there is a balance of interests.  Counsel highlights the one side, investor insurance, strike suits, et cetera, the case should be dismissed.

But in reality, if you look at the *Tellabs* decision, for example, the Court instructs the district courts to find the appropriate balance obviously to avoid investor insurance as being the key to unlock the courthouse doors, but recognizing the extreme importance of the federal securities laws to supplement the FTC and the Justice Department to ensure that those disclosure requirements are met.

And that brings us to the triple layer pleading requirement that was mentioned, and I will also touch on it.  Of course, you have Rules 8(a) plausibility standard, Iqbal Twombly analysis.  Rule 9(b) provides the particularity that needs to be

applied to the averments of fraud.  But the only heightened pleading requirements as it were established by the Reform Act are explaining why the alleged false statements that are pleaded with particularity under 9(b) are false.  And then for the scienter element, establishing a strong inference, which the Supreme Court defines in *Tellabs* as being at least one that's cogent and compelling as one offered by the defendants.

And so that brings us, I think, to the central point where there is just a disagreement with counsel's representation of what the gist of the aver fraud here is, which really has little to do with whether the defendants admitted they were violating the law or engaged in wrongful conduct.  That is not the alleged falsity that's at hand.  Those are conclusions drawn by precipitating facts.  And it's those precipitating facts and the non-disclosure of them which forms the backbone of the Securities Exchange claim being advanced by my client.  And there's a fundamental difference between those two realities.

And we certainly plead and believe the two courses of business conduct that were discussed earlier were, in fact, violative of the FTC Act.  But whether or not that's true doesn't really have any relation to whether the practices themselves should have been disclosed but weren't.  Nor does it speak to whether the practices were sustainable as a business model, or whether they produced illusory revenue streams.  And so whether or not the conduct was, in fact, illegal is not dispositive issue

certainly for your Honor.

As Chief Judge Jackson explained in the *Amedisys* case, the plaintiff isn't here representing the United States government, so it really matters not that it was a no-admission denial -- total denial settlement.  The question is whether the precipitating facts should be disclosed under the securities laws.  And that's what we're asking your Honor to consider and we should have been disclosed.

And whether or not those practices were, in fact, illegal doesn't, again, address whether they were sustainable or whether they produced appropriate and legitimate revenue growth for the company.

THE COURT:  Let me ask you, if your case survives, aren't I making precedent in which any time there's a government investigation of a company, FTC or otherwise, there's then a viable securities case, because that, as I read your complaint, seems like what we have here?  You have a lot of paragraphs about the company said X, Y and Z.  And then you say at the end, because they didn't disclose the underlying allegations from what the FTC eventually came after, everything they said is false.  It seems like that's all we have here, and I'm troubled to allow that to proceed and create precedent --

MR. ASTLEY:  I certainly understand that, your Honor.  And if that were the case, frankly, I would agree with you, and a dismissal would be in order.  But it's not the case and it's not

the case in which there's a government investigation that there's necessarily a corollary securities law violation.

Within the Eleventh Circuit, as well as the Supreme Court, those -- they set the standard for when disclosures about government investigations or failure to disclose material facts pertaining to those investigations can lead to a corollary securities fraud violation.

And so from the Supreme Court's standpoint in the *Matrixx* example, *Matrixx Initiatives* v. *Siracusano*, a 2011 case, companies can control what they have to disclose by controlling what they choose to say to the market, but a defendant may be liable when they put the reasons for a corporation's success at issue but fail to disclose material sources of that success where they're predicated on improper or illegal business practices.

So it's not -- the point being, it's not the fact that there is an investigation, nor is it the fact that the defendants failed to disclose they did something wrong, nor is it the fact that they failed to disclose the underlying practices that even precipitated the investigation to begin with, but what is at issue is when the defendants voluntarily choose of their own free will to come to investors and explain the source of their success when they're answering direct questions from analysts, which I'll highlight, asking them how they're earning this money, why are your bad debt expenses going up at a higher rate than we've seen, and they choose to answer those questions.  It's not a no comment,

we'll get back to you, they answered those questions explicitly. That gives rise to a securities fraud case if those responses are materially misleading.  And these responses were.

So it is not a situation where simply an investigation begets a fraud case and your Honor is creating bad precedent. The rule is well-known and these defendants well knew the rule. They've been publicly traded for many years, as we learned today.

When you choose to speak, you must speak wisely, but most importantly, you must speak truthfully, as the Eleventh Circuit instructs.  I'm quoting, the disclosure required by the securities laws is measured not by literal truth but by the ability of those statements to inform accurately investors rather than mislead perspective buyers.

And so that brings us full circle.  The defendants well articulated their grounds for dismissal today.  They basically covered the full array, failure to allege falsity, puffery, safe harbor and opinion, and I would also like to touch on those categories.  But I think one of the other sort of observations that I'll make leading into these remarks is if you want to get to a result, for the defendants it's one of dismissal.  And they're great lawyers.  You can search the Westlaw or the Lexis directory and cobble together a host of cases, and they have many of them, the vast majority of them aren't even in the Eleventh Circuit, and get to the conclusion that dismissal is warranted.  But in doing so, you completely miss the forest for the trees.

And so what's more important, at least from my vantage point representing my client, your Honor, is trying to elucidate what the appropriate analytical framework is within the Eleventh Circuit for your Honor to consider the law as it pertains to each one of the at-issue elements.  And we believe if you apply the appropriate Eleventh Circuit analytical framework, you will come to the conclusion that dismissal is not warranted.

But if you're sort of just very broadly looking at the case the way the defendants are and the way they presented it, it's easy just to jump to that conclusion and miss entirely the steps of whether and how you should have gotten from point A to point B.  For example, whether a statement of -- alleged statement of falsity is pleaded with particularity.  There's a standard for that in the Eleventh Circuit established by the *Garfield* case.

And the PSLRA also establishes each alleged statement of falsity must be specifically pleaded and the reasons why must be stated, Section 21(d).  But the question of whether or not a complaint for a pleading on a Rule 12 motion is stated with particularity is whether it specifies, quote, the who, what, when, where and how of defendants' statements.  In *Garfield* v. *NDC Health* case from 2006.

There is no dispute, and the defendants didn't contend today, that we do not precisely identify every alleged false statement, the associated omissions flowing from those statements and the grounds for falsity, the reasons for falsity.  They take

issue with all of them.  They have extreme charts.  They literally identified -- apparently there's 137 of them.  They are clearly on notice of what every single alleged false statement and omission is.  That is the standard for pleading with particularity in the Eleventh Circuit.

And time and time again, the *BellSouth* case, Judge Duffey's case, 2005, and *Faro Tech* case, Middle District of Florida case from 2007, just highlight the basic standard who, what, when, where, why of the alleged false statements establishes pleading with particularity in the Eleventh Circuit.

What the defendants fundamentally are asking your Honor to adjudicate is the merits of the dispute, these things just aren't false, not because of perhaps some sort of affirmative defense like safe harbor, puffery, we'll get to those sort of things, apparently they're just not false, they're not actionable. And that is not correct, that's not correct under the appropriate particularity of standard within the Eleventh Circuit.

When you get to the categories of statements, and I'm happy to use the three that they framed, I had them as four but, really, one of the categories is part of the same, it becomes evident that what the defendants were reporting to investors was false.  And it was materially so.  And I'll get to the materiality portion.

Again, if you start from the proposition, and it's undisputed, there were two corporate practices, illegal or not,

that are at hand during this class period, 2017, because it's the fiscal '17 year which came out in February of 2018, the start of the class period, through February of '20, but for this three-year time period it is just not disputed. They were closing stores, profitable stores, with competitors with anti-compete agreements that lasted for three years in a ten-mile radius in order to secure the sustainable growth, the transformational initiatives as the AB segment was highlighted to the market.

And, number two, they were duping customers, poor people, subprime folks, challenged-credit customers, as we heard, to buy product using leases that did not have disclosed terms, that cost way more than the cash price, even though those very customers were told it was the same as cash, that there was no interest rate, that it was not a loan. Those facts are undisputed even though liability flowing from them is. But that frames the falsity analysis.

If the Court accepts at the Rule 12 stage that they were engaged, illegal or not, in two practices, closing stores with anti-competitive -- I'm sorry, noncompete agreements and selling product to consumers, declaring that it was the same as cash, no loan, no interest rate, for that was inaccurate, then following the appropriate analytical framework within the Eleventh Circuit it becomes clear those statements are actionable.

And as to the first category, the financial performance, it's not as if the defendants are liable under the securities laws

because they put out there their financial numbers, they stated their revenues, they stated their sales, their net income, earnings per share, that is not the reason why they're being held to account under the securities laws, but they provide the context for what comes next, which does manifest itself into the violation.  For all of those financial metrics, which are detailed in the complaint, paragraph 113, quarter after quarter, they have earnings releases, they have conference calls, they have 10-Qs and 10-Ks.  In other words, they have an array of investor communications that explain and detail the hard numbers.  And you read those things in tandem and you apply it to the Eleventh Circuit standard of literal truth not being the consideration for liability under the securities laws but rather whether the statements are accurately informing investors or misleading them, it becomes clear that they were being misled.

And you bring it home when you start evaluating, for example, questions that analysts were asking, because what fundamentally was going on between the two undisputed practices was they closed profitable stores but they got non-competes in other stores.  And they got -- so they were able to keep the Aarons Business afloat.  It wasn't doing well.  There were plenty of disclosures.  But while Progressive was getting up to speed, which harkens back to sort of the history that we were getting; 2013, retailers across the country, brick and mortar is the way of the dinosaurs, everything is coming online, Amazon is ramping up,

everything that we all know just living in America, so true was for the lease-to-own segment. But Progressive was a new company in 2014, had just acquired. The AB segment was the legacy core operation of the big Aarons Business.

So you have to buy yourself time to keep your legacy operations afloat to provide your new leading segment, Progressive Leasing, the time to get its operations up and running through the use of deceptive practices in order for that to become the future of the company, which is what it became.

But investors aren't dumb. I mean, again, these are coverage analysts. They have fiduciary obligations to their clients. They're making recommendations; buy, sell or hold. We're all in the same place. We all have our retirement portfolios. We all are looking for information to make informed decisions.

And so analysts are asking these people, for example, in the first quarter of '18, paragraph 136, Progressive had another quarter of outstanding execution and strong invoice and revenue growth.

And an analyst asks, can you characterize where those invoices per active door, which was an increase at that point of 20 percent came from. How are you generating it? Which this is reflected in their Exhibit 14.

And what does Mr. Woodley say in response, it wasn't because -- he didn't tell the analyst who was asking this

question, hey, how are you doing so well, he didn't tell them it's because we have marketing materials, we're training our employees to tell consumers it's no interest or it's not a loan or it's the same as cash, everything we know to be true, and your Honor is going to accept it as true, but what did he tell him, the analyst who was asking how did you generate these revenues?  Well, we spend lots of time motivating our retail associates to get better at completing the Progressive transaction.

Well, you're darn right the sales associate was better at completing the Progressive transaction.  He's the guy in the best light telling the consumer this is a no-interest loan, no harm, no foul.  Why pay full price today when you can pay it over time tomorrow?  It costs you nothing.  It's the same as cash.  This isn't even a loan.

So that is not an accurate response, knowing and accepting as true, they were training those employees to say it was interest free, there wasn't an interest rate, they're training employees to say it was the same as cash.  It's not the same as cash.  Training employees to say it's not a loan.  It is a loan.  That is a materially-false statement and it's not designed to be accurate, it's designed to mislead.

This is not the only time.  Jump a year later, paragraph 190, on a conference call.  An analyst is asking, hey, can you tell me, is there any commentary you can give just in terms of what drove that significant sequential improvement in invoice

volume.

And just to take a step back, the company uses metrics, and you'll see if you evaluate the defendant's exhibits and the Ks and the Qs, active doors are those stores like Best Buy, Lowes, what have you, where there's going to be at least one lease transaction in the trailing 12 months. And the number of those transactions is their invoice volume. So active doors and invoice volumes are two of the companies' key metrics.

So this analyst, first quarter of '19, conference call, paragraph 190, can you just give me some commentary, guys, about what's driving this sequential improvement in invoice volume. Again, it's not, hey, Mr. Analyst or Mrs. Analyst, it's because we're telling the consumer it's same as cash, or we're telling consumers there's no interest rate, it's because we are -- there's more deals, more transactions, and more leases per door, and it's just execution going extremely well.

Well, maybe that's literally true, it's certainly designed to mislead. Literal truth is not the standard in the Eleventh Circuit. They were executing very well, but what they were executing was an entirely deceptive course of conduct. That answer is materially false to an investor who would want to know if the growth the company was seeing is organic, legitimate growth, you're beating your competitors at the doorstep, or is it rigged growth, that's not sustainable. Those are two entirely different sort of revenues that I think anybody who was making an

investment decision between Aarons on the one hand, publicly traded, and Rent-A-Center, the key competitor, publically traded, on the other hand might want to know.  Rent-A-Center isn't engaged in nonsense.  Aarons is.  I'm going to put my hard-earned retirement dollars in Rent-A-Center, for example.

But also it's not as if, your Honor, that -- again, analysts aren't dumb, revenues and all of the colorful language the defendants were voluntarily choosing to extol about that revenue and where it came from and how it was generated, that's not the only thing analysts were looking at, because like Newton's laws of physics, for every reaction, there's an equal reaction.  If you're duping consumers, presumptively those people aren't going to be happy.  No one wants to be duped.  No one wants to pay more than they were told they were going to have to pay.

So what's the natural consequence of coming to the realization that you've been duped?  You stop paying.  You turn back the product.  And that's what happened.  And that's measured in a measure called bad debt expense, which wasn't discussed but is part of that financial performance category.

And, again, there's example after example in the complaint, analysts asking on the one hand, hey, guys, how are you doing so well.  And on the other hand, why the heck are your bad debt expenses increasing sequentially so rapidly.  And just like the defendants were misrepresenting by omission as to the source of their revenue growth and success, they were misdirecting and

omitting the reason why the bad debt expense was going up.

For example, the end of fiscal '17 conference call, paragraph 120, they're noting that their bad debt expense went up. This is reflected in Exhibit 7.  I heard comment about the ranges of bad debt and write-offs trending higher.  I'm wondering if you could -- this is the analyst asking, I'm wondering, defendants, could you comment what the driver of that is.  So they see bad debt going up, there's a specific question asking record revenues, you're telling us you're -- we've asked you in that very same conference where those revenues are coming from and you're saying it's coming from wonderful execution and just closing more deals. And then we're turning around and saying, okay, can you explain to us why your bad debts are going up.

And Mr. Woodley responds, it relates to our decision. We're deploying a range of strategies.  We don't want to discuss the specific strategies, but our strategy with respect to decisioning is to capture more of the opportunity, and that's really what the goal is as it relates to our decisioning strategies.

And so, again, there's a lot of circle speak as far as my lay understanding would be.  But, again, if you carefully consider it, he, Mr. Woodley, is explaining that the bad debt is a product of their specific decisions that they have well in hand, which, again, he relates to the market.

For example, in the fourth quarter of '18, paragraph

180, another question of many asking, hey, I know there's been a lot of focus on bad debt expense increasing.  I think the concern on bad debt expense is we're kind of -- we are in the cycle and if you're seeing anything, so there's a worry that if you're kind of opening up to a certain customer, that may be exposing you more. Well, what kind of customer is the analyst asking about?  The customer who's not going to pay.  That's what bad debt is; are you leasing to people who aren't going to pay.

And what does Mr. Woodley respond?  Yes, our bad debt is up, but I just say that's reflective of the fact that the lease pools are performing inline with our expectations, allaying the market's concern about observable real-world financial metrics. And that is entirely false and misleading under applicable Eleventh Circuit authority.

And you can go through the *Fleet Core* case, Judge May's case, a recent case from 2018, where a defendant publicly tells investors one thing about the revenue sources where there are non-disclosed facts that are truthful, that statement is material misrepresentation.

Or Judge Story's decision from awhile ago, the *Scientific Atlantic* case, a plaintiff may state a claim for securities fraud by alleging that a company misrepresented its financial condition by failing to disclose sales practices that could reduce the company's future revenues, which, again, if you bring it home, that's precisely what we saw.

42

Analysts are asking, hey, why are you doing so well. It's our decisioning, we're executing really well.  Then why are your bad debts going up?  Well, that's perfectly inline with that decisioning and it's what we expected.

Then settlements happen with the FTC, one of which your Honor entered in April of '20, the other was an administrative settlement back in 2019.  But what happens when they make that announcement in February of '20?  The entire company goes off the rails.  They stop the practices, they miss their earnings, their outlook for 2020 is dismal.  On top of that they have to pay the federal government $190 Million.  What did they do about the AB segment, which has been faltering but has been sustained by trying to consolidate its operations through anti-competitive noncompete agreements?  They write off the entire business.  $450 Million of goodwill is written off as soon as the Progressive deceptive campaign comes to an end and they're no longer closing stores with noncompete agreements with their competitors price-fixing.  They write off the whole business.

So if you read the complaint through the natural and appropriate arc, it makes complete sense for what the defendants were doing in terms of trying to keep the AB balls in the air while Progressive gets up and running.  Progressive got up and running through a whole host of, if not illegal, deceptive practices that certainly weren't sustainable.  They produced illusory revenue because people stopped paying and the bad debt

expense went through the roof.  And when it stopped, because the federal government came in, the company's financial progress came to an end and AB almost entirely was shuttered as an ongoing concern.  That is the arc of a false and misleading picture under the federal securities laws.

The defendants then go to the next step and say, well, even if you plead with particularity the who, what, when, where, why, the simple first sentence of any news story, as the Eleventh Circuit states it, it's still these statements weren't actionable because they're not material, as if materiality is just some sort of thing you get from your gut.  I don't think investors would want to know that.  That's not important to me.  It is untethered to any applicable standard.  But, of course, there is a standard. There's a standard of the Supreme Court and there's a standard within the Eleventh Circuit.

The most recent example is the *Ocwen* case from 2019. There are others but that's an easy reference.  It instructs district courts when considering a motion to dismiss, a Court shouldn't grant the motion unless the alleged misrepresentation, puffery, or otherwise, should not dismiss the alleged misrepresentation, puffery or otherwise, unless, quote, it's so, so obvious, obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of importance.

So it's not just immaterial as we may banter around the water cooler, it's got to be so obviously unimportant that

reasonable people, which I would consider us all, can't even disagree on it.  We all agree that no reasonable minds could differ.

But that doesn't fully answer the question either because it begs the question, what is puffery?  Defendants would have you believe that it's, oh, if you're just talking about revenues, or talking about your record performance, or discussing bad debt expense or how things -- how things are going in your opinion, those are all puffery, but that's not what the Eleventh Circuit says.

The *Ocwen* decision, page 319, puffery is things such as an exaggerated opinion, exaggerated hyperbole.  For example, Disney Land claims to be the happiest place on earth.  Is it really the happiest place on earth?  I've been there many times with my kids and it's the last place I want to be, but I enjoy it.

What about Avis' boast:  We Just Try Harder.

Or Dunkin Donuts:  America Runs on Dunkin.

Those slogans are the type of expressions that the Eleventh Circuit has provided district courts in order to orient yourselves to know what people could reasonably disagree about or not.  Is it so obviously unimportant that the CEO of Dunkin Donuts says America Runs on Dunkin?  Yeah, he probably should be sued for securities fraud for saying that, but that has nothing whatsoever to do with speaking about the sources of your revenues, the underlying practices that you're not disclosing when you're

answering analyst's question about how --

(Interruption by the court reporter)

MR. ASTLEY:  Practices, how you're generating money, where the bad debt expense is coming from, and the nature of the ongoing investigations by the federal government.

The other consideration for materiality highlighted by Judge Duffey, for example, in the *BellSouth* case, again, is investors themselves.  We're just here in the sterile environment of the courtroom, but what do real people say?  What do investors say?  Well, how do you know what the investor's view of the importance of non-disclosed information is?  You look at what happens to the stock price when the truthful information is disclosed.  And that's what happened here.

There's four disclosures pleaded in the case.  The receipt of the investigative demands from the federal government, the settlement on the AB side, plus the enforcement proceeding on the Progressive side, and then the settlement with Progressive for the $190 Million.

In total, Judge, the stock didn't fall by $4.20, it fell 42 percent.  It lost nearly half its value only because the market came to learn they were closing stores with noncompete agreements.  Counsel's absolutely correct, it's a common practice to have reciprocal purchase agreements, swap agreements.  The complaint that's attached to the exhibit notes that fact.  So that's not what's driving stock analysts' negative reaction to a settlement

with the federal government that disallows them from engaging in swap agreements, it's the unknown unique part to these swap agreements, the noncompete clauses in them.  That's a material fact.  And when the market learned that for the first time, it reacted.

Same for Progressive, when the market learns not that the FTC brought an action but what that -- what the underlying facts of that investigation represent in the form of how the company was generating its revenues, which was inconsistent with what they were being told throughout the class period, the stock fell 20 percent alone.

And, as counsel indicated, and to your earlier question, it didn't fall 20 percent in one day, your Honor, because there was $175 Million fine, to a billion or $2 Billion of revenue.  It fell because the market was coming to learn for the first time that the revenue all along from 2015 to 2020 was being generated by practices that when the company said it was no longer engaging in them pursuant to the stipulation that your Honor executed in favor of Aarons and the FTC, the 2020 outlook was through the floor.  It was going to be dismal.  Practices stop, company goes downhill, analysts now learn what's been going on in the preceding three years and they're not happy about it.

So to bring it home, the standard is so obviously unimportant to a reasonable investor defined as something other than a mere slogan.  And you look at the stock price to help

orient yourself as to whether the particular information in this case in context was important to reasonable minds, and it's indisputable that it was.

If you turn to safe harbor, there's no doubt under Section 21(e), there's no affirmative defense, there is immunity for forward-looking statements.  But, Judge, if you want to benefit from the law, you have to follow the law.  And these defendants aren't following the law.

If you look up 21(e), 15 USC 78u-5, there's an entire process, an entire standard rather, for what constitutes a forward-looking statement and when it would be protected.  Most obviously statements of present condition aren't covered.  In case after case it says that.  Omissions of material fact aren't covered.  Counsel argues, or the defendants argue, well, look -- *Harris v. Ivax*, 96 (sic), it says, unquestionably omissions are covered.  And that's not what the case says.  The case says, unquestionably cases brought pursuant to 10b, misrepresentation of material fact or omission of the same, that safe harbor applies to 10b actions, but that's fundamentally different than saying omissions can be immunized under the safe harbor.

And if you just look at Subsection I within the statute, again, Section 21E, the safe harbor provision, voila, there's a definition for forward-looking statements.  And what's the definition of a forward-looking statement?  A statement.  A statement about future prospects.  A statement about assumptions.

A statement.  A statement.  A statement.  It's not failure to state something that you should have stated.  The very definition in the law that provides the immunity doesn't apply to omissions. And many, many Courts find this.

We cite *Tower Services*, one of Judge Morton's decisions back from 2019.  Judge Cohen's decision, the *Southern Company* decision from 2018.

So it doesn't apply to present statements of fact.  It doesn't apply to omissions.  It doesn't apply to statements issued in accordance with GAAP.  Again, one of the exclusions in the statute, what are the statements issued here in accordance with GAAP?  Every 10-K.  By Section 13(d) of the Securities Exchange Act they're required to file their annual report.  Forward-looking statements in that document aren't immunized by the rule itself. And perhaps most importantly, risks that already have been materialized or have already occurred aren't immunized under the safe harbor statute.

So when you boil it down to actually abide by the law, there is no doubt where there's forward-looking statements that are accompanied by meaningful cautionary language, they are afforded an immunity.  But, again, go back and look at page 6 to their presentation.  As an example to their Exhibit 4, which is the 137 statements that they tried to digest, every single one of those has a present portion and a future portion.  And it's not true that *Harris v. Ibex -- Ibex v. Harris* says you just sort of

roll it up as one and dismiss it as forward looking.

Again, look at the *Ocwen* decision, Eleventh Circuit case, 2019, they go through great pains to explain what's forward looking in that mixed situation, part forward looking and part present tense, and you disaggregate, use some common sense.

If the present portion is inextricably intertwined with the forward looking, you call forward looking. But if you can disaggregate, you disaggregate. The difference being as simple as our revenues this year were great, next year's even look better. The present portion, our revenues are great, or these are record revenues as they would have stated from the class period. That is clearly a present tense statement whatever they may say about the future prospects. That's different than saying, we estimate next year's revenues to be X, and a plaintiff is saying, well, implicit in that statement about next year's prospects is that you've made an estimate now. Your current estimate for next year is whatever it's going to be. That is forward looking even though clearly in order to utter those words the defendants must have had an estimate at that moment about what next year was going to look like.

So when it's inextricably intertwined, it's forward looking. But when you can disaggregate, you can disaggregate. And literally you can go through their Exhibit 14 or even see the examples on slide 6 on today's presentation and invariably the first part of that sentence should be disaggregated and is

absolutely at issue in this case.

Secondly, and counsel highlighted it a number of times, but it does get confused in many of these cases, Section 10(b) applies to two entirely different -- or I should say, scope of liability, there's two entirely different silos as it were. You have misrepresentation of the material fact. Not really at issue in this case, but you have omission of material fact. The non-disclosure. Comission versus omission. And every one of these statements, whether literally true or not, fail to disclose not an admission of wrongdoing or illegality but of the underlying unsustainable business practices that were generating the very revenues that the market was asking questions about.

So then that brings it home. For those truly forward-looking statements, was there meaningful cautionary language? Well, what does "meaningful" mean? It's got to be specifically tailored is the quotation -- this would be in *Ocwen* as well -- specifically tailored to the risks that materialized. But they are using bulk over substance.

If you look at their 10-K risk disclosures, they have every disclosure under the sun, your Honor; the sky may fall, our business may come to an end, customers may not want to shop at our stores anymore, an act of God may occur, the government may reign hell on us. I mean, those sorts of disclosures apply to every company in America, but what they don't specifically warn against is the underlying business practices and the risks that are going

to flow from them.  But even if they did under the law, you can't immunize yourself through cautionary language that's already occurred.

And this is the way the Eleventh Circuit sums it up, this is in the *FINRA* case that counsel alluded to, to warn that the untoward may occur when the event is contingent is prudent.  To caution that it is only possible for the unfavorable event to happen when they have already occurred is deceit.

So there's a critical difference applying the appropriate Eleventh Circuit analytical standard between warning against a future risk and one that's already being realized.  This company was under investigation since July of 2018, almost the entirety of the class period.  It is to say more to say we may have to pay fines, or there may be enforcement proceedings, that is not specifically tailored to the underlying risks that were already being seen and materializing through these various disclosures and these investigations.  So the safe harbor under the applicable Eleventh Circuit framework wouldn't even apply assuming it was forward looking and you got to the meaningfulness analysis.

Finally on opinions.  Counsel, again, doesn't fairly distinguish between two different courses of conduct for which Securities Exchange Act liability can flow.  But *Omnicare*, 135 Supreme Court, 1318, a 2015 case, does.  You have your misrepresentations silo and you have your omissions silo.  Within

the misrepresentation silo, unless an opinion isn't sincerely held, and that's stated with particularity, that's not actionable. But no one is accusing these defendants of not believing that they were doing something lawful.  Whether or not that turned out to be true, that's an entirely different thing, but we're not accusing them of not believing that.  But that's only one of three bases under *Omnicare* to find liability for opinion statements.

The most important thing is the third prong, failure to disclose, in other words, omission of material facts, that go to the basis of the opinion being expressed.  And I would have your Honor take note that literally the statements at issue in *Omnicare* were we believe we are in compliance with the law.  Nearly identical to the statements at issue here.  We believe we are in compliance with the FTC Act.  And those are found they could be actionable despite them being opinions because of undisclosed facts that go to the validity of the opinion that had been expressed.

While a statement of opinion is not misleading just because external facts show the opinion to be incorrect, the Supreme Court says:  A reasonable investor may understand an opinion to convey facts about how the speaker has formed the opinion.  And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience.  Page 189.

So there's absolutely, if you apply the appropriate legal, the analytical framework, there's particularity, there's

materiality, there's no application fairly of the safe harbor. And even opinion statements can be actionable clearly under the Supreme Court jurisprudence as has been applied many times in the Eleventh Circuit.

So let me then bring this home in my limited remaining time with scienter. Sometimes in these cases it gets conflated because when you read the triple-layered standard, the one that jumps out to most people is the most unusual one, the cogent and compelling in order to satisfy a strong inference, which is the standard under the statute. But in reality I agree with counsel that falsity is really the fundamental thread in these cases. And what you see when you read very carefully the long history of scienter jurisprudence is if there's no "there" there, you can't lie about it.

So fundamentally the linchpin to get to scienter is demonstrating from a Rule 12 standard that there's a "there" there, that there was actually something to misrepresent about. And if you can show that there was something to misrepresent about, it becomes a lot shorter of a bridge to link it to the defendants who were failing to disclose that something that they were misleading about. And that's what we have here.

Indisputably these two courses of conduct were going on, whether illegal or not, but they certainly weren't sustainable and they were producing illusory revenue that the market was specifically asking about. And so the Court's job per *Tellabs*,

2017 Supreme Court case, is not to scrutinize each of the scienter allegations in isolation but to assess them holistically.

The defendants don't even offer here today an inference of non-culpability.  They say that, hey, we don't prove or we don't plead that these defendants didn't legitimately believe what they were doing was lawful, not even the issue at hand, but that's not an inference of non-culpability.

But if you accept it as true, that these underlying practices were going on, they weren't disclosed, it's an omissions theory of the case, these folks were under investigation for these very practices for the entire class period, then it becomes a lot easier to link the defendants to these courses of conduct, as Judge Thrash found in the *MiMedx* case.  The alleged fraud here could only have been carried out by senior management.  Only Mr. Lindsay and Mr. Robinson and Mr. Michaels could close entire stores, carve up regions of the country and give those over to competitors, profitable stores mind you, for the express person of -- for the express reason of gaining other territory elsewhere in the country.

The Eleventh Circuit says certain types of fraud, such as sophisticated Enron-style accounting, undeniably required participation of senior management.  It's not the standard in the Eleventh Circuit that we have to have an e-mail or I have to have the CEO's secretary giving me a statement as part of an investigation that I heard a conversation he was admitting that he

did something illegal. That evidence never exists. Evidence is not the standard for a pleading. But strong inference is demonstrated by a cogent and compelling, a plausible inference at least 50/50, not speculative.

And to this end, you also have to keep in mind that Progressive and the AB segment were talking about 98 percent of the company's revenues. These literally are the only two segments of the company from which the -- from which the company is generating its business. It's just -- it's not possible, it's unimaginable that, as Judge Sands says in the *Flowers* case, one who functions in the chief operating officer role and serves as one of the core members of senior management isn't necessarily provided significant information formally and informally about the financial performance or failure of performance over which he or she had operational responsibility. And that's flowing from another one of the Northern District of Georgia cases, Judge Duffey's case, the *Freeman's* security case from 2005.

So, again, if you focus on Eleventh Circuit precedent and, in particular, the Northern District of Georgia precedent, there is an array of cases that set out the appropriate framework. And to be fair, your Honor, they all don't come out in plaintiff's favor. Much of these cases that I've been highlighting today are mixed grants and denials for motions to dismiss. *Flowers* was one that these lawyers here defended, for example.

So the point is not to get to a result, it's to impart

56

hopefully on you through my presentation there's an appropriate analytical framework within the circuit.  And if you apply it, we would submit, your natural conclusion would be to allow the case to proceed.  But if you want to get just to the conclusion, and it's a conclusion of granting the motion, the defendants have provided you a clear roadmap jumping all over the country to do so.

Commissioner Slaughter, what she said was, Progressive's deceptive tactics were not a small or hidden part of the business. It was the entire business model.  Progressive was well aware that its tactics were deceptive having received tens of thousands of complaints from consumers and from the company's retailers.  The deception was carried through multiple aspects of Progressive's business; sales training, marketing.  In sum, the facts in the case lead her to conclude that the wrongdoing permeated the business such that there's no basis on which to excuse senior leaders.

If you're looking for a cooperating witness, which the Eleventh Circuit sanctions in the *Mizzaro* case, there is no better cooperating witness than Commissioner Slaughter.  There is a public record.  It's no different that she call me on my office phone, your Honor, and said, listen, I was able to review e-mails and talk to witnesses, and I came to the conclusion that there's no excuse and we were to plead that in the complaint as a cooperating witness, and then counsel wouldn't have an argument

because we would have a cooperating witness.  We have better than a cooperating witness, we have a FTC commissioner saying publically, based on the facts presented in that case, that not only is it her conclusion that senior executives should be held liable, fair enough, that's just a conclusion, but the facts of the case represent that it wasn't a small or hidden part, it was the fundamental business model.

Then if you turn to the stock sales, your Honor, they absolutely -- I would highlight you to paragraphs 305, 307, 308, and 310, we walk through the stock sales for each of the defendants.

Under *Tellabs*, they absolutely can add to an indicia of scienter, and they were extremely suspicious here.  For example, in the two preceding years prior to the class period, Mr. Robinson had only sold roughly $2 Million in stock.  But during the two-year class period, he sold over triple that.  And if you look at the dates of those sales, they follow very closely with alleged false statements, and in certain instances just prior to alleged revelations.

If you look at Mr. Woodley's stock sales, for example, paragraph 307, in the two preceding years before the fraud began he only sold roughly $300,000 worth of stock, but during the class period amazingly he's selling almost 4.3 Million.  That's some factor on the sales.  And, again, if you look at the timing of those sales, most of them, all but two of them, follow just after

alleged false statements.

So it's not simply a numbers game, hey, they sold X percent versus Y percent, you have to look at the timing of them, is there a plausible connection between the sales and either the fraud itself being perpetuated, the omissions, or the fact the defendants are coming to realize that the jig is up and are trying to profit while they can by selling before revelations.

And I think that turns us to the 10b51 plans. It's, again, absolutely an affirmative defense. I would highlight you to 17 CFR 24010b5-1. If you want to benefit from the law, Judge, again, you have to follow it. It's an affirmative defense that has a number of elements that must be obtained. You can't enter into the plan during the class period. It happened here. It happened after the investigation was announced. You have to show that the sales that were executed didn't deviate from the plan. You have to show that the sales were pursuant to the plan and you didn't alter them. None of those facts are before your Honor.

The only acknowledgment by the lead plaintiff was that any supposed plan doesn't provide them a defense in this case, and that's far from an admission that there is a plan that affords them immunity at the Rule 12 stage. That affirmative defense encompassed within that statute, that regulation, has not been satisfied and should be rejected.

So in conclusion, I'll just circle back to where I began. This is a case brought on behalf of real investors who

lost real money. My client is a pension fund, represents thousands of hardworking folks in Nevada. They counted on this money based on the representations that were being made by the defendants. Those statements are demonstrably false by omission. And when the market came to learn of the real circumstances, the stock collapsed by 42 percent. And that establishes a legitimate claim under appropriate Eleventh Circuit standards.

THE COURT: Thank you, Mr. Astley.

Mr. Smith, anything in rebuttal?

MR. SMITH: Yes, your Honor. I'll just hit a couple of quick points.

THE COURT: Is everybody okay? Anybody need a comfort break?

MR. SMITH: I'm okay. I don't think I'll need the full time unless you have questions.

So let's talk about what there was to disclose here, okay.

So the company received inquiries from the FTC. They got what are called CIDs, civil investigative demands, requesting documents, opening an investigation. What did the company do? They immediately went out and they told investors, told the market, hey, we've received CIDs, one about Progressive's disclosures, one about these reciprocal sales agreements. They said, we believe we're in compliance, but we've received these. And as soon as the investigation's resolved and the company

decided to settle, they went out and told the market of that.

We've cited to you the cases that say the company has no duty to accuse itself of fraud.  It has no duty to self-flagellate.  They didn't know how the FTC was going to come out when they got these CIDs.  They believed that their practices were compliant.

And I think counsel's made a significant admission here, that they don't have any pleading that these executives did not genuinely believe that these practices were compliant with the law.  And I think that's extremely significant for both the scienter portion of the argument and for other portions of the argument.

So looking at the two practices that they said, well, you should have disclosed either that you were violating the FTC Act, or even if you weren't going to disclose that you were violating the act, you needed to disclose the underlying practices.  Well, these store -- when we were closing stores and selling the agreements, which the FTC said, and the plaintiffs acknowledge, was a common practice, the FTC first said that in the complaint that they filed as part of that settlement, that there were reciprocal agreements where they were done at the same time or they had mutual covenants about not competing in a territory, this was a small number, the FTC said, of agreements, and that occurred from June of 2015 to May of 2018.  So this just bled over like two-and-a-half months into the class period, all right?

So there was -- the company agreed, okay, you don't like it, the company and its competitors agreed to stop the reciprocal practices, didn't pay any fine or penalty and moved on.  There was nothing to disclose other than what the company did disclose.

And, further, there is zero connection between the stopping of the reciprocal practices and any financial performance of the company, that's pure speculation.  And there is nothing to support it.  The FTC said that it would involve a small number. The plaintiffs haven't begun to try to size this in any way or provide any facts to show that this was material or had any impact on the financial performance of Aarons or the competitors.

The second issue about disclosures to the consumers, you know, there was discussion about, well, this drove up your bad debt, your bad debt increased because of these practices.  Well, here's the fundamental flaw, there's no showing, there's no particularly pled fact connecting these practices to the bad debt number, that's pure speculation.  The practices, your Honor, are not alleged to have just arisen in the middle of the class period where you have, okay, your performance -- your bad debt is trundling along at 5 or 6 percent and then it spikes coincident with the adoption of these so-called unfair disclosure practices. The same practices were there the whole time.

So there's no connection that says, well, bad debt rose -- they speculate that bad debt rose because you were engaging in these practices, but the practices were the same

practices that occurred both before the class period and during the class period.

So, again, there's no particularly pled fact to support this information or connect the so-called unfair disclosure practices to an increase in bad debt or any other financial metrics.

Just quickly on *Omnicare*, the Supreme Court did rule that it was theoretically possible that an opinion could be misleading by omission, but it was very firm that this was a rare case and it said it would be, quoting *Omnicare*, no small task for an investor, closed quotes, to establish such a case.  In *Omnicare*, the plaintiff was able to say -- point to a warning from an attorney that said that a particular practice carried a heightened risk of legal exposure under those anti-kickback laws. There's no allegation in this case that suggests that any of the executives had some legal opinion that the practices were unfair or deceptive or misleading.  In fact, quite to the contrary. Plaintiffs acknowledge that there's nothing to suggest that the executives didn't genuinely believe that the practices were compliant.

The plaintiff argued that on scienter that the defendants don't offer an inference of non-culpability.  We certainly included that in our briefs and we maintain it here today and they acknowledge it.  The defendants -- there's nothing that suggests that the defendants did not genuinely believe their

statements that we believe we're in compliance, we've gotten these investigative demands, we're telling you about them, and there's nothing to suggest that they had contrary information such as a legal opinion in *Omnicare* that undercut that belief and opinion.

Finally on Commissioner Slaughter's dissent, I think I've covered that. The majority of the commissioners rejected that view. They didn't include any executive in the complaint. She was unable to point to any specific fact about Mr. Woodley's participation, knowledge of anything that was unfair or deceptive, nothing like, for example, was in *Omnicare* about receiving some opinion that the practices were not, in fact, compliant.

And I point you back to *LendingClub*. It's just not sufficient to point to a third parties' statement or investigation that's not corroborated with additional detail, no former employees that say, oh, yeah, we all knew these were deceptive, and there's nothing to corroborate that. And it's not enough to point to the fact that the company received government investigations and say, ergo, there's a securities fraud.

And I do think in closing that the Court is right to consider the policy ramifications of allowing a complaint like this, which is based on nothing more than the fact that the company received government investigations and chose to resolve those on a non-admission basis, no-admissions basis, that that could open the floodgates to securities fraud class actions every time that occurs to a corporation. That's not the law here.

64

The plaintiffs were unable to distinguish *FindWhat* in its statement that, look, the fact that, as the company later admitted, some of your revenue came from a fraudulent practice, that does not -- not saying that, not -- omitting that information from a statement about your revenue does not render the revenue statement misleading.

So, your Honor, we in closing feel that the plaintiffs have failed to jump the high bar put up by the PSLRA, and we ask that you dismiss the complaint.

THE COURT: All right. Thank you, sir. I appreciate it, Mr. Smith.

Mr. Astley, I appreciate your arguments as well.

Mr. Smith, if you could send Ms. Walker your slide deck if she doesn't have it, obviously copying Mr. Astley, that would be appreciated.

I hope everyone takes care. Thank you.

(PROCEEDINGS REPORTED WERE CONCLUDED AT 12:07 P.M.)

_____

65

C E R T I F I C A T E


UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA


    I do hereby certify that the foregoing pages are a true and

correct transcript of the proceedings taken down by me in the case

aforesaid.

    This the 17th day of November, 2021.




                             _____

                             PENNY PRITTY COUDRIET, RMR, CRR
                             OFFICIAL COURT REPORTER