UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SHIVA STEIN, individually and on
behalf of all others similarly situated,

    Plaintiff,

  v.

AARON'S, INC., et al.,

    Defendants.

CIVIL ACTION NO.
1:20-CV-02030-JPB

## ORDER

This matter is before the Court on Defendants'[1] Motion to Dismiss Lead

Plaintiff's Complaint for Violations of the Federal Securities Laws [Doc. 51].  This

Court finds as follows:

## PROCEDURAL HISTORY

This case began on February 28, 2020, when Shiva Stein, an individual

investor in Aaron's stock, filed a securities fraud class action complaint against

Aaron's and several of its officers and directors in the United States District Court

for the Southern District of New York.  [Doc. 1].  The case was transferred to this

Court on May 12, 2020.  [Doc. 19].

---

[1] Defendants are Aaron's, Inc., John W. Robinson, Steven A. Michaels, Ryan K. Woodley and Douglas A. Lindsay.  Robinson, Michaels, Woodley and Lindsay are hereinafter referred to as the "Individual Defendants."

Laborers Pension Trust Fund for Northern Nevada ("Plaintiff") was appointed as lead plaintiff on May 28, 2020.  [Doc. 32].  Thereafter, on July 17, 2020, Plaintiff filed an Amended Complaint for Violations of the Federal Securities Laws ("Amended Complaint") on behalf of all persons and entities that purchased or otherwise acquired the publicly traded stock of Aaron's between February 15, 2018, and February 19, 2020 (the "Class Period").  [Doc. 40, p. 7].  In essence, the Amended Complaint alleges that Defendants (1) engaged in two illegal schemes and (2) violated the securities laws by not informing investors that the illegal schemes inflated the financial results.  The allegations of the Amended Complaint are discussed in more detail immediately below.

## FACTUAL ALLEGATIONS

### A.    Aaron's

Aaron's is a leading rent-to-own company that provides household items like furniture, computers and appliances to consumers who cannot purchase the items outright.  Id.  According to Plaintiff, "Aaron's targets 'underserved, credit challenged' customers with the promise of more flexible payment options and no credit check."  Id.  Because of its customer base, Aaron's is regulated by "local, state, and federal laws."  Id. at 8.  Particularly relevant here, Aaron's is also subject to the regulatory oversight of the Federal Trade Commission ("FTC").  Id.

Aaron's conducts business through three operating segments, only two of which are relevant here:  (1) Aaron's Business ("AB") and (2) Progressive Leasing, Inc. ("Progressive").[2]  Id.  AB offers products to customers through Aaron's stores and Aaron's.com.  Id.  Progressive, on the other hand, is Aaron's virtual lease-to-own segment.  Id.

At all relevant times, the Individual Defendants were executives for Aaron's. More specifically, Defendant Robinson served as CEO of Aaron's, Defendant Woodley served as CEO of Progressive, Defendant Michaels served as Aaron's CFO and President of Strategic Operations and Defendant Lindsay served as President of AB.  Id. at 17-18.

## B.    Illegal Practices

Plaintiff asserts that in the time leading up to the Class Period, both AB and Progressive relied on illegal schemes to maintain Aaron's appearance of continued growth and profitability.  Specifically, Plaintiff alleges that AB relied on anti-competitive swap agreements that violated the Federal Trade Commission Act ("FTCA").[3]  Id. at 10.  As to Progressive, Plaintiff maintains that Defendants "engaged in deceptive and predatory practices . . . by hiding from consumers the

---

[2] The third segment is Dent-A-Med, Inc.  [Doc. 40, p. 26].

[3] In these swap agreements, Aaron's would sell a closing store's customer contracts to a competitor in exchange for Aaron's agreement to not open any stores in the geographic location where the contracts were sold, and vice versa.  [Doc. 40, p. 32].

full price they were paying for products obtained through Progressive's [rent-to-own] contracts." Id. at 10.

Plaintiff alleges that in July 2018, "[n]egative news began to emerge regarding [Aaron's] predatory and deceptive practices" when Aaron's publicly disclosed that it had received a Civil Investigative Demand ("CID") from the FTC about whether the leasing disclosures made by Progressive to potential customers violated the FTCA (the "2018 CID"). Id. at 12.  Aaron's stock price fell as a result of this disclosure, and Plaintiff asserts that the price would have fallen much further but for Defendants' false assurances that they were in compliance with the FTCA and fully cooperating with the FTC. Id.  Similarly, in April 2019, Aaron's delivered more news to investors and disclosed that it had received another CID from the FTC (the "2019 CID"). Id. at 13.  Unlike the 2018 CID, this one related to the swap agreements. Id.

In November 2019, Defendants disclosed to investors that the FTC was commencing an enforcement action against Progressive regarding the disclosures and that Aaron's had entered into a Consent Decree regarding the swap agreements. Id.  Then, in February 2020, Defendants revealed to investors that Aaron's had negotiated a $175 million settlement with the FTC as to Progressive's

leasing disclosures.  Id. at 14.  Upon this news, Aaron's stock price fell "nearly 42%" from its Class Period high.  Id.

## C.   False and Misleading Statements

The present suit arises from 157 allegedly false and misleading statements that Defendants made during the Class Period.  These statements generally fall into the following categories, which the Court discusses below:  statements about (1) Aaron's financial performance and sustainable growth; (2) Aaron's restructuring program; (3) Aaron's compliance with state and local laws; (4) Aaron's commitment to good relationships with customers and customer service; (5) bad debt expenses; and (6) the CID requests and settlement with the FTC.

### 1.   *Aaron's Financial Performance and Sustainable Growth*

Plaintiff asserts that Defendants made false statements about Aaron's financial performance and growth.  By way of example, in addition to reporting quarterly financial results, Defendants made statements like "Progressive performed at a high level, continuing its trend of growing revenues and profits through increasing invoice volume."  [Doc. 40, p. 98] (emphasis omitted).  Plaintiff argues that the financial results and statements such as this one were false and misleading because Defendants concealed that Aaron's was using illegal practices.  Plaintiff contends that these illegal practices artificially inflated Aaron's financial

results and gave investors the false impression of continued growth.  Id. at 61.

Moreover, Plaintiff argues that Defendants' statements about Aaron's growth were

misleading because AB's growth was actually declining.

> 2.   *Aaron's Restructuring Program*

On numerous occasions, Defendants informed investors that a number of

stores were closing and that the store closures were pursuant to a restructuring

"program to identify, close and consolidate underperforming stores and right size

the Company's footprint in existing markets."  Id. at 56 (emphasis omitted).

Defendants also told investors that they closed stores to "rationalize its Company-

operated Aaron's store base portfolio to better align with marketplace demand."

Id. at 72 (emphasis omitted).  Plaintiff asserts that these statements, and others like

them, were misleading because the stores were actually closed as part of the illegal

swap agreements.  Id. at 61-62.

> 3.   *Aaron's Compliance with State and Local Laws*

Defendants made multiple statements about Aaron's compliance with

various regulations.  For example, in 2017, Defendants stated that they were

"executing a strategic plan" that focused on "champion compliance" to "position

us for success over the long-term."  [Doc. 40, p. 58] (emphasis omitted).  In

another statement, Aaron's recognized that it operated in an extensively regulated

industry "subject to the requirements of various federal, state and local laws and regulations." Id. at 58-59.  Against this backdrop, Defendants told investors that "[w]e continue to believe and set expectations that long-term success requires all associates to behave in an ethical manner and to comply with all laws and regulations." Id. at 59 (emphasis omitted).  Notably, Defendants assured investors that Aaron's was adequately disclosing the terms of its lease purchase agreements "as a matter of good business ethics and customer service." Id. at 84 (emphasis omitted).  Defendants further stated that Aaron's takes compliance seriously and invests "a ton in compliance." Id. at 96 (emphasis omitted).  Plaintiff argues that these types of statements were false and misleading because Aaron's was actually engaged in illegal, deceptive, predatory and anti-competitive conduct in violation of the FTCA.  Id. at 87.

4.    *Aaron's Commitment to Customer Service and Experience*

Plaintiff contends that Defendants made misleading statements about customer service.  As just one example of these statements, Defendants stated that they were focusing on investing and innovating to provide a "superior customer experience." Id. at 100 (emphasis omitted).  According to Plaintiff, such statements were false and misleading because Defendants did not actually provide

great customer service but instead employed illegal practices and misrepresented the total price to consumers.  Id. at 81.

5.     *Bad Debt Expenses*

Defendants often reported increasing bad debt expenses.  Plaintiff contends that this practice was false and misleading because Defendants never disclosed that the bad debt expenses were increasing because of Aaron's illegal, predatory and deceptive marketing and lending practices.  Id. at 87.

6.     *CID Requests and Settlement with the FTC*

Defendants made several statements to investors concerning the CID requests and the subsequent settlement with the FTC.  For instance, after the FTC sent the 2018 CID to Aaron's, Defendants told investors that they were "fully cooperating" and that they believed they were complying with the FTCA.  Id. at 71.  Then, upon learning that the FTC intended to commence an enforcement action against Progressive for alleged violations of the FTCA, Defendants stated: "We believe that we conduct our Progressive Leasing business in compliance with the [FTCA] . . . and are prepared to vigorously defend our position."  Id. at 105 (emphasis omitted).  As to the swap agreements and AB, in August 2019, Defendants announced that Aaron's had reached a proposed consent agreement with the FTC that would prohibit certain sales of stores in the future.  Id. at 106.

With this announcement, Defendants reiterated their belief that the sales complied with the FTCA.  Id.  Plaintiff contends that these statements were false and misleading because they misrepresented that Aaron's was operating in compliance with all relevant government regulations and concealed that Aaron's was engaging in illegal, deceptive, predatory and anti-competitive conduct.

**D.    Plaintiff's Claims**

Based on the allegations above, Plaintiff brings two claims:  (1) Violation of §10(b) of the Exchange Act and Rule 10b-5 against Defendants; and (2) Violation of § 20(a) of the Exchange Act against the Individual Defendants only. Defendants have moved to dismiss Plaintiff's claims, and the motion is now ripe for review.

**LEGAL STANDARD**

A "triple-layered" pleading standard governs cases brought pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").  Carvelli v. Ocwen Fin. Corp., 934 F.3d 1307, 1317 (11th Cir. 2019).  This "triple-layered" pleading standard requires a plaintiff to satisfy the notice pleading requirements contained in Federal Rule of Civil Procedure 8(a), the heightened pleading standards found in Federal Rule of Civil Procedure 9(b) and the special fraud pleading requirements

imposed by the PSLRA.  Id. at 1317-18.  "Failure to meet any of the three standards will result in a complaint's dismissal."  Id. at 1318.

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 9(b), however, has a heightened pleading requirement and mandates that a plaintiff "state with particularity the circumstances constituting fraud."  In the securities fraud context, the Eleventh Circuit Court of Appeals has explained that Rule 9(b) requires a plaintiff to specifically allege:

> (1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud.

Carvelli, 934 F.3d at 1318.  In a similar vein, the PSLRA requires a plaintiff to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  The PSLRA also sets forth a scienter requirement:  specifically, "with respect to each act or omission alleged," a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  Id. § 78u-4(b)(2)(A).

## DISCUSSION

In Count One, Plaintiff asserts that Defendants violated § 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder by making material

misrepresentations or omissions in press releases, conference calls and the

company's financial statements.  Section 10(b) makes it unlawful to

> use or employ, in connection with the purchase or sale of any
> security registered on a national securities exchange . . . , any
> manipulative or deceptive device or contrivance in contravention
> of such rules and regulations as the [Securities and Exchange]
> Commission may prescribe as necessary or appropriate in the
> public interest or for the protection of investors.

15 U.S.C. § 78j(b).  In turn, under Rule 10b-5, it is unlawful for any person in

connection with the purchase or sale of any security, directly or indirectly,

> (a)   To employ any device, scheme, or artifice to defraud,
> (b)   To make any untrue statement of a material fact or to omit
>       to state a material fact necessary in order to make the
>       statements made, in the light of the circumstances under
>       which they were made, not misleading, or
> (c)   To engage in any act, practice, or course of business which
>       operates or would operate as a fraud or deceit upon any
>       person.

17 C.F.R. § 240.10b-5.

A plaintiff bringing a claim pursuant to § 10(b) and Rule 10b-5 must plead

the following six elements:  "(1) a material misrepresentation or omission; (2)

made with scienter; (3) a connection with the purchase or sale of a security; (4)

reliance on the misstatement or omission; (5) economic loss; and (6) a causal

connection between the material misrepresentation or omission and the loss,

commonly called 'loss causation.'"  Mizzaro v. Home Depot, Inc., 544 F.3d 1230,

1236-37 (11th Cir. 2008) (quoting Dura Pharms, Inc. v. Broudo, 544 U.S. 336,

341-41 (2005)).

In Count Two, Plaintiff asserts that the Individual Defendants are liable as

"control persons" under § 20(a) of the Exchange Act.  Section 20(a) provides that:

> Every person who, directly or indirectly, controls any person
> liable under any provision of this chapter or of any rule or
> regulation thereunder shall also be liable jointly and severally
> with and to the same extent as such controlled person to any
> person to whom such controlled person is liable . . . unless the
> controlling person acted in good faith and did not directly or
> indirectly induce the act or acts constituting the violation or
> cause of action.

15 U.S.C. § 78t(a).  "This statute 'imposes derivative liability on persons that

control primary violators of the Act.'"  Mizzaro, 544 F.3d at 1237 (quoting

Laperriere v. Vesta Ins. Grp., 526 F.3d 715, 721 (11th Cir. 2008)).  A plaintiff

bringing a § 20(a) claim must allege the following elements:  (1) that the corporate

defendant committed a primary violation of the securities laws; (2) that the

individual defendants had the power to control the general business affairs of the

corporate defendant; and (3) "that the individual defendants 'had the requisite

power to directly or indirectly control or influence the specific corporate policy

which resulted in primary liability.'"  Id. (quoting Theoharous v. Fong, 256 F.3d 1219, 1227 (11th Cir. 2001)).  Significantly, if a plaintiff fails to plead a violation of § 10(b) and Rule 10b-5, a claim under § 20(a) necessarily fails as well.  See Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006).

Defendants contend that dismissal is required for the following reasons:  (1) many of the alleged statements are protected by the PSLRA's safe harbor for forward-looking statements; (2) some of the alleged statements are not actionable as a matter of law because they are immaterial corporate "puffery" or because they are statements of opinion; (3) Plaintiff fails to plead particularized facts as to why any of the challenged statements are false or misleading; and (4) Plaintiff fails to plead particularized facts as to whether Defendants acted with the required state of mind.  The Court will assume—without deciding—that Plaintiff has sufficiently pled its allegations of misrepresentations and omissions.[4]  Accordingly, the Court will focus its analysis on the sufficiency of Plaintiff's allegations with respect to scienter.

---

[4] The Court is doubtful that all 157 statements are actionable.  Some of the statements do not appear to be false or misleading.  Moreover, it is readily apparent that some of the statements are protected by the PSLRA's safe harbor for forward-looking statements and that other statements constitute nonactionable puffery or opinions.

**A.   Scienter**

The PSLRA requires a plaintiff in a securities fraud case to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  Importantly, a plaintiff must plead sufficient facts to show scienter "with respect to each defendant and with respect to each alleged violation of the statute."  Phillips v. Scientific–Atlanta, Inc., 374 F.3d 1015, 1017-18 (11th Cir. 2004).  Although a plaintiff must demonstrate each defendant's state of mind, the relevant facts and reasonable inferences may be aggregated to establish the necessary inference.  Id. at 1018 n.6.

"In this Circuit, § 10(b) and Rule 10b-5 require a showing of either an 'intent to deceive, manipulate, or defraud,' or 'severe recklessness.'"  Thompson v. RelationServe Media, Inc., 610 F.3d 628, 634 (11th Cir. 2010) (quoting Mizzaro, 544 F.3d at 1238).  The Eleventh Circuit describes "severe recklessness" as follows:

> [s]evere recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Mizzaro, 544 F.3d at 1238 (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1282 n.18 (11th Cir. 1999)).

Thus, to adequately allege scienter and survive a motion to dismiss, a plaintiff must plead "with particularity facts giving rise to a strong inference that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." Id. (internal quotation marks omitted). An inference of scienter is "strong" when the inference is

> more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 324 (2007).

The scienter inquiry asks "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Id. at 323. In making this determination, "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." Id. at 322, 326. "In sum, the reviewing court must ask: When the allegations are accepted as true and taken

collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" Id. at 326.

In the Motion to Dismiss, Defendants argue that Plaintiff's scienter allegations are insufficient. The Court has reviewed the allegations, and it seems that Plaintiff does not allege any direct support for scienter and instead relies upon circumstantial evidence (which is permissible). Plaintiff's circumstantial scienter allegations fall into the following categories: (1) the importance of the AB and Progressive segments to Aaron's and the substantial experience of the Individual Defendants; (2) the FTC investigations; (3) the magnitude of the fraud; and (4) the Individual Defendants' motivations to conceal their fraud. The Court will first discuss these categories of allegations individually and will then discuss the allegations collectively.

1.   *The Importance of the AB and Progressive Segments and the Experience of the Individual Defendants*

Plaintiff argues that a strong inference of scienter exists because the illegal schemes existed in AB and Progressive—the segments most important to Aaron's. Plaintiff contends that "Defendants closely monitored each segment's financial metrics, operating strategies, and business prospects and spoke about them in the Company's press releases and SEC filings." [Doc. 40, p. 129]. As to the statements specifically, Plaintiff argues that Defendant Robinson's statements

discussing "company specific strategies" and highlighting Progressive's continued "optimize[d] performance" and Defendant Michaels's similar statement that "we're optimizing and rationalizing our store footprint" "support an inference that Defendants each had personal knowledge of the specifics of Progressive's and AB's performances and the strategies and initiatives underlying those performances." Id. at 130.  Ultimately, Plaintiff contends that given the importance of AB and Progressive to Aaron's, "it is reasonable to infer that Defendants were closely involved in these segments' illegal practices in violation of the [FTCA] and, therefore, knew or were reckless in disregarding the full extent of liability that Aaron's would face when it was forced to cease such practices." Id. at 131.

Plaintiff also alleges that the Individual Defendants' substantial experience and respective roles within Aaron's provide additional circumstantial evidence of scienter.  According to the Amended Complaint, Defendant Robinson was the CEO of Aaron's during the Class Period and had held that position since 2014.  Id. at 135.  As to Defendant Michaels, Plaintiff asserts that he had been with the company since 1995 and, as Aaron's CFO, had oversight of analytics and business development and was responsible for developing and implementing strategies to strengthen AB.  Id.  Defendant Lindsay, the President of AB, was responsible for

17

overseeing the AB segment, and Defendant Woodley was the CEO of Progressive. Id.  In short, Plaintiff asserts that in light of this collective experience, "it is reasonable to infer that each of the Individual Defendants knew and/or were reckless in disregarding the desperate and illegal attempts that the Company was making to maintain growth."  Id.  Plaintiff further alleges that the Individual Defendants had access to "highly relevant information" and "regularly monitored" each segment's performance.  Id. at 136.

Essentially, Plaintiff claims that scienter is sufficiently pled because the Individual Defendants were high-ranking officials and the alleged illegal schemes occurred in the two most important segments.  The Eleventh Circuit has expressed "skepticism" about this approach to pleading scienter and "about allegations that hinge entirely on a theory that senior management 'must have known' everything that was happening."  Mizzaro, 544 F.3d at 1250-51.  As a result, the Eleventh Circuit requires that a plaintiff allege "*some* facts showing how knowledge of the fraud would or should have percolated up to senior management."  Id. at 1251.  As to the fraud occurring in Aaron's primary business segments, "the fact that an alleged fraud concerned a company's core business does not itself establish a strong inference of scienter."  In re Equifax Inc. Sec. Litig., 357 F. Supp. 3d 1189, 1240 (N.D. Ga. 2019).  In sum, "[i]t is not automatically assumed that a corporate

officer is familiar with certain facts just because these facts are important to the company's business; there must be other, individualized allegations that further suggest that the officer had knowledge of the fact in question." Id. (quoting In re Heartland Payment Sys., Inc. Sec. Litig., Civ. No. 09-1043, 2009 WL 4798148, at *7 (D.N.J. Dec. 7, 2009)).

The Court recognizes that Plaintiff also alleged that the Individual Defendants were privy to "highly relevant information" and "regularly monitored" each of the business segments.  However, the Amended Complaint contains no allegations specifying what "highly relevant information" Individual Defendants had access to or what "regular[] monitoring" of each segment entailed.  Cf. In re Flowers Foods, Inc. Sec. Litig., No. 7:16-CV-222, 2018 WL 1558558, at *14 (M.D. Ga. Mar. 23, 2018) (determining that a plaintiff sufficiently pled scienter by alleging that the defendants had access to meaningful internal reports, including a legal opinion stating that the company was not in compliance with the law).  More particularly, the Amended Complaint does not specify (1) what the highly relevant information was (e.g., a legal opinion advising that the disclosures were illegal); (2) what form the information was in (such as a monthly report or other communication); or (3) how the information was conveyed to the Individual Defendants (via email, in a meeting, etc.).  In the absence of particularized facts,

Plaintiff's allegations are too conclusory to meet the heightened pleading standard applicable to this case.

Other courts in this circuit have found allegations similar to Plaintiff's to be insufficient.  For example, in <u>Mogensen v. Body Central Corp.</u>, the Middle District of Florida found that

> [t]he Amended Complaint does, of course, allege that the individual defendants were hands-on, active managers who regularly received and reviewed information about the company. But without any detail of what these reports contained, this cannot support an inference of scienter.  Otherwise, any executives working at a company with an internal reporting system would work at their peril.  To impute knowledge of or extremely reckless disregard for the truth from the mere existence of an internal reporting system, and the mere active engagement of management, would allow almost any securities fraud case to proceed into discovery.

15 F. Supp. 3d 1191, 1220 (M.D. Fla. 2014) (citation omitted).  The Northern District of Georgia reached a similar conclusion in <u>In re Coca–Cola Enters. Inc. Sec. Litig.</u>, 510 F. Supp. 2d 1187, 1201 (N.D. Ga. 2007), holding that

> [t]he essence of [the plaintiffs'] allegations is that because of the Defendants' positions and their general duty to monitor the information on [an internal tracking program], the Defendants must have known about [an alleged scheme to manipulate financial results and stock prices].  The Amended Complaint fails to provide any specific allegations regarding a time, place or manner in which any of the Individual Defendants was specifically informed or indicated special knowledge as to [defendant Coca Cola's challenged] . . . activities.  These

pleadings are thus insufficient to demonstrate an inference of scienter.

After fully considering the Amended Complaint, the Court finds that Plaintiff's allegations regarding the Individual Defendants' positions within the company, without more, do not support an inference of scienter. See In re Equifax, 357 F. Supp. 3d at 1241 (holding that the plaintiff failed to establish a strong inference of scienter based on allegations of a defendant's position within the company and a general duty to monitor operations).

2.    *The FTC Investigations*

Plaintiff asserts that three different FTC investigations support an inference of scienter.  Plaintiff first cites to the FTC investigations into Progressive's leasing disclosures and AB's swap agreements.  Plaintiff argues that because Progressive and AB were core business segments and were being investigated by the FTC, "it is reasonable to infer that Defendants knew or were reckless in disregarding that Progressive was engaged in illegal, predatory, and deceptive practices and that AB was engaged in illegal, anti-competitive conduct." [Doc. 40, p. 131].  Plaintiff goes on to allege that a strong inference of scienter exists because the FTC ultimately determined that Aaron's violated the FTCA and had been violating the Act since at least June 2015 with the swap agreements and 2016 with the lease disclosures.  Id. at 132.  As Plaintiff notes, one commissioner from the FTC

dissented in the Progressive settlement because she believed that Progressive's CEO—Defendant Woodley—knew that Progressive's disclosures violated the FTCA and that he participated directly in the illegal practices.  [Doc. 40-6, p. 5].

Plaintiff additionally alleges that scienter can be inferred because of a 2014 FTC investigation that was unrelated to the wrongdoing alleged in this case.  That investigation involved allegations that some franchisees installed and used software to secretly monitor customers.  [Doc. 40, p. 133].  Essentially, Plaintiff contends that this other misconduct "demonstrates Aaron's prevalent culture of flouting applicable regulations, which further supports the inference that Defendants knew or were reckless in disregarding unlawful practices at Progressive and AB."  Id. at 134.

As a general rule, government investigations can contribute to an inference of scienter.  Thorpe v. Walter Inv. Mgmt., Corp. 111 F. Supp. 3d 1336, 1376 (S.D. Fla. 2015).  Notably, because "state of mind is the key issue in analyzing scienter, unless the investigation reveals each defendant's state of mind for the alleged fraud, the effect of the investigation on the scienter analysis is limited."  Id.  In the discussion that follows, the Court will examine each of the FTC investigations to determine whether they support an inference of scienter.

As to the 2019 CID and ensuing FTC investigation into the swap agreements, neither the FTC complaint, [Doc. 40-3], nor the resulting consent order, [Doc. 40-4], include facts showing that the Individual Defendants acted with scienter.  In other words, there are no allegations that the Individual Defendants knew about the swap agreements or knew that the swap agreements were illegal when the stores were closed.  This investigation thus does not support an inference of scienter in any way.

The Court next turns to the 2018 CID and the FTC investigation into Progressive's lease disclosures.  In conjunction with that investigation, the FTC complaint does allege that Progressive—not any of the Individual Defendants specifically—had knowledge of widespread consumer confusion and complaints resulting from the disclosures.  [Doc. 40-5].  To show scienter, however, Plaintiff would need to show, at the very least, that the knowledge of that confusion and complaints about the disclosures percolated to the Individual Defendants in this case.  Significantly, the FTC complaint stops short of alleging that any of the Individual Defendants or Progressive knew that the disclosures were illegal.

Plaintiff's allegation concerning the dissenting commissioner's opinion that Defendant Woodley knew about the disclosures' illegality provides the most compelling evidence of scienter.  However, the dissent is not sufficient on its own

to support a strong inference of scienter because Plaintiff fails to plead the foundation or basis of the commissioner's conclusion that Defendant Woodley knew of the fraud.  The commissioner fails to specify in her dissent at what point Defendant Woodley became aware of disclosures' illegality, why she thinks that Defendant Woodley was involved or how Defendant Woodley became involved in the first instance.  The commissioner's dissent is a mere conclusory assertion that Defendant Woodley knew about the fraudulent conduct and participated in it. Thus, while this FTC investigation is probative, it is not sufficient on its own to raise a strong inference of scienter.

Finally, the 2014 FTC investigation into Aaron's provides no evidence of scienter.  That investigation, which involved software that monitored customers, was completely unrelated to the wrongdoing in this case.  The Court easily concludes that the 2014 FTC investigation does nothing to show that the Individual Defendants acted with fraudulent intent as to the swap agreements or the leasing disclosures in this case.

3.    *Magnitude of the Fraud*

To further support its scienter argument, Plaintiff contends that because the fraud was so large, Defendants must have known about it or were severely reckless in not discovering it.  In this case, Plaintiff alleges that the fraud must have been

significant because Aaron's settled with the FTC for $175 million, and its stock price decreased 42% throughout the Class Period.

"A number of decisions cite the magnitude of the fraud in weighing an alleged inference of scienter." In re Eagle Bldg. Techs., Inc. Sec. Litig., 319 F. Supp. 2d 1318, 1326 (S.D. Fla. 2004) (collecting cases).  In these decisions, however, to show a fraud's magnitude, the plaintiff typically alleged specific facts about how the fraud affected the company's financials while the fraud was ongoing.  While Plaintiff here has alleged that Defendants were punished by the FTC, Plaintiff did not establish the "magnitude of any cash balance overstatements . . . [or] that any accounting errors were glaring" during the alleged fraud.  In re Jiangbo Pharms., Inc. Sec. Litig., 884 F. Supp. 2d 1243, 1263 (S.D. Fla. 2012).  Plaintiff also failed to allege with any specificity what percentage of the earnings were bolstered or inflated by the purported illegal activity.  Ultimately, Plaintiff did not allege any facts that would show that Aaron's financial information was so skewed that any fraud would be "glaring."  Id.

Even if this Court were to find that the fraud was significant based on the resulting $175 million settlement and the stock price decrease, an allegation about the fraud's magnitude, without more, is not sufficient to support scienter.  The

Eleventh Circuit has held that "simply alleging that a widespread fraud may have occurred is not enough." <u>Mizzaro</u>, 544 F.3d at 1247.

4.    *Defendants' Motivations to Conceal the Alleged Fraud*

Plaintiff alleges that Defendants had financial motivations to give false and misleading statements to investors.  First, Plaintiff claims that the Individual Defendants were motivated by greed, as evidenced by the fact that the Individual Defendants sold Aaron's common stock at artificially inflated prices.  In the Amended Complaint, Plaintiff discusses the Individual Defendants' stock sales. As to Defendant Robinson,[5] Plaintiff alleges that he sold 132,500 shares of Aaron's common stock (14.6% of his holdings) during the Class Period.  <u>Id.</u> at 142.  Before the Class Period, Plaintiff alleges that Defendant Robinson only sold 58,750 shares.[6]  <u>Id.</u>  Essentially, Plaintiff argues that "[t]hese lucrative stock sales show that the Individual Defendants were looking to cash out a significant portion of their holdings before the truth regarding Aaron's various FTC violations and the negative financial impact resulting from the cessation of their unlawful practices was revealed." <u>Id.</u> at 145.

---

[5] The allegations against Defendant Woodley, Defendant Michaels and Defendant Lindsay are very similar to the allegations against Defendant Robinson.  The Court discusses in detail Defendant Robinson's sales as an illustrative example.
[6] Plaintiff does not allege what percentage of his holdings Defendant Robinson sold in the time leading up to the Class Period; Plaintiff only alleges how many shares were sold.

The Eleventh Circuit has recognized that "the timing of stock trades by insiders . . . may be relevant to inferring scienter.  Stock sales or purchases timed to maximize returns on nonpublic information weigh in favor of inferring scienter; the lack of similar sales weighs against inferring scienter."  Mizzaro, 544 F.3d at 1253.  "A stock sale may be deemed unusual when it is made at a time or in an amount that suggests that the seller is maximizing personal benefit from inside information."  In re AFC Enters., Inc. Sec. Litig., 348 F. Supp. 2d 1363, 1374 (N.D. Ga. 2004).  Significantly, "[s]tock sales by insiders are only relevant to scienter when they are suspicious."  Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc., 594 F.3d 783, 793 (11th Cir. 2010).  To show scienter, a complaint "must allege some information about the insider's trading history for [the court] to determine whether 'the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information.'"  Id. (quoting Mizzaro, 544 F.3d at 1253).

It is true that the Individual Defendants made numerous stock sales during the Class Period, and Plaintiff alleged some facts concerning the prior trading history of the Individual Defendants.  In pertinent part, Plaintiff argues that a strong inference of scienter exists because the Individual Defendants sold more stocks during the Class Period than they sold in the two years leading up to the

Class Period.  The alleged sales, however, are neither suspicious nor consistent

with Plaintiff's theory of scienter.  Defendant Robinson's stock sales were

automatically made pursuant to a 10b5-1 trading plan[7] on April 30, 2018; July 30,

2018; August 2, 2018; October 29, 2018; March 21, 2019; April 30, 2019; and July

30, 2019.[8]  These stock sales reflect a pattern of regular and automatic dispositions

following earnings announcements.  The timing of these sales was thus quite

ordinary, and Plaintiff has not shown why sales on any of these dates were unusual

or suspicious.  For instance, Plaintiff does not allege that the sales were made on

the eve of negative announcements.  In fact, the last stock sale cited by Plaintiff to

show scienter occurred on July 30, 2019—more than six months before

Defendants' February 2020 announcement of the $175 million FTC settlement,

which caused the stock price to decline 19%.  See In re AFC Enters., Inc. Sec.

Litig., 348 F. Supp. 2d at 1374 (holding that a strong inference of scienter did not

exist when the stock sales occurred well in advance of the negative

---

[7] Some courts in this circuit have found that stock sales completed pursuant to a Rule
10b5-1 trading plan "cannot support an inference of scienter unless the trading plan was
adopted during the class period and the plaintiff alleges with particularity facts showing
that the defendant was aware of an impending price drop at the time the plan was
adopted." Mogensen, 15 F. Supp. 3d at 1222.  Although Plaintiff has alleged that the
trading plan in this case was adopted during the Class Period, Plaintiff has not alleged
that Defendants were aware of an impending price drop at the time the plan was adopted.
[8] The other defendants' sales were on the same dates.

announcement).  Ultimately, the automatic nature of the sales negates any inference of scienter that might otherwise have arisen.

After fully considering the allegations in the Amended Complaint, the Court concludes that Plaintiff has not alleged sufficient facts to show that the stock sales occurred at times calculated to maximize personal benefit from undisclosed inside information.  Even if the Court were to find that the stock sales were somewhat suspicious, stock sales "are not sufficient *on their own* to raise a strong inference of scienter."  In re Equifax, 357 F. Supp. 3d at 1244.

Plaintiff also asserts that the Individual Defendants were motivated to make misleading statements by (1) their desire to keep their jobs and (2) their desire to show Aaron's long-term profitability, reputation and stock price.  [Doc. 40, p. 146].  The Eleventh Circuit has found that general allegations of motive, such as maintaining reputation and stock price, do not support a strong inference of scienter.  See FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1303 (11th Cir. 2011) (holding that a defendant's alleged motive to meet Wall Street's revenue expectations was insufficient to establish scienter).  Accordingly, this Court finds that the Individual Defendants' motivations to keep their jobs and make Aaron's look profitable is insufficient to support a strong inference of scienter.

5.    *Plaintiff's Collective Scienter Allegations*

Having determined that none of Plaintiff's allegations, standing alone, is sufficient to create a strong inference of scienter, the Court now considers the allegations collectively.  As stated previously, a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Tellabs, 551 U.S. at 324.  As the Eleventh Circuit has stated, "the question [of scienter] . . . boils down to whether a reasonable person *would* infer that there was at least a fifty-fifty chance that the individual defendants knew about the alleged fraud (or were severely reckless in not knowing about it)."  Mizzaro, 544 F.3d at 1249.  Further, the Eleventh Circuit permits courts to consider "all relevant facts and reasonable inferences therefrom" in the aggregate when analyzing the question of scienter.  Phillips, 374 F.3d at 1018 n.6.

In this case, Defendants argue that an inference against fraudulent intent is more compelling because Defendants disclosed the two CIDs when they were received and provided regular disclosures over the course of the investigation.  Under these facts, Defendants contend that the more compelling inference is that Aaron's believed at all times that its conduct was compliant with the law.  After

considering the factual allegations in the Amended Complaint, the Court agrees with Defendants.

In this case, Plaintiff's Amended Complaint contains no allegations about the "'particular times, dates, places, or other details of the alleged fraudulent activity.'"  In re Equifax, 357 F. Supp. 3d at 1233 (quoting In Re Coca–Cola, 510 F. Supp. 2d at 1199).  Instead, Plaintiff primarily relies upon inferences based on the roles that the Individual Defendants held in the company and the size of the fraud.  These general allegations do not suffice.  While Plaintiff has argued that the FTC investigation supports a strong inference of scienter, the FTC investigation fails to show the Individual Defendants' state of mind.  Absent allegations that the Individual Defendants had access to information placing them on notice that the two schemes were illegal, the Court agrees with Defendants that the "non-fraudulent inference"—specifically, that Defendants believed that they complied with the law—is more natural than an inference that the Individual Defendants knowingly or recklessly perpetrated a fraud on the investing public.  While Plaintiff may have done enough to show that it is merely *plausible* that the Individual Defendants acted with scienter, the Amended Complaint does not contain sufficient factual allegations to defeat a motion to dismiss under the

PSLRA's heightened pleading standards.  Accordingly, Defendants' Motion to Dismiss is **GRANTED**.

**B.**  **Leave to Amend**

In a footnote in its Response in Opposition, Plaintiff requested leave to file a second amended complaint if the Motion to Dismiss is granted in whole or in part. Plaintiff did not set forth any basis as to why amendment would be proper or attach a proposed amendment for this Court to review.  The Court thus cannot determine at this time whether amending the complaint would be futile.  Moreover, in the Eleventh Circuit, "a request for leave to amend is not properly made when it is 'imbedded within an opposition memorandum.'"  McGinley v. Fla. Dep't of Highway Safety & Motor Vehicles, 438 F. App'x 754, 757 (11th Cir. 2011) (quoting Rosenberg v. Gould, 554 F.3d 962, 967 (11th Cir. 2009)).  Accordingly, without a proper motion, Plaintiff's request for leave to amend is **DENIED** without prejudice.[9]

**CONCLUSION**

For the reasons stated above, Defendants' Motion to Dismiss [Doc. 51] is **GRANTED**.  The Clerk is **DIRECTED** to close this case.  Plaintiff may file a

---

[9] If Plaintiff desires to amend, the Court will permit Plaintiff to file a properly supported motion for leave to amend.  The motion shall be filed no later than twenty-one days from the date of this order.

Motion for Leave to Amend within twenty-one days from the date of this order.  In the event the Motion for Leave to Amend is granted, the case will be reopened.

      **SO ORDERED** this 29th day of September, 2022.

 

 

_____
**J. P. BOULEE**
United States District Judge